IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THOMPSON'S GAS & ELECTRIC SERVICE, INC., a Maryland corporation, REGIONS PROPANE-ALABAMA, LLC, an Alabama Limited Liability Company, SUBURBAN GAS PROPANE PARTNERS, LLC, a Maryland Limited Liability Company, SHELBY PROPANE GAS COMPANY, INC., an Alabama corporation, and DEUPREE GAS, INC., an Alabama corporation, <br><br> Plaintiffs, <br><br> v. <br><br> BP PRODUCTS NORTH AMERICA, INC., DONALD CAMERON BYERS, MARTIN MARZ, JAMES SUMMERS, MARK RADLEY, DENNIS ABBOTT and CODY CLABORN, <br><br> Defendants. | FILED COPY: MAY 9, 2008 <br> 08CV2693   EDA <br> JUDGE MORAN <br> MAGISTRATE JUDGE KEYS <br><br><br><br><br><br> Case No. <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

### I.    INTRODUCTION

1.    As fully alleged below, BP North America, Inc. ("BPNA" or "Defendant"), by and through its employees, engaged in acts and practices that constitute violations of the federal antitrust laws, including Sections 2 and 3 of the Sherman Act, 15 U.S.C. §§ 2, 3, and the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1 *et seq.*  BPNA attempted to monopolize and monopolized the supply of propane stored in TEPPCO's Mont Belvieu Texas caverns and shipped through the TEPPCO pipeline system ("TET propane").  This pipeline system was the dominant source of propane supply in the TEPPCO Pipeline Service Area, encompassing portions of the mid-West and the Northeastern United States.  BPNA undertook to monopolize

and did monopolize the supply of TET propane for delivery in February 2004.  Defendants intended to test, perfect, and apply their strategies for implementing such propane corners "at will" in the future.

2.      Between January 7, 2004 and March 15, 2004 (the "relevant period"), BPNA's Trading Desk entered into multiple transactions in the spot market to purchase February 2004 TET propane.  As BPNA amassed its monopoly position, Defendants drove up spot prices for February TET propane.  As Defendants knew, by driving up spot prices for TET propane, BPNA also drove up the benchmark price of February 2004 TET propane reported by the Oil Price Information Service, or OPIS.  Because of its undisputed comprehensiveness and reliability, the Mont Belvieu OPIS TET daily reported pricing was adopted industry-wide as the benchmark for pricing long-term supply contracts and purchase agreements throughout the TEPPCO Pipeline Service Area, including contracts for imported propane into the Service Area and the sale of propane produced at local refineries.

3.      Separate from its accumulation of propane in the spot market, during the relevant period BPNA was also a major producer of propane with refining and fractionation operations in Texas and the Gulf Coast.  During the relevant period, BPNA delivered propane to the Mont Belvieu TET storage caverns for sale at prices inflated as a result of Defendants' monopolization and corner of February 2004 TET propane.  BPNA sold propane directly to market participants at prices inflated by the corner.  As detailed below, BPNA supplied propane into the TEPPCO Pipeline Service Area from its refining and fractionation operations in Sarnia, Ontario, Canada, at prices tied to Mont Belvieu OPIS TET pricing.

4.      As alleged in detail below, these market manipulations caused substantial damages to all market participants who purchased propane directly from BPNA and other

Producers at prices tied to Mont Belvieu OPIS TET pricing. Wholesalers, for example, who were short February 2004 TET propane were forced to pay the supra-competitive prices that BPNA dictated in the spot market in order to cover their positions. Wholesalers and Marketers paid supra-competitive prices as they took delivery of propane from Producers during the relevant period under, for example, long-term supply contracts and purchase agreements that were priced based on Mont Belvieu OPIS TET pricing.

5.      Plaintiffs bring this action to recover the damages they suffered during the relevant period as the result of BPNA's illegal conduct. Plaintiffs are either a direct purchaser of February 2004 TET propane in the spot market or purchased propane from entities that purchased propane directly from BPNA or other Producers during the relevant period at prices tied to Mont Belvieu OPIS TET pricing.

## II.      JURISDICTION AND VENUE

6.      Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and obtain injunctive relief as well as reasonable attorneys' fees and costs with respect to injuries arising from Defendants' violations of the federal antitrust laws, including Sections 2 and 3 of the Sherman Act, 15 U.S.C. §§ 2, 3, and under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, to recover actual damages resulting from injuries arising from violations of that Act.

7.      The Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a), Section 7 of the Sherman Act, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25(c). The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8.      Jurisdiction and venue are proper in this District pursuant to 15 U.S.C. § 2, 7, 15, 22 and 26, 28 U.S.C. § 1391(b)(2), and 7 U.S.C. § 25(c), in that Defendants are found in, reside or transact business in this District or because part of the events or omissions giving rise to the claims occurred in this District.

III.    PARTIES

A.      Plaintiffs

9.      Thompson's Gas & Electric Service, Inc., ("Thompson"), is a Maryland corporation with its principal place of business in Boonsboro, Maryland.  Thompson serves residential, commercial, industrial, agricultural and motor fuel propane customers in the northeast.

10.     During the relevant period, Thompson purchased propane directly from Producers at prices that were artificially inflated as the result of Defendants' wrongful and illegal monopoly and corner detailed herein.

11.     Regions Propane-Alabama, LLC ("Regions") is an Alabama limited liability company with its principal place of business in Centre, Alabama.  Regions serves residential, commercial, industrial, agricultural and motor fuel propane customers in the southeast.

12.     During the relevant period, Regions purchased propane directly from producers at prices that were artificially inflated as a result of defendants' wrongful and illegal monopoly and corner detailed herein.

13.     Suburban Gas Propane Partners, LLC ("Suburban") is a Maryland limited liability corporation with its principal place of business in Centre, Alabama.  Suburban serves residential, commercial, industrial, agricultural and motor fuel propane customers in the southeast.

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

14.    During the relevant period, Suburban purchased propane directly from producers at prices that were artificially inflated as a result of defendants' wrongful and illegal monopoly and corner detailed herein.

15.    Shelby Propane Gas Company, Inc. ("Shelby") is an Alabama corporation with its principal place of business in Montevall, Alabama.   Shelby serves residential, commercial, industrial, agricultural and motor fuel propane customers in the southeast.

16.    During the relevant period, Shelby purchased propane directly from producers at prices that were artificially inflated as a result of defendants' wrongful and illegal monopoly and corner detailed herein.

17.    Suburban Gas Incorporated ("SGI") is an Alabama corporation with its principal place of business in Alabama.   SGI serves residential, commercial, industrial, agricultural and motor fuel propane customers in the southeast.

18.    During the relevant period, SGI purchased propane directly from producers at prices that were artificially inflated as a result of defendants' wrongful and illegal monopoly and corner detailed herein.

19.    Deupree Gas, Inc. ("Deupree") is an Alabama corporation with its principal place of business in Alabama.   Deupree serves residential, commercial, industrial, agricultural and motor fuel propane customers in the southeast.

20.    During the relevant period, Deupree purchased propane directly from producers at prices that were artificially inflated as a result of defendants' wrongful and illegal monopoly and corner detailed herein.

PDF Complete

Click Here & Upgrade
Expanded Features
Unlimited Pages

**B.    Defendants**

21.    BP North America, Inc. ("BPNA") is a wholly owned subsidiary of BP Plc. BPNA is one of the largest producers of natural gas liquids, including propane, in North America.  BPNA maintains its principal place of business at 28100 Torch Parkway, Warrenville, Illinois.  BPNA's production, transportation and sales of propane were handled by its BP Natural Gas Liquids Business Unit (the "Business Unit").  During the relevant period, BPNA produced propane in refineries and natural gas production and fractionation facilities in, *inter alia*, Texas, the Gulf Coat, and eastern Canada.  BPNA's trading of propane was handled by its BP North American Gas and Power ("NAGP") unit.  The Business Unit and NAGP were units of BPNA. BPNA, by and through its employees, attempted to monopolize and monopolized and cornered the supply of February 2004 TET propane.

22.    Donald Cameron Byers ("Byers") was the Chief Operating Officer for NAGP in both April 2003 and February 2004, and was later named the President and Chief Executive Officer of NAGP.  Byers was knowledgeable of, approved and/or facilitated the monopoly and corner of TET propane detailed herein.

23.    Martin Marz ("Marz") was the Compliance Manager for the NAGP during the relevant period.  Marz was knowledgeable of, approved of and/or facilitated the monopoly and corner of TET propane detailed herein.

24.    James Summers ("Summers") was the Vice President of Natural Gas Liquids ("NGLs") & Chemicals Trading for BPNA in February 2004, and reported directly to defendant Byers.  Summers was knowledgeable of, approved the implementation of and/or facilitated the monopoly and corner of TET propane detailed herein.

25.     Mark Radley ("Radley") was the NGLs Trading Bench Leader for BPNA in both April 2003 and February 2004.  Radley was knowledgeable of, approved the implementation of and/or facilitated the monopoly and corner of TET propane detailed herein.

26.     Dennis Abbott ("Abbott") was the "second-in-command" of NGLs trading in February 2004, and acted as the Trading Bench Leader in Radley's absence.  Under the direction of, *inter alia*, Radley, Abbott actively participated in the execution of the monopoly and corner of TET propane detailed herein.   In June 2006, Abbott pleaded guilty to conspiracy to manipulate the price of February 2004 TET propane.  Abbott faces up to five years in prison and a fine of up to $250,000.  He is presently cooperating with federal investigators.

27.     Cody Claborn ("Claborn") was the primary propane trader at BPNA in February 2004.  Under the direction of, *inter alia*, Radley, Claborn actively participated in the execution of the monopoly and corner of TET propane detailed herein.

28.     BPNA, Byers, Marz, Summers, Radley, Abbott and Claborn are referred to collectively herein as "Defendants."

## IV.     INTERSTATE TRADE AND COMMERCE

29.     At all times relevant herein, Defendants attempted to monopolize and did monopolize and corner the market for February 2004 TET propane with the purpose and intent of artificially inflating the price, and with knowledge their actions would artificially inflate the price paid for propane deliverable in February 2004.  TET propane is shipped and delivered within states and across state lines, and thus Defendants engaged in wrongful conduct that involved United States commerce among many states.

## V.     SUBSTANTIVE ALLEGATIONS

## A.     The Manufacture and Distribution of Propane

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

30.     Propane is a by-product (referred to in the industry as a "co-product") either from the refining of petroleum or from the fractionation of natural gas produced from natural gas fields or wells.  Fractionation is the process of separating certain gases such as propane, butane and ethane from natural gas.

31.     As detailed below, the principal means of storing and transporting substantial quantities of propane around the country is through established storage and pipeline systems. These pipeline systems originate at underground storage caverns, called "hubs," where large quantities of propane are collected from refineries, fractionation facilities, imports and gas fields. Existing pipeline systems within the United States feed separate geographic regions of the country.

32.     In addition to pipeline systems, propane in any specific geographic region is available from two other sources: propane produced and sold directly from refineries and fractionation facilities located within the region, and imported propane transported by rail, truck, barge or ship to private storage facilities in the region.

33.     Propane has two principal uses, as fuel for commercial and residential heating, particularly in the mid-Western and Northeastern United States, and in the production of plastics by the petrochemical industry.  Commercial (including agricultural) and residential use represent approximately 60% of propane consumed.  Petrochemical industry consumption represents the remaining approximately 40%.  The demand for commercial and residential propane for heating is highly seasonal, peaking in winter.  Petrochemical demand is more stable year-round.

**B.     The Nation's Propane Pipeline Storage and Delivery Systems.**

34.     During the relevant period, two major propane storage and distribution hubs operated in the United States east of the Rocky Mountains – Mont Belvieu, Texas and Conway,

Kansas. Major propane producers, including BPNA, had significant crude oil refining operations in or near Mont Belvieu, Texas, which fed propane into these storage caverns. In addition, BPNA had large natural gas and fractionation operations in the Gulf area that also fed propane into the Mont Belvieu caverns.

35.    TEPPCO Storage Partners LP and Duke Energy Field Services[1] co-owned several of the caverns located in Mont Belvieu during the relevant period. Propane stored in these caverns was referred to and traded in the industry as "TET propane."[2] As detailed below, TET propane was shipped from Mont Belvieu through the Texas Eastern Products Pipeline Co. LLC ("TEPPCO") pipeline system.

36.    In addition to propane stored in the TET cavern (and delivered through the TEPPCO pipeline), Producers stored propane in other caverns at Mont Belvieu, which as then transported through other pipeline systems through Texas and the Southeast. These systems included, principally, the Enterprise pipeline system, which ran from Mont Belvieu down along the Texas Gulf Coast, and the Dixie pipeline system, which ran through Louisiana, Mississippi, Georgia, and up into North Carolina. The propane stored in these caverns was referred to and traded in the industry as "non-TET propane." The Mid-America Pipeline Company ("MAP CO") pipeline system transports propane from the Conway, Kansas storage caverns through the central portion of the country. Each of these pipeline systems services distinct geographic areas in the country.

## C.    Market Participants for Propane

37.    Various market participants were involved in the propane industry during the relevant period. As described above, producers, including BPNA, produced propane either in

---

[1] Duke Energy Field Services is a joint venture between Duke Energy Corporation and Philips Petroleum Company.
[2] The original owner of this cavern was the Texas Eastern Transmission Corp., or "TET."

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

natural gas fractionation facilities or oil refineries as a by-product of their refining operations. During the relevant period there were at least eight major producers of propane. BPNA was one of the largest. Producers sold propane to various other market participants, including Wholesalers and Marketers. Wholesalers purchased propane for resale to Marketers. Marketers were companies that bought propane either directly from Producers or from Wholesalers for sale and delivery directly to commercial and residential consumers.

38.     Then, as now, pipeline companies did not take title to the propane. They charged government-set tariffs for transporting the propane. Brokers were companies that facilitated purchase and sale transactions between other market participants. Brokers also did not take title to the propane. Traders were companies that bought and sold propane. Traders did take title to the propane they purchased.

**D.      The TEPPCO Pipeline Service Area**

39.     During the relevant period, the TEPPCO pipeline serviced an area that include all or portions of the following nineteen states: Arkansas, Delaware, Southern Illinois, Southern Indiana, Kentucky, Southeastern Missouri, New Jersey, New York, Southern Ohio, Pennsylvania, Northern Tennessee, Virginia and West Virginia, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire and Maine. These nineteen states and/or portions of these states are collectively referred to herein as the "TEPPCO Pipeline Service Area." The TEPPCO pipeline either ran through these states or ran through states contiguous to them.

40.     The TET propane transported through the TEPPCO pipeline was the dominant source of supply in the TEPPCO Pipeline Service Area. As described in detail below, throughout the TEPPCO Service Pipeline Area, Mont Belvieu OPIS TET pricing was the

benchmark price or index at which propane, regardless of the source of supply, was bought and sold.

**E.      The Supply and Delivery of Propane into the TEPPCO Pipeline Service Area**

41.     There were three sources of propane into the TEPPCO Pipeline Service Area: Propane from the TEPPCO Pipeline; Refinery Production; and Propane Imports.

42.     Propane from the TEPPCO Pipeline.  Market participants purchased and took delivery of TET propane at terminals – off-loading points along the TEPPCO pipeline.  Direct purchasers of TET propane during the relevant period included Wholesalers, Marketers and Traders.

43.     Refinery Production.  Producers also sold propane produced in refineries located in the TEPPCO Pipeline Service Area[3]  Market participants contracted directly with these Producers, and took delivery of propane at the Producers' refineries.  During the relevant period, eighteen refineries operated within the TEPPCO Pipeline Service Area, located in Arkansas, Delaware, Kentucky, New Jersey, Pennsylvania, Tennessee, Virginia and West Virginia.

44.     Propane Imports.  Imported propane was also transported into the TEPPCO Pipeline Service Area by Producers, Wholesalers and other market participants.  Imported propane entered by rail or truck from Canada, and by ship and barge from other foreign sources, including Europe, Africa and South America.  Points of entry for this imported propane were Virginia, New York Harbor, Rhode Island and New Hampshire.  During the relevant period, BPNA was a major producer of propane from its natural gas fractionation facilities in Canada. BPNA sold the propane it stored at the Sarnia, Ontario, Canada facilities for export into the TEPPCO Pipeline Service Area.  This propane was transported from Sarnia into the TEPPCO

---

[3] Only de minimus natural gas fractionation occurred in the TEPPCO Pipeline Service Area during the relevant period.

Pipeline Service Area by rail and truck through points of entry in upstate New York and Vermont.

45.     Regardless of the source of supply, whether from Canada, Europe or Africa, propane bound for the TEPPCO Pipeline Service Area was sold based on Mont Belvieu OPIS TET pricing.   Foreign producers, including BPNA, sold propane directly to Wholesalers, Marketers or other market participants based on Mont Belvieu OPIS TET pricing.

**F.     TEPPCO was the Dominant Source of Propane Supply**

46.     During the relevant period, the TEPPCO pipeline supplied at least sixty percent of the total supply into the TEPPCO Pipeline Service Area.  Imports constituted approximately one quarter of the supply into the Service Area.  Imports from Sarnia, substantially controlled by BP, constituted approximately forty percent of the total imported supply.  Refinery production in the area constituted approximately ten percent of the total supply in the Service Area.  Defendants owned and controlled at least 60% of the total supply of propane into the TEPPCO Pipeline Service Area during the relevant period.

**G.     Spot Transactions for TET Propane – The Mechanism for BPNA's Accumulation of TET Propane**

47.     During the relevant period, TET propane traded on a spot basis.  Spot trades were transactions between two parties for a specified volume of TET propane.  In any given month, market participants bought and sold propane for delivery in either the current month or future (or "out") months.  Spot transactions were for large volumes of propane, 10,000 barrels or more.  A barrel equals forty-two U.S. gallons of propane.   Various market participants, including Producers, Wholesalers, Traders, and commercial buyers like petrochemical companies entered into spot trades for TET propane ("TET spot trades").   The parties to these transactions negotiated the price, arriving at a specified dollar value for the transaction.  The number of

executed TET spot transactions could range from between zero to upwards of seventy trades per day, in amounts that ranged from a minimum of 10,000 barrels per trade to a million barrels or more per trade.

48.     During the relevant period, various available services – including Chalkboard – allowed buyers and sellers to post bids and offers for TET propane.  Although these bids and offers were posted on an anonymous basis, once the parties closed the deal, the parties' identities were then disclosed one to the other to permit them to finalize delivery and payment terms.

49.     Counterparties also traded during the relevant period directly with each other for spot transactions.  As with Chalkboard transactions, the terms of these directly negotiated spot transactions were also reflected in written negotiated contracts.

50.     Spot transactions were also arranged through Brokers.  As noted above, Brokers did not take title to the traded propane; rather, they served instead to match supply and demand in the market.  Brokers acted similarly to Chalkboard by maintaining anonymity (at their principal's request).  However, as with Chalkboard, the parties had to negotiate directly with each other to finalize delivery and payment terms.

51.     Like any other market, the pricing of TET propane in the spot market during the relevant period was determined by supply and demand.  Participants in the TET spot market subscribed to various services to acquire a constant flow of information regarding available bids and offers over the course of the day.  As set forth below, Defendants' accumulation of TET propane through their ongoing spot purchases tightened the supply of TET propane and artificially raised February 2004 Mont Belvieu OPIS TET prices to supra-competitive levels.

**H.     The OPIS Price Reporting System and Mont Belvieu OPIS TET Benchmark Pricing**

52.     The primary means of tracking and reporting propane spot transactions in the United States is the Oil Price Information Service, or OPIS.  OPIS describes itself as the world's most comprehensive database and source of wholesale petroleum pricing and news information. On a daily basis, OPIS monitors more than 70,000 rack prices for multiple petroleum-based products, including heating oil, gasoline, diesel and propane.  Market participants for propane subscribe to OPIS, or otherwise have access to OPIS daily pricing information.

53.     During the relevant period, OPIS separately tracked and reported pricing information for virtually all propane spot transactions of at least 10,000 barrels or greater quantity occurring for, *inter alia*, propane sold out of the Conway, Mont Belvieu TET and Mont Belvieu non-TET hubs.  These transactions were either voluntarily reported to OPIS by one of the counterparties to the transaction, or were identified by OPIS representatives when canvassing the market over the course of a day.

54.     At the end of each day during the relevant period, OPIS reported the high, low and simple average price from among all confirmed spot transactions entered into that day for, *inter alia*, Conway, TET and non-TET propane.  For each of these hubs, OPIS separately reported the high, low and average daily prices on three types of spot transaction, "out" – reflecting spot trading in the next month's propane; "prompt" – reflecting spot trading in the current month's propane with delivery due within the next 72 hours; and "any" – reflecting spot trading in the current month's propane with delivery due at any time during the month, but typically occurring at or near the end of the month.  The average OPIS "prompt" price reported daily for TET propane spot transactions was referred to in the industry as "Mt Belvieu OPIS TET."  As set forth below, parties based their contractual pricing terms on Mont Belvieu OPIS

TET pricing or a formula based on a combination of reported Mont Belvieu OPIS TET prices (referred to hereafter as "Mont Belvieu OPIS TET pricing").

55.     During the relevant period, OPIS was widely recognized as providing the most reliable and transparent pricing information available for propane transactions.  OPIS was one of the leading reporting publications in the petroleum-based products industry.  OPIS reports on its webpage that more than 100 billion gallons of fuel annually are pegged to OPIS benchmark prices.  OPIS has been the industry benchmark for propane pricing since at least 1986.  Prior to that time, there was no reliable public disclosure of propane transaction prices.   The determination of prices charged to purchasers of propane was largely opaque and left to the discretion of the Producers.  Absent a public and respected pricing benchmark, there was no objective and publicly reported cross-check against which a customer could assess the reasonableness of a quoted price.  By creating an open and transparent reporting system, OPIS brought uniformity and standardization to propane pricing.

56.     Because OPIS daily reporting of prompt, any and out spot transaction prices for TET propane represented the single most respected and comprehensive system for reporting open, transparent and arm's length daily transactional prices for the dominant source of propane supply for the TEPPCO Pipeline Service Area, Mont Belvieu OPIS TET pricing was uniformly understood to be, and accepted as the benchmark or index price for propane produced or delivered in the TEPPCO Pipeline Service Area.  Mont Belvieu OPIS TET pricing not only set the price of TET propane sold from the TEPPCO pipeline; prices for propane sold from local refineries, storage facilities and imported propane were based on it as well.

57.     In addition, January 2004 New York Mercantile Exchange (NYMEX) futures trading for February 2004 propane specified delivery to the TEPPCO system.  Nearby futures

prices (*e.g.*, for the next month out, namely futures trading in January for February propane) were affected by the Defendants' accumulation of their long position in February TET propane during the month of January. This illegal conduct drove up the nearby futures price in the NYMEX futures market.

**I.       Supply Contracts and Purchase Agreements**

58.     Many market participants secured necessary supplies of propane for the winter heating season through the long-term supply contracts, often negotiated during the preceding spring. Wholesalers and Marketers, for example, contracted with Producers and other Wholesalers for set amounts of propane, deliverable in designated amounts on a monthly basis at specified locations. Under the terms of supply contracts, as discussed below, the price the buyer paid was not pre-set at the time the contract was entered into, but rather was determined at the time of delivery based on contractual pricing formulas expressly tied to Mt Belvieu OPIS TET pricing.

59.     In addition to purchases made pursuant to supply contracts, market participants also purchased propane as needed on any given day. The price term for these "purchase agreements" was determined at the time of delivery. The prices paid in these transactions were based on Mt Belvieu OPIS TET.

60.     During the relevant period, market participants entered into supply contracts and purchase agreements directly with Producers for TET propane, for delivery at TEPPCO terminals, as well as for propane produced at refining facilities, or imported or shipped to private storage facilities located in the TEPPCO Pipeline Service Area.

**J.       Pricing Methods for Supply Contracts and Purchase Agreements**

61.     During the relevant period, market participants principally used one of two pricing methodologies for propane sold in the TEPPCO Pipeline Service Area under long-term supply contracts or pursuant to purchase agreements.  These methods applied whether the propane was sold off the TEPPCO pipeline, from local refineries or imported to storage facilities.  As detailed above, because Mont Belvieu OPIS TET was the industry benchmark price in the TEPPCO Pipeline Service Area, propane sold there was priced by express reference in the contract or purchase agreement to Mont Belvieu OPIS TET pricing – for example, to either the daily reported Mont Belvieu OPIS TET price in effect the day of delivery, the average of the preceding five or ten business day Mont Belvieu OPIS TET prices, or using some other formula based on Mont Belvieu OPIS TET pricing.  Propane was also sold based on a daily set "rack" or "posted" price, which was also tied to the daily reported Mont Belvieu OPIS TET pricing.

62.     Sales prices for propane sold off of the TEPPCO pipeline also included transportation charges in the form of government-set fixed tariffs, set for each terminal point, and non-negotiable line loss charges, calculated to reflect propane lost from the pipeline during transportation.  In addition, state and federal environmental fees were also added to all propane sold.  The only discretionary pricing component was the "seller's margin" – which reflected whatever markup the seller chose to add.  All other costs were pre-set and controlled.

**K.     Petrochemical Industry Purchases**

63.     As noted above, the petrochemical industry consumes propane on a year-round basis.  Pursuant to a process called thermal cracking, feedstock such as propane is "cracked" into, among other end products, ethylene, which is then used to produce plastics.  Because of the substantial quantities of propane consumed by the petrochemical industry, the majority of ethylene crackers are located along existing pipeline routes or near ports.  In the eastern portion



of the United States, the majority of these facilities are located along the Gulf Coast or around the Enterprise pipeline system.

64.    Petrochemical companies in the southeastern part of the United States price overseas propane imported from, for example, Africa and Europe, at Mont Belvieu OPIS TET pricing or a blend of Mont Belvieu OPIS TET and non-TET pricing.  In addition, during the relevant period, petrochemical companies bought propane directly from BPNA at prices tied to Mont Belvieu OPIS TET pricing.

65.    As set forth in detail below, through their monopolization and corner, Defendants drove up the prices of propane throughout the TEPPCO Pipeline Service Area to supra-competitive levels.  Direct purchasers throughout the region were injured.

## VI.    DEFENDANTS' EXECUTION OF THEIR PROPANE MONOPOLY AND CORNER

### A.    Defendants' Trial Run of the Propane Monopolization and Corner in April 2003

66.    In April 2003, BPNA employees, pursuant to instructions provided to them by Radley, engaged in a trial run of the manipulative trading strategy they deployed ten months later in February 2004.  Pursuant to this strategy, BPNA built a long position in April 2003 TET propane for the purpose of cornering the April 2003 TET propane market.

67.    Going into April 2003, BPNA had established a significant long position in April 2003 TET propane.  On April 2, 2003, in a taped conversation[4] (a transcript of which is provided at Exhibit A hereto), Abbott called Claborn.  Radley joined the conversation, which included the following statements:

<u>Abbott</u>:  How does it feel taking on the whole market man?

---

[4] Consistent with industry practice, during the relevant period, BPNA recorded the Trading Bench member's telephone conversations.  Trading Bench personnel were fully aware that their conversations were being recorded.  A true and accurate copy of all recording cited herein (as made publicly available by the U.S. Commodities Futures Trading Commission ("CFTC") were provided as exhibits to the CFTC Complaint, filed in the United States District Court for the Northern District of Illinois on June 28, 2006 (the "CFTC Complaint").

Claborn:  Whew, it's pretty big man.

Abbott:  Dude, you're the entire [expletive deleted] propane market.

*  *  *

Radley:  Don't worry about it, it's the first two days of the month.  Plenty of lead time for people to think that barrels will emerge and take a short position.

*  *  *

Abbott:  No, I mean, it's cool, 100% of the open interest in propane, probably, and uh 3% of the open interest in nat gas . . . I dig it, it just, sometimes it's hard, it just feels hard to take on the whole market sometimes.

*  *  *

Radley:  Here's my one fear, and it's a significant fear.  Everybody waits until the last [expletive deleted] day to cover, and then we get wound up in a [expletive deleted] bunch of legal disputes.  That's my fear.

Abbott:  Yeah.

Radley:  That's my fear.  People don't cover, don't cover, then the last day they either default or come to us to get them out of it and then we have to try and basically set a price that seems fair. …

68.     BPNA employees, acting pursuant to Radley's instructions, purchased April 2003 TET propane throughout the month of April in an effort to corner the April 2003 TET propane market.  The April 2003 propane manipulation scheme acted as a trial run for the subsequent February 2004 TET propane monopoly and corner.

**B.     Defendants Effectuated the February 2004 Propane Corner as Part of Their Long-Term Goal to Be Able to Effect a Corner "At Will" in the Future**

69.     Defendants believed that the month of February would be more susceptible to a successful propane market corner than April had been.  Their reasoning was discussed in a taped conversation between defendants Radley and Abbott on February 5, 2004:

Radley:  The second point is that … I would imagine the minimum operating level at the end of Feb is higher than it is at the end of March or April because I think wholesalers –

Abbott:  Have to have something on hand.

Radley:  Have to hold barrels.

Abbott:  In order to pump the first day.

Radley:  Do you know what I mean?

Abbott:  That's right.

Radley:  So I think the minimum level might be a little higher than we're assuming based on what we experienced in April [2003].  When we squeezed the April/May.

Abbott:  Right, right.  Right, which was one of the reasons why it was harder to own all that April.  It was harder.  That's why we had to take on a little bit more than we thought we had to take on in April.  …  And that's why I think that 2 million, 2.1 million barrels as that min in Feb., I think that's real, man, I think that is the – that's the bottom at TET.

*See* transcript of February 5, 2004 conversation, attached as Exhibit B hereto.

70.     Defendants' recorded conversations and internal documentation make it clear that they planned to implement additional TET propane corners in the future.  For example, defendant Radley was recorded in the February 5 conversation as stating:

Two things I thought of.  …  One, in terms of whether we should do this or not in terms of talking to Jim [Summers] is that what we stand to gain is not just we'd make money out of it, but we would know from thereafter that we could control the market at will.  If we never break the threshold, we'll never know what the answer is, do you know what I mean?

71.     Later in the same conversation, Radley and Abbott reiterated the same point:

Abbott:  Okay.  That's something to think about.  I like that idea.  I like – well, that's one way to pitch it, anyway, that there's value in knowledge.

Radley:  Yeah, even if it's just for ourselves in terms of do – you know, needing the extra push to go for it if we're a little uncertain.  You know, the payoff isn't just this year.  It's saying for as long as we carry on trading.

<u>Abbott</u>:  Yeah, and that's … kind of what my attitude is.

**C.    Defendants' Trading Strategies in Executing their February 2004 TET Propane Corner**

72.    As described below, and detailed in both recorded conversations and in an internal assessment undertaken by BPNA following the February 2004 manipulation to ensure the increased efficacy of future corners, Defendants combined a strategy of buying up physical TET propane supplies with at least three related trading strategies in executing their February 2004 TET propane corner.  They employed the first strategy in January 2004 (referred to herein as "Strategy #1"), when they bought February "out" contracts, contracts for delivery of February TET propane.  Using this strategy, Defendants ended the month of January with a substantial long position in February TET propane.  A long position arises when a company incurs an obligation to buy and receive propane.

73.    In February, Defendants employed two additional strategies.  They increased their long position by buying February TET propane "any" contracts, namely February TET propane deliverable in February (referred to herein as "Strategy #2").  In addition, based on their inside knowledge that, as the result of their monopoly and corner, they would artificially widen the spread (or price differential) between the February OPIS TET "any" price and the March OPIS TET "out" price over the course of February, Defendants also went long on the February/March spread (referred to herein as "Strategy #3").  In other words, Defendants went long (or bought) February TET and went short (or sold) March TET, intending to profit from the increased price spread their corner would create over the course of the month.

**D.    January Purchases of February TET Propane**

74.     In pursuit of Strategy #1, during January 2004, BPNA built a sizable "long" position in February 2004 TET propane.  By building this position, Defendants got a jump start on amassing control of February 2004 TET propane before February even began.

75.     Radley, the Trading Manager of Natural Gas Liquids (NGL) at BPNA, repeatedly indicated in January that the propane market was ripe for manipulation.  On January 8, 2004, in an audiotaped conversation with other BPNA employees, Radley stated that the propane market was "vulnerable to a squeeze."   On January 13, 2004, in a conversation with another BPNA employee, Radley stated that the propane market was "tight enough that if someone wanted to play games with it, potentially they could."

76.     From Wednesday, January 7 until Friday, January 30, Defendants steadily increased their long position in February TET propane.  Defendants' January purchases of February "out" propane coincided with the dates of the two recorded conversations quoted above.  On January 8, Defendants had just completed a significant one-day purchase, almost doubling the size of BPNA's February TET long position from January 7.  On January 13, Defendants began a second push to increase their long position in February TET propane, which continued until the end of the month.

77.     Over the course of January, Defendants approximately tripled BPNA's position in February 2004 TET propane.   In addition, the CFTC alleges that according to defendant Summers, "Entering Feb[ruary] NAGP owned nearly 50% of available physical propane bbls [barrels] at the TET location."

78.     As a result of this conduct, Defendants artificially inflated, *inter alia*, the daily "out" prices reported by OPIS for Mont Belvieu February 2004 TET propane, injuring, among others, purchasers of February 2004 NYMEX futures contracts in January 2004, entities who

sold February 2004 NYMEX futures contracts prior to January 2004 and were obligated to buy them back at artificially inflated prices to close their futures positions, and entities who bought February "out" propane in January based on Mont Belvieu OPIS TET inflated prices.

**E.      Defendants' Manipulative Conduct Continued in February**

    **(i)      Defendants' Propane Trading during the First Two Weeks of February**

79.      Beginning on the first trading day in February (Monday, February 2), Defendants actively began to implement trading Strategy #2, namely, the aggressive purchase of February TET "any" propane.  By the end of the first week in February (Friday, February 6), Defendants had more than doubled the size of their February TET propane long position, to approximately 2.75 million barrels.

80.      An internal BPNA document (as quoted in the CFTC Complaint) described Defendants' employment of trading Strategy #3, namely going long the February/March spread:

> In February, 2004 the NGls trading bench entered into a strategy to create a long February – March spread … *The bench planned on holding a large portion of existing TET Mont Belvieu propane inventory.  It was believed that the resulting lack of supply at TET would drive up prices, further widening the spread.  The bench would then liquidate its inventory at higher prompt prices before the end of February.*  It was expected that only a small portion of the inventory would be rolled into March resulting in a minimal loss against a substantial gain.

(emphasis in the CFTC Complaint).

81.      Senior BPNA management were fully informed of, and authorized the execution of the propane monopoly and corner.  For example, Radley and Summers met with Marz, Compliance Manager for BPNA's NAGP unit, to obtain approval to proceed.  Marz not only gave his approval, he explicitly cautioned Trading Bench personnel to refrain from using certain words in conjunction with executing the scheme, including the word "squeeze."  As detailed below, personnel from the Trading Bench also had multiple conversations with Byers during the

relevant period about the manipulative scheme and its execution. Defendant Byers was the Chief Operating Officer for the NAGP unit.

82.    During the second week of February, BPNA, by and through its employees following directions from Radley, continued its aggressive purchase of February 2004 TET "any" propane. Defendants ended the day on Monday, February 9 having increased their long position through TET spot purchases of approximately 825,000 additional barrels.

83.    At approximately 4:45 p.m. CST on February 9, 2004, Radley (who was on vacation and thus was not in the office that day) called Claborn to get an update on the day's progress in executing the monopoly and corner. Abbott subsequently joined the conversation. A transcript of this conversation is attached hereto as Exhibit C. During the conversation, Radley, Claborn and Abbott remarked that, among other things:

Claborn:  How much we got on? I was just looking at that. You want to guess? 3.1.

Radley:  You been busy today?

Claborn:  Oh, yeah. Did it very quietly, ten lots, five lots, ten lots, fifteen here, five here. The biggest lot I think I bought was 75.

Radley:  Off who?

Claborn:  Morgan Stanley. We did get – right out of the chute we bought the 150s off Koch at 5/7/8.

Radley:  Yeah.

Claborn:  So we dropped that. And then it was just a bunch of little ones, the little guys. We did – Nordico (ph) did, God, 100, probably 150, 175 smoothly. I mean there was no big lots, it's like fifteen here, ten here, then here, fifteen there. I did two Chalkboard deals all day.

Radley:  Where was the spread at the end of the day?
3
Claborn:  I would say conservatively probably around 6-1/4.

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

Abbott:  6-1/2, 6-1/4.

\* \* \*

Abbott:  I characterize it as I was kind of surprised we were able to get three hundred from the marketplace basically, maybe three, four hundred from the marketplace without moving it that much.  I mean, we definitely were moving it at the end of the day.  It was definitely firming up at the end of the day and it feels like it, you know, could – the market could have been anywhere, like sellers were at 65 cents or 62 cents, depending on where the market was, right?

Radley:  Yeah.

Abbott:  So it's kind of – it seems like something that will just kind of move fairly easily.  And then there's one more seller out there that's Dow.  I think Dow has one chunk they can do and it's about – maybe that's about it.

\* \* \*

Abbott:  I mean tomorrow – Tomorrow if we are able to buy another four or five hundred thousand barrels tomorrow from the marketplace, I would be genuinely shocked, I mean really shocked.  So, you know, that's it.  Then I think we're just kinda – we'll just have to play a waiting game and see, you know, how it's going to shape up.

Radley:  Still remains to be seen, isn't it?  Still need to see some of these shorts come in.

Abbott:  Yeah, I mean I had – I mean, we –

Radley:  Were we the only buyer today?

Claborn:  Pretty much.

Abbott:  Pretty much.

Claborn:  There's a few other deals done besides us but nothing – not many at all.  Just a few, not – I think you could put them all on one hand.  It wasn't us, but –

84.     Defendants recognized that the weather could affect the success of their manipulative scheme, as cold weather would cause demand to remain high throughout the month of February.  As such, they further noted:

Radley:  Well what about the weather outlook?

<u>Claborn</u>:  Yeah, it's still good.

<u>Abbott</u>:  The weather – yeah, I mean, the weather's still cold in the Northeast, I mean, the parts of the Midwest are now kind of just normal, normal temps is what they're forecasting, but the Northeast is still cold, still below and much bellows.  I mean, the other thing – I mean, the other thing that's – I mean, when you think about it, you know, we're not – talking with Cody [Claborn] here as we, you know, always talked about every single minute.  But, you know, we're not going to take delivery of the stuff till February 29th, right?  27th, 28th.

<u>Radley</u>:  Right.

<u>Abbott</u>:  I mean, the shippers who are going to be required to ship, yeah, they're not going to feel, people aren't going to feel concerned until it's time, right?

<u>Radley</u>:  Exactly.

<u>Abbott</u>:  This could be the last week.

<u>Radley</u>:  Sure, sure, that's right.  That's absolutely right.  There's no doubt about that.

85.    Defendants closely tracked the conduct of shorts for February 2004 TET propane:

<u>Abbott</u>:  There's absolutely shorts in the TET market, who will have to cover it.  He [Trammogas] goes – so I mean he – he's not extremely bullish, but he just thinks that, you – I mean, hey, I mean it's at, you know, 78 percent of crude.  I mean, it's not that cheap.  It's not expensive.

<u>Radley</u>:  No, no, no.  There's a long way to push it without <unintelligible>.

<u>Abbott</u>:  Yeah, yeah.

* * *

<u>Radley</u>:  This moment don't forget that although we might have three point one million long, we haven't got 3.1 million of physical yet, right?

<u>Abbott</u>:  No.

<u>Claborn</u>:  No we got 2.4 million right now.  It'll go down to 2.1 after it all priced from this point forward.

<u>Abbott</u>:  Yeah.



Claborn:  Well, it'll be about 2.2, I think.

Abbott:  It can get pretty exciting if we continue – if we go off 3 million long.  I mean, there will be – there will be – it will be exciting.

86.    Radley, Abbott and Claborn assessed the likely reaction of the market to their corner, noting:

Radley:  Oh, it sounds pretty good, sounds pretty good.  Something's got to give, doesn't it.

Claborn:  Got to give.

Abbott:  It could be very well, yeah, it could be very –

Radley:  <unintelligible> very curious.  You know, half of me is saying, look.  the fact that nothing's really moved in terms of spread yet is good, because people aren't, you know, looking for ways or alternatives or backing out demand or that sort of thing, so that's kind of a good thing.  The down side is, of course, it all happens at the last minute, it gets a bit messy, people start cheating, you know.

Claborn:  Not delivering.

Radley:  Not delivering.  You know, it starts to look a little bit funny as well, that the spread, you know, just erupts at the last minute.

Claborn:  And we don't get the price out on all this paper.

Abbott:  Well, then it's a different thing.  If we don't get a price out of this paper and we have –

Radley:  The advantage of paper, is that we're selling at an index price, there's no complaints.  If we squeeze it in the last four or five days of the month, forgive my French, it's going to be hard to say what's the fair price of the market at the time.

87.    Defendants described their efforts to deceive market participants into believing February 2004 TET propane was readily available, belying their active cornering activities.  Specifically, Defendants caused offers to sell February TET propane to be presented to the market, but at prices set sufficiently above prevailing market prices so as to be unlikely to result in actual sales.  This strategy created the appearance – through the use of anonymous trading

platforms like Chalkboard – that there were potentially multiple suppliers of February 2004 TET propane willing to sell:

> Abbott:  I think as long as we continue to show two ways, I mean we continued to show offers today on the screen and we're showing offers just to get people comfortable with the idea of selling.  So we're continually offering it at the same time we're trying to pick up volume today.  And I think as long as you continue to show offers, then I think that's fair, you know.  We're giving some people an out, okay?

> Radley:  Yep.

> Abbott:  It's not – it's not unfair.  So we'll see.

> Radley:  Sounds good, guys.

88.     As set forth in the CFTC Complaint, because of his use of the word "squeeze," when he returned from vacation, Radley brought the above conversation to the attention of Summers.  Summers testified under oath that he brought the conversation – and Radley's use of the word "squeeze" – to the specific attention of Byers and Marz.  He further testified that all three individuals then reviewed the audiotape.  Byers testified before the CFTC that Tim Bullock, then President of BP NAGP also became aware of Radley's description of BPNA's February 2004 TET propane strategy as a "squeeze."

89.     In the above quoted February 9 conversation, Claborn stated that BPNA owned 2.4 million barrels of physical TET propane as of that day.  Total TEPPCO system physical propane inventory fell slightly between February 9, 2004 and February 13, 2004, decreasing from just over 3.2 million barrels on February 9, 2004 to just over 3.1 million barrels on February 13, 2004.  As of February 9, BPNA already owned approximately 75% of total February TET propane inventory.

90.     During this same period, Defendants further increased their February long position by over 1.4 million barrels.  BPNA's long position by the close of business on Friday,

February 13 exceeded 3.2 million barrels.  Thus, as of February 13, 2004, BPNA's long position in February 2004 TET propane *exceeded* the entire TEPPCO system propane inventory.

91.     As reported by OPIS, the average "any" price of February 2004 Mont Belvieu TET propane rose during the first two weeks of February, from a low of around 61 cpg to 70.125 cpg on Friday, February 13.

92.     As the result of Defendants' illegal conduct described above, prices paid in spot transactions for TET propane during this two week period were artificially inflated.  Market participants, including Wholesalers who purchased February 2004 TET propane directly from BPNA or any other Producer in the spot market were injured.  As detailed above, the average, high and low spot prices for Mont Belvieu TET propane were reported daily on the OPIS system. Mont Belvieu OPIS TET pricing was the benchmark or index on which market participants throughout the TEPPCO Pipeline Service Area bought and sold propane, whether delivered through the TEPPCO pipeline, or purchased from a refinery or imported from Canada or overseas.  As the result of Defendants' conduct, Mont Belvieu OPIS TET pricing rose to supra-competitive levels.  These inflated prices reverberated through the TEPPCO Pipeline Service Area, damaging market participants, including Wholesalers and Marketers, who purchased propane directly from BPNA or any other Producer through supply contracts and purchase agreements based on Mont Belvieu OPIS TET pricing.

**(ii)     Defendants' Propane Trading During the Third Week of February**

93.     On Sunday, February 15, 2004, there was a rupture in the TEPPCO pipeline near Coshocton, Ohio.  TEPPCO issued a press release that advised that operations of all terminals, including propane terminals, east of Todhunter, Ohio – with the exception of Eagle, Pennsylvania – would be suspended until the pipeline could be repaired.  The pipeline rupture

had the effect of increasing the amount of TET propane remaining in and available at the TET storage caverns. By February 16, 2004, the total TEPPCO system inventory had increased to just over 3.3 million barrels.

94.    In testimony before the CFTC, Summers acknowledged that even though, at the time the pipeline ruptured, Defendants' position in February 2004 TET propane was much greater than the demand initially anticipated by the Trading Bench, BPNA further increased its February 2004 TET propane position because of the rupture. He stated that if:

> [BPNA] hadn't purchased that volume, then the short positions would be buying that volume from the marketplace, so we wouldn't be in a position to meet that demand. … If we had chosen not to buy it or in fact sell our position, then the shorts could have covered a large portion of their positions at that time.

95.    In a February 16, 2004 taped conversation, Claborn made it clear that Byers was being kept apprised of how the execution of the monopoly and corner was unfolding during the relevant period. Specifically, Claborn said that " . . . he talked to Cameron,[5] told him what we were doing, Cameron said just don't try to bring any extra attention . . .."

96.    Defendants continued their aggressive purchasing campaign of February 2004 TET propane between Tuesday, February 17 and Friday, February 20. During that week, Defendants – by and through BPNA's employees, under Radley's direction – purchased at least an additional 1.4 million "any" barrels of February 2004 TET propane. By the close of business on February 20, Defendants' long position in February 2004 TET propane had increased to just under 4.7 million barrels.

97.    The total TEPPCO system propane inventory steadily increased from just over 3.4 million barrels on February 17 to just over 3.6 million barrels on February 20, 2004. The prices

---

[5] The only person with supervisory authority over the NGL Trading Bench that went by the name of "Cameron" at the time was Byers. Defendants' TET position on that date was around 5.1 million barrels, and that the total available supply currently in TET storage was around 3 million barrels.

of February TET propane increased over the course of the week.  Throughout this week, Defendants' long position in February 2004 TET propane continued to exceed the entire TEPPCO system propane inventory, at times by as much as one million barrels.

98.    On February 19, 2004, at approximately 9:30 a.m., Byers, Marz, Summers and Radley met in Byers' office to discuss the Trading Bench's activities with respect to February 2004 TET propane.  In that meeting, Radley informed Marz and Byers that BPNA's long position in February 2004 TET propane "exceeded the availability of barrels in the marketplace at that time."  Marz acknowledged that during the meeting they discussed the fact that Defendants' TET position on that date was around 5.1 million barrels, and that the total available supply currently in TET storage was around 3 million barrels.

99.    In the course of the meeting, Byers took handwritten notes regarding BPNA's February 2004 monopoly and corner.  Those notes read:

- Bulk Mt. Belvue *[sic]*

- People reducing inventory

- Unregulated – OTC + Chalkboard

- 25 – 35 shorts to us

- Heavily backwardated

100.    By "heavily backwardated," Byers was referring to the unusual phenomenon that, despite the fact that inventory amounts of February 2004 TET propane were increasing over the course of the month, Defendants' actions pursuant to the corner were causing prices to rise, thus *increasing* the spread between the price of February and March TET propane.  Under normal, competitive market conditions, an increasing supply would lead to a decline in prices, thus *reducing* the spread.

101.    Radley informed Byers and Marz that the Trading Bench could unwind the large position it had built in February 2004 TET propane if that were Byers' and Marz's decision. Following the February 19, 2004 meeting, Defendants not only chose not to unwind BPNA's February 2004 TET position, they continued to *increase* their position in February 2004 TET propane.

102.    At this same meeting, Byers, Marz and Radley also discussed the fact that the Trading Bench had exceeded the BPNA policy trading limit – which exposed BPNA to levels of financial risk that could be maintained only with management approval.  As detailed herein, following the February 19 meeting, Defendants continued to exceed this trading limit.

103.    Defendants' conduct artificially inflated the Mont Belvieu OPIS TET pricing, raising the average reported Mont Belvieu OPIS TET "any" price from 67.125 cents on February 17 to 71.125 cents on February 20.  As a result, Defendants also increased the spread between the price of February and March TET propane to supra-competitive levels, driving the spread to 9.63 cents on February 17 and to 12.44 cents by February 20.

104.    By the third week of February, rumors were circulating among market participants that there was a corner on.  As described in Section VIII below, purchasers had little recourse to alternative supplies in the short run in the face of ever rising prices.  Little additional supply could or did come into the market to offset the Defendants' monopoly position, leaving daily spot trading constrained by the Defendants' grip on the February TET supply.  Purchasers of February TET propane, bound by pricing terms tied to Mont Belvieu OPIS TET pricing, even if aware of pricing abnormalities, had little option but to honor their contracts and pay the artificially inflated prices OPIS was now reporting.  Defendants knew that as they drove up the price of Mont Belvieu OPIS TET, market participants throughout the TEPPCO Pipeline Service

Area would be and in fact were damaged as they sought to ensure the propane supplies needed to service heating and commercial demand in the region.

### (iii)    Defendants' Actions during the Final Week of February

105.    On Monday and Tuesday, February 23 and 24, Defendants – by and through BPNA employees and following Radley's directions – further increased their long position in February 2004 TET propane.  Defendants bought February 2004 TET "any" propane at prices ranging on Monday from 73.5 to 75.125 cpg, and on Tuesday from 74.25 cpg to 78.25 cpg.

106.    After 11:00 a.m. on February 24, BPNA employees, following directions by Radley, sold over 500,000 barrels of February 2004 TET propane at supra-competitive prices of between 79 cpg and 88.25 cpg.  Reflecting BPNA's dominant and controlling position in February 2004 TET propane, on February 24, 2004, between 12:33 and 4:35 p.m., there were *no* offers on Chalkboard to sell February 2004 TET propane in volumes greater than 10,000 barrels *other than* those offers made by Defendants themselves at noncompetitively set inflated prices.

107.    In furtherance of the scheme, on February 24, 2004, BPNA employees executed an internal transaction "re-designating" three million barrels of February 2004 TET propane as March 2004 TET propane "wet" barrels.[6]  Abbott executed this internal transaction at the direction of management, noting:

> Rolling Feb[ruary] length to WET March market.  We will be carrying bbls [barrels] over to march *[sic]*.

108.    At that time, three million barrels of TET propane represented approximately 75% of the entire TEPPCO system propane inventory.  This rollover violated established company protocol of not rolling-over unsold barrels until the end of the month.  Prior to this transaction, the Trading Bench had never executed an intra-month (as compared to end of month) rollover of

---

[6] "Wet" refers to a forward transaction for delivery on a specified day.

one month's NGL barrels into a subsequent month. This rollover strengthened the corner for February 2004 TET propane by further artificially reducing the supply of propane available for the market. Working, *inter alia*, through Brokers, Defendants informed market participants that the available supply of February 2004 TET propane had been substantially reduced. Reflecting this dramatic change in supply, as detailed below, there was a sharp increase in both the Mont Belvieu OPIS TET pricing, including the "any" and "prompt" prices, and in the February/March spread on this day.

109. Some additional supply of February TET propane entered the market to take advantage of the higher prices Defendants had caused as the result of their corner. This increase in supply of propane to the TET cavern occurred in several ways, including Producers who shipped propane to Mont Belvieu specifically designating that such propane was to be stored at the TET cavern rather than any other cavern, and entities who owned propane stored in the non-TET caverns at Mont Belvieu physically removing that propane and transporting it, by truck, over to the TET caverns.[7] Because of the sharp run-up in the price of TET propane during this period, there was an active effort to move propane from the non-TET to TET storage caverns. This had the effect of artificially increasing OPIS reported prices for non-TET propane.

110. In order, *inter alia*, to purchase this additional supply, on Wednesday, February 25, 2004, BPNA employees, following Radley's instructions, continued their aggressive purchase of February 2004 TET propane, buying more than 600,000 additional barrels at prices between 85.25 cpg and 91.25 cpg.

111. As the result of their illegal conduct, Defendants were able to force the purchase price for TET propane in the spot market to a reported OPIS high of 92.75 cpg.

---

[7] There were no pipelines connecting the non-TET and TET caverns at Mont Belvieu; therefore, any movement of propane from one cavern to another had to be done by truck.


112.    BPNA's long position in February 2004 TET propane increased to just over 4.9 million barrels on February 25.  This amount continued to exceed the total TEPPCO system propane inventory, which on that date had increased to just over 4.1 million barrels.

113.    On Thursday, February 26, 2004, Defendants purchased over 250,000 additional barrels of February TET propane at prices between 79.5 cpg and 84 cpg.  In furtherance of the corner, they *refused to sell* any February 2004 TET propane to the market.

114.    On February 26, 2004, BPNA employees executed a second internal rollover transaction "re-designating" 800,000 barrels of February 2004 TET propane as March 2004 "wet" barrels, further constricting the available supply of February 2004 TET propane.  This second rollover occurred on the same day that BPNA was refusing to sell February 2004 TET.

115.    The total TEPPCO system inventory for that day increased to just over 4.3 million barrels of propane.  As the result of the execution of Defendants' scheme, by the end of the month, BPNA owned over 88% of all February 2004 propane inventory in the TEPPCO system, and carried a long position of over 5.1 million barrels.

116.    Early Friday, February 27, 2004, BPNA employees, following Radley's directions, purchased approximately 50,000 additional barrels of February 2004 TET propane before 9:00 a.m.  By 10:00 a.m., BPNA was the primary seller of February 2004 TET propane for any significant volume.  BPNA employees, including Claborn – acting at the direction of Radley – were able to and did dictate the price of this propane as they released it for sale to, *inter alia*, shorts who needed it to cover their contractual obligations.

117.    BPNA's market dominance was explicitly captured on a recorded conversation between Claborn and a voicebroker:

Voicebroker:  Where's your next one?



<u>Claborn</u>:  O.K.  Confirm, Anadarko buys 25,000 physical TET Feb. at .8850.

<u>Voicebroker</u>:  Correct.  … that was Paul.

<u>Claborn</u>:  Next one is … uh … 89, … 89.

<u>Voicebroker</u>:  89?

<u>Claborn</u>:  Yep.

<u>Voicebroker</u>:  [Talking on other line] … 89.  [To Claborn] Just one second.  [On other line] You got one shot at it.  [To Claborn] I'm telling people they got one shot.

<u>Claborn</u>:  That's it.

<u>Voicebroker</u>:  How's your day going, man?  You're done by the way with SHY.

<u>Claborn</u>:  SHY buys 25,000 at .89.

<u>Voicebroker</u>:  89.  Where's your next?  89 and a half?

<u>Claborn</u>:  89 and a half.

<u>Voicebroker</u>:  All right.  [On other line] .89 and a half, next [to Claborn] . . . Are you just walking them up a half step?

<u>Claborn</u>:  Now.

<u>Voicebroker</u>:  For now, you are . . .

<u>Claborn</u>:  . . . yes.

<u>Voicebroker</u>:  [on other line] . . . 89 and a half is next, his next offer comes in a penny higher.  . . . Alright, I'll shoot it across to you . . . um . . . you're gonna get done.

<u>Claborn</u>:  Oh, I know.  But were are off that right now.

<u>Voicebroker</u>:  Oh, you're off that right now?

<u>Claborn</u>:  You want something, you bring it to me.

<u>Voicebroker</u>:  Ok.

<u>Claborn</u>:  Bring me the bid.

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

<u>Voicebroker</u>:  O.k.  Alright, thanks Cody.

*See* copy of transcript of this conversation, attached hereto as Exhibit D.

118.    Defendants were able to drive the reported OPIS high price for TET propane in the spot market up to 94 cpg.

119.    As the result of Defendants' illegal conduct, the daily reported Mont Belvieu OPIS TET average "any" prices rose substantially in the final week of February, from 74.9375 cents to a high of 89.50 cents.  In addition, the February/March spread almost doubled, from 15.8 cents to a high of 29.1 cents.  In contrast, the spread between the February price and the March price for propane sold out of the Conway, Kansas hub fell during this same period from 5.1 to 4.1 cents.

120.    As the result of Defendants' illegal conduct described above, both prices paid in spot transactions for TET propane and Mont Belvieu OPIOS TET daily reported prices during this week were artificially inflated.  Market participants, including Wholesalers who purchased February 2004 TET propane in the spot market directly from BPNA, or any other Producer, were injured.  In addition, market participants, including Wholesalers and Marketers, who purchased propane based on Mont Belvieu OPIS TET pricing, whether from TEPPCO, local refineries or as imports, were also injured.

**F.    The Adverse Impact of the Corner Continued after February 2004**

121.    On March 1, 2004, the price of TET propane fell precipitously.  The Mont Belvieu OPIS TET average price on Monday, March 1, 2004 was 61.75 cpg, almost 25 cpg below the Friday, February 27 average published price.  The price for March 2004 TET propane continued to fall for the remainder of that week.  By March 10, 2004, the price of March 2004 TET propane had fallen to 56.125 cpg.

122.    Certain counterparties failed to deliver February TET propane to BPNA by the end of the month in satisfaction of their obligations.  BPNA employees refused to accept late delivery at the lower March 2004 prices, and instead dictated that each counterparty that failed timely to deliver February TET propane had to pay 94 cpg to satisfy its obligation.  BPNA employees, following Radley's directions, refused to negotiate on this price.

123.    As noted above, multiple supply contracts tied the purchase price to, for example, the average or blended Mont Belvieu OPIS TET prices over a preceding five or ten business day period.  Under this pricing formula, Defendants' monopoly and corner continued to inflict financial damage on these parties and entities in their direct purchases of March propane from Producers of TET propane up through and including Monday, March 15, 2006.

## VIII.  THE ABILITY FOR ALTERNATIVE SOURCES OF PROPANE TO FLOW INTO THE TEPPCO PIPELINE SERVICE AREA TO UNDERMINE THE CORNER WAS EXTREMELY LIMITED.

124.    As detailed above, Defendants were able to acquire and control virtually the entire inventory of physical February 2004 TET propane.  The size of this available inventory was limited by the size and storage capacity of the TET caverns.  Defendants demonstrated over the relevant period that they were willing and able to, and did, buy up available supplies of TET propane that was delivered to the TEPPCO system, driving up prices for that propane.  Market participants who were required by contract to deliver February 2004 TET propane therefore had no alternative but to purchase February 2004 TET propane from Defendants at the supra-competitive prices they imposed as part of their illegal monopoly and corner.

125.    Throughout the TEPPCO Pipeline Service Area, long-term supply contracts and purchase agreements tied the price of propane to Mont Belvieu OPIS TET pricing.  Defendants' illegal conduct drove up Mont Belvieu OPIS TET pricing, and thus, the prices market

participants were required to pay for propane throughout the TEPPCO Pipeline Service Area. This was true for any increased propane supplies that might have occurred in the supply of propane into the TEPPCO Pipeline Service Area during the relevant period.

126.    There was little ability for alternative sources of propane supply to enter the TEPPCO Pipeline Service Area in a timely manner in reaction to Defendants' monopoly and corner. Other pipeline systems could not have responded by transporting alternative supplies of propane into the TEPPCO Pipeline Service Area because of physical limitations of pipeline system delivery. Refineries contributed only a small percentage of the total propane consumed in the TEPPCO Pipeline Service Area. The bulk of refinery produced propane was sold based on long-term supply contracts or purchase agreements at prices tied to Mont Belvieu OPIS TET pricing. The fact that propane is only a minor by-product of crude oil and natural gas refining imposed a further restriction on the likelihood or ability of refineries rapidly to shift to produce substantially increased amounts of propane in reaction to Defendants' corner.

127.    The ability of propane imports from overseas to respond to Defendants' monopoly and corner was also extremely limited. Shipments of propane from Europe, Africa and South America take at least three weeks, making it impossible for importers to have been able to react in a timely manner once talk of the corner began to circulate among market participants. The only geographic location with propane for import into the TEPPCO Pipeline Service Area that could react quickly to changes in market conditions was Sarnia, Canada, and BPNA controlled virtually all propane out of Sarnia. Beyond these logistical considerations, lie refinery propane, the bulk of imported propane during the relevant period was sold at prices tied to Mont Belvieu OPIS TET pricing, including the propane BPNA sold out of Sarnia into the Service Area.

128.    In summary, Defendants drove up the pricing benchmark in the TEPPCO Pipeline Service Area as the result of their illegal conduct.  The short duration of the corner, directed to February 2004 propane, precluded the market from providing any meaningful substitute source of supply.

## IX.    MONOPOLY POWER AND THE RELEVANT MARKET

129.    BPNA attempted to attain, did attain and did exercise monopoly power over propane sales during the relevant period in the TEPPCO Pipeline Service Area (the "Relevant Market").  BPNA attempted to attain, did attain and did exercise monopoly power over February 2004 Mont Belvieu OPIS TET propane.  During the relevant period, BPNA monopolized the physical supply of propane in the TEPPCO system and had a long position in February TET propane in excess of the physical inventory.  Through these monopolistic practices, BPNA drove up February Mont Belvieu OPIS TET pricing, the benchmark on which propane in the TEPPCO Pipeline Service Area was sold.  During the relevant period, BPNA attempted to attain, did attain and did exercise monopoly power over in excess of 60% of the supply of propane for delivery in the TEPPCO Pipeline Service Area.

### COUNT I

### Against All Defendants

### (Monopolization - § 2 of the Sherman Act)

130.    Plaintiffs incorporate by reference each of paragraphs 1 through 119 above as if fully set forth herein.

131.    BPNA willfully acquired, maintained and exercised monopoly power over the Relevant Market.  As alleged herein, it did so by executing an unlawful "market squeeze" or corner, starting with a test of the strategy in 2003 and executing the squeeze for the February

2004 TET propane markets, thereby controlling and manipulating the available supply of propane within the Relevant Market.

132.    BPNA had multiple purposes for adopting its unlawful scheme.  It sought to reap monopoly profits in the sale of propane in the February 2004 and future TET market (which it accomplished through the "market squeeze" or corner that was intended to and did eliminate competing sellers of this propane), and more broadly, in the TEPPCO Pipeline Service Area, where it controlled at least 60% of the available propane supply.  Defendants also sought to perfect the ability to control the TET propane market "at will," allowing them to employ monopoly and corner strategies at opportune future times to obtain monopoly profits on a recurrent basis.

133.    BPNA's actions to acquire, maintain and exercise monopoly power were not a consequence of superior product, business acumen or historic accident.  Its actions were the consequence of its consciously unlawful plan and practices.

134.    As alleged herein, defendants Byers, Marz, Summers, Radley, Abbott and Claborn each participated in the unlawful acts alleged herein or acquiesced in or ratified them.

135.    Defendants' actions are in violation of 15 U.S.C. § 2 *et seq.*, in that they helped BPNA to monopolize the Relevant Market by foreclosing competition, which in turn allowed BPNA to artificially inflate the price of propane sold during the relevant period at a level that would not be obtainable in a competitive market.

136.    There is no pro-competitive justification for Defendants' actions.

137.    Defendants acted with an anticompetitive purpose and its actions had anticompetitive effects.

138.    The foregoing acts and conduct by Defendants have restrained or prevented competition and threaten to continue to restrain or prevent competition.

139.    The business of Defendants, their actions in pursuance thereof and their unlawful scheme are within, and directly affect trade and commerce among the several states.

140.    Plaintiffs have been injured in its business or property by reason of Defendants' antitrust violations.    Their injury consists of paying higher prices for propane than would otherwise have prevailed in a truly competitive market.    Such injury is of the type the antitrust laws were designed to prevent.    The antitrust injury to Plaintiffs was the direct and foreseeable result of the Defendants' multiple actions, as alleged herein.

141.    As a consequence, Plaintiffs are entitled to a permanent injunction, restraining BPNA from engaging in additional anticompetitive conduct, to judgment pursuant to 15 U.S.C. § 15 awarding Plaintiffs three-fold the damages sustained to its business or property, and to recover the costs and expenses of this action, including reasonable attorneys' fees.

## COUNT II

### Against All Defendants

### (Attempted Monopolization - § 2 of the Sherman Act)

142.    Plaintiffs incorporate by reference each of paragraphs 1 through 131 above as if fully set forth herein.

143.    Defendants acted with specific intent to achieve (and did achieve) for BPNA monopoly power over the Relevant Market.

144.    Defendants engaged in manipulative and anticompetitive acts directed to accomplishing this unlawful purpose.    As alleged herein, they did so by executing unlawful "market squeeze" or corner test in 2003 and executed their squeeze for the February 2004 TET

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

propane market, which enabled them to control and manipulate the available supply of propane within the Relevant Market.

145.    BPNA had multiple purposes for attempting to achieve this monopoly power.  It sought to reap monopoly profits in the sale of propane, both in the TET propane market (which it would have (and did) accomplish through the "market squeeze" or corner that was intended to and did eliminate competing sellers in February 2004) and, more broadly, in the TEPPCO Pipeline Service Area, where it intended to (and did) control substantial amounts of available propane supply.  Defendants also sought to perfect the ability to control the TET propane market "at will," allowing them to employ monopoly and corner strategies at opportune future times to obtain monopoly profits on a recurrent basis.

146.    There was a dangerous probability that Defendants would succeed in achieving monopoly power in the Relevant Market, through the unlawful acts alleged herein.

147.    As alleged herein, defendants Byers, Marz, Summers, Radley, Abbott and Claborn each participated in the unlawful acts alleged herein or acquiesced in or ratified them.

148.    The business of Defendants and their actions in pursuance thereof and of the unlawful scheme described herein are within, and directly affect trade and commerce among the several states.

149    Plaintiffs have been injured in its business or property by reason of Defendants' antitrust violations.  Their injury consists of paying higher prices for propane than would otherwise have prevailed in a truly competitive market.  Such injury is of the type the antitrust laws were designed to prevent, and flows from Defendants' unlawful conduct in attempting to monopolize and corner the market.  Such injury was the direct, intended and/or foreseeable result of the Defendants' conduct, as alleged herein.

150.    By reason of the foregoing, Plaintiffs are entitled to a permanent injunction, restraining BPNA from engaging in additional anticompetitive conduct, to judgment pursuant to 15 U.S.C. § 15 awarding to Plaintiffs three-fold the damages sustained to its business or property, and to recover the costs and expenses of this action, including reasonable attorneys' fees.

## COUNT III

### Against All Defendants

### (Restitution/Disgorgement/Unjust Enrichment)

151.    Plaintiffs incorporate by reference each of paragraphs 1 through 140 above as if fully set forth herein.

152.    Defendants, including BPNA, benefited from their unlawful acts through, *inter alia*, the receipt of overpayments by Plaintiffs and the payment of bonuses and other compensation.    It would be inequitable for Defendants to retain the benefit of these overpayments, bonuses and other compensation that were conferred by Plaintiffs on BPNA, or paid to Defendants pursuant to or as the result of the unlawful conduct described herein.

153.    Plaintiffs are entitled to the establishment of a constructive trust consisting of the overpayments and/or other compensation or benefits to BPNA and/or to any of the other named defendants.    These Defendants should contribute sums equal to the amount of all such overpayments, compensation and/or benefits received from which Plaintiffs may make claims on a pro-rata basis for restitution.

## COUNT IV

### Against All Defendants

### (Commodity Exchange Act)

154.     Plaintiffs incorporate by reference each of paragraphs 1 through 143 above as if fully set forth herein.

155.     This claim is brought pursuant to 7 U.S.C. § 25(a)(1)(D) and 7 U.S.C. § 13(b), for damages caused by Defendants' manipulation of the price of NYMEX futures contracts for February 2004 propane and of the propane underlying such contracts.

156.     Plaintiffs purchased and/or sold contracts for delivery and future delivery of propane, including for and in February 2004.

157.     As alleged herein, Defendants had the ability to influence market prices for (a) NYMEX futures contracts, including for February 2004 propane; and (b) propane within the Relevant Market.  This ability was demonstrated by BPNA's acquisition of control over the supply of February 2004 TET propane, and the resulting effect on the prices of NYMEX futures trading for February 2004 propane and the price of February 2004 TET propane.

158.     In executing their "market squeeze" or corner strategy with respect to the market for TET propane, including February 2004 TET propane, Defendants intended to influence market prices for (a) NYMEX futures contracts, including those for February 2004 propane; and (b) propane within the Relevant Market.

159.     During the relevant period, artificially inflated prices existed for (a) NYMEX futures contracts, including those for February 2004 propane; and (b) propane within the Relevant Market.

160.     Defendants caused these artificial prices by executing their monopoly and corner strategies with respect to the market for February 2004 TET propane, as alleged herein.

161.     Plaintiffs, who purchased NYMEX futures contracts impacted by Defendants' actions described above, or who sold such impacted NYMEX futures contracts and were

obligated to buy them back to close their future positions, paid prices higher than would have existed in a normal competitive market as a direct and proximate result of Defendants' unlawful manipulation, and are entitled to recover damages pursuant to 7 U.S.C. § 25(a)(1)(D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request judgment as follows:

A.    Declaring that Defendants violated and are in violation of Section 2 of the Sherman Act and common law alleged herein;

B.    Awarding three-fold damages sustained by Plaintiffs as a result of the anticompetitive conduct alleged herein under applicable federal or common law;

C.    Ordering injunctive relief, preventing and restraining Defendant BPNA and all persons acting on its behalf from further engaging in the unlawful acts alleged herein;

D.    Awarding Plaintiffs' costs, interest, expenses and reasonable attorneys' fees and experts' fees incurred in connection with this action; and

E.    Awarding such further relief as the Court may find necessary and appropriate.



**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

a trial by jury.

Date:    May 9, 2008

Respectfully submitted,


/s/John P. Palumbo
  John P. Palumbo

Stephen W. Heil
CRAY HUBER HORSTMAN HEIL
& VanAUSDAL LLC
303 West Madison Street, Suite 2200
Chicago, IL 60606
Telephone:  (312) 332-8450
Fax:  (312) 332-8451

COUNSEL FOR PLAINTIFF