2035005GW9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THOMPSON'S GAS & ELECTRIC     )
SERVICE, INC., a Maryland corporation, )
REGIONS PROPANE-ALABAMA, LLC, )
an Alabama Limited Liability Company, )
SUBURBAN GAS PROPANE )
PARTNERS, LLC, a Maryland Limited )
Liability Company, SHELBY PROPANE )    Case No.  08 CV 2693
GAS COMPANY, INC., an Alabama )
corporation, and DEUPREE GAS, INC., )    Judge Moran
an Alabama corporation, )
    )    Magistrate Judge Keys
    Plaintiffs, )
    v. )
    )
BP AMERICA INC., BP CORPORATION )    JURY TRIAL DEMANDED
NORTH AMERICA INC., BP INTERNATONAL )
SERVICES COMPANY, BP PRODUCTS NORTH )
AMERICA INC., BP ENERGY COMPANY, and )
BP AMERICAN PRODUCTION COMPANY, )
    )
    Defendants. )

## AMENDED COMPLAINT

## I.  INTRODUCTION

1.  As fully alleged below, BP America, Inc., by and through its subsidiaries and employees (collectively "Defendants" or "BP"), engaged in acts and practices that constitute violations of the federal antitrust laws, including Sections 2 and 3 of the Sherman Act, 15 U.S.C. §§ 2, 3, and the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1 *et seq*.  BP attempted to monopolize and monopolized the supply of propane stored in TEPPCO's Mont Belvieu Texas caverns and shipped through the TEPPCO pipeline system ("TET propane").  This pipeline system was the dominant source of propane supply in the TEPPCO Pipeline Service Area, encompassing portions of the mid-West and the Northeastern United States.  As BP has admitted

in the Deferred Prosecution Agreement ("DPA") entered into with the Department of Justice, BP undertook to monopolize and did monopolize the supply of TET propane for delivery in February 2004. As their prior conduct, recorded phone conversations, internal documentation and admissions in the DPA make clear, BP intended to test, perfect, and apply their strategies for implementing such propane corners "at will" in the future.

2.      Plaintiffs bring this action to recover the damages they suffered during the relevant period as the result of BP's illegal conduct.

## II.    JURISDICTION AND VENUE

3.      Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and obtain injunctive relief as well as reasonable attorneys' fees and costs with respect to injuries arising from Defendants' violations of the federal antitrust laws, including Sections 2 and 3 of the Sherman Act, 15 U.S.C. §§ 2, 3, and under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, to recover actual damages resulting from injuries arising from violations of that Act.

4.      The Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a), Section 7 of the Sherman Act, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25(c). The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.      Jurisdiction and venue are proper in this District pursuant to 15 U.S.C. § 2, 7, 15, 22 and 26, 28 U.S.C. § 1391(b)(2), and 7 U.S.C. § 25(c), in that Defendants are found in, reside or transact business in this District or because part of the events or omissions giving rise to the claims occurred in this District.

III.    **PARTIES**

A.    **Plaintiffs**

6.    Thompson's Gas & Electric Service, Inc., ("Thompson"), is a Maryland corporation with its principal place of business in Boonsboro, Maryland.  Thompson serves residential, commercial, industrial, agricultural and motor fuel propane customers in the northeast.

7.    During the relevant period, Thompson purchased propane directly from producers at prices that were artificially inflated as the result of Defendants' wrongful and illegal monopoly and corner detailed herein.

8.    Regions Propane-Alabama, LLC ("Regions") is an Alabama limited liability company with its principal place of business in Centre, Alabama.  Regions serves residential, commercial, industrial, agricultural and motor fuel propane customers in the southeast.

9.    During the relevant period, Regions purchased propane directly from producers at prices that were artificially inflated as a result of defendants' wrongful and illegal monopoly and corner detailed herein.

10.    Suburban Gas Propane Partners, LLC ("Suburban") is a Maryland limited liability corporation with its principal place of business in Centre, Alabama.  Suburban serves residential, commercial, industrial, agricultural and motor fuel propane customers in the southeast.

11.    During the relevant period, Suburban purchased propane directly from producers at prices that were artificially inflated as a result of defendants' wrongful and illegal monopoly and corner detailed herein.

12.     Shelby Propane Gas Company, Inc. ("Shelby") is an Alabama corporation with its principal place of business in Montevall, Alabama.  Shelby serves residential, commercial, industrial, agricultural and motor fuel propane customers in the southeast.

13.     During the relevant period, Shelby purchased propane directly from producers at prices that were artificially inflated as a result of defendants' wrongful and illegal monopoly and corner detailed herein.

14.     Suburban Gas Incorporated ("SGI") is an Alabama corporation with its principal place of business in Alabama.  SGI serves residential, commercial, industrial, agricultural and motor fuel propane customers in the southeast.

15.     During the relevant period, SGI purchased propane directly from producers at prices that were artificially inflated as a result of defendants' wrongful and illegal monopoly and corner detailed herein.

16.     Deupree Gas, Inc. ("Deupree") is an Alabama corporation with its principal place of business in Alabama.  Deupree serves residential, commercial, industrial, agricultural and motor fuel propane customers in the southeast.

17.     During the relevant period, Deupree purchased propane directly from producers at prices that were artificially inflated as a result of defendants' wrongful and illegal monopoly and corner detailed herein.

**B.     Defendants**

18.     Defendant BP America Inc. ("BP America") was a wholly owned subsidiary of BP p.l.c.  BP America was a holding company incorporated under the laws of the State of Delaware and headquartered in Warrenville, Illinois, within the Northern District of Illinois.

4

19.     Defendant BP Corporation North America Inc. ("BP Corporation") was a subsidiary of BP America at all times relevant herein.

20.     Defendant BP International Services Company ("BP International") was a subsidiary of BP America at all times relevant herein.

21.     Defendant BP Products North America Inc. ("BP Products") was a subsidiary of BP America at all times relevant herein.  BP Products maintained its principal place of business in Warrenville, Illinois and is one of the largest producers of natural gas liquids, including propane, in North America.

22.     Defendant BP Energy Company was a subsidiary of BP America at all times relevant herein.

23.     Defendant BP America Production Company ("BP Production") was a subsidiary of BP America at all times relevant.

24.     Within and across the corporate structure of BP, there were a number of groups, business units, teams and employees focused on specific aspects of the companies' business. These groups, business units and employees were not separate legal entities but rather existed within and across various BP legal entities.

25.     Defendants BP America, BP Corporation, BP International, BP Products, BP Energy, BP Production and the groups, business units, teams and employees described herein, are collectively referred to as "BP" or "Defendants."

## IV.     THE NGL TRADING BENCH AND SUPERVISORY EXECUTIVES

26.     The organizational group responsible on a global basis for overseeing BP's trading activity was the Integrated Supply & Trading ("IST") group.  Within IST there were a number of regional business units.  The regional business unit responsible for the trading of gas

and power products, including propane, in North America was North America Gas & Power ("NAGP").  During 2003 and 2004, the team within NAGP focused on the trading of natural gas liquids, including propane, was known as the NGL trading bench ("NGL Trading Bench" or the "Bench").

27.    A separate regional business unit responsible for the production, transportation, and sales of natural gas liquids, including propane, in North America was the Natural Gas Liquids Business Unit "NGLBU").

28.    During February 2004, the NGL Trading Bench was located in Houston, Texas, and employed approximately eight traders.  All of the members of the NGL Trading Bench were employees of BP America Production, reporting to managers and other executives who were employed by other BP America subsidiaries.  The NGL Trading Bench entered into contracts to purchase and sell propane on behalf of BP Products.

29.    The NGL Trading Bench purchased and sold propane for use in BP Products' wholesale and petrochemical businesses, and for speculative purposes to generate a profit.

30.    Donald Cameron Byers ("Byers") was the Chief Operating Officer of NAGP in both April 2003 and February 2004, and was later named the President and Chief Executive Officer of NAGP.   Byers was responsible, among other things, for the development, implementation, and execution of trading and marketing strategies for NAGP and was an employee of BP International.

31.    Martin Marz ("Marz") was the Compliance Manager for NAGP during the relevant period.  Marz sat on the NAGP trading floor and was an employee of another BP America subsidiary, BP America Production.

32.    Timothy Bullock ("Bullock") reported to the Chief Executive Officer or Business Unit Leader of NAGP.  Bullock was an employee of BP International.

33.    James Summers ("Summers") was the Vice President of Natural Gas Liquids ("NGL's") & Chemicals Trading for BP in February 2004, and reported directly to Byers.

34.    Mark Radley ("Radley") was the NGL Trading Bench Leader for BP in both April 2003 and February 2004.  Radley's responsibilities included the development and oversight of the NGL Trading Bench's trading strategies, and reporting to and seeking approval from executives who oversaw the NGL Trading Bench's trading operations.

35.    Dennis Abbott ("Abbott") was the "second-in-command" of NGL's trading in February 2004, and acted as the Trading Bench Leader in Radley's absence.  Under the direction of, *inter alia*, Radley, Abbott actively participated in the execution of the monopoly and corner of TET propane detailed herein.  In June 2006, Abbott pleaded guilty to conspiracy to manipulate the price of February 2004 TET propane.  Abbott faces up to five years in prison and a fine of up to $250,000.  He is presently cooperating with federal investigators.

36.    Cody Claborn ("Claborn") was the primary propane trader at BP from at least January 2003 to April 2005.

37.    The DPA includes allegations regarding the conduct of BP Trader #2.  According to the DPA, BP Trader #2 was a trader primarily responsible for trading ethane and other NGLs, as well as propane, during 2003 and 2004.  During February 2004, BP Trader #2 assisted with the trading of TET propane and aided in the execution of the manipulation scheme.  On information and belief, Plaintiffs believe that BP Trader #2 was Carrie Kienenberger.

38.    The DPA also includes allegations regarding the conduct of BP Trader #3. According to the DPA, BP Trader #3 was primarily responsible for trading other categories of

propane during 2003 and 2004, but also traded TET propane during the relevant time period.  On information and belief, Plaintiffs believe BP Trader #3 was Timothy Moby.

## V.     INTERSTATE TRADE AND COMMERCE

39.     At all times relevant herein, Defendants attempted to monopolize and did monopolize and corner the market for February 2004 TET propane with the purpose and intent of artificially inflating the price, and with knowledge their actions would artificially inflate the price paid for propane deliverable in February 2004.  TET propane is shipped and delivered within states and across state lines, and thus Defendants engaged in wrongful conduct that involved United States commerce among many states.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.     The Manufacture and Distribution of Propane

40.     Propane is a by-product (referred to in the industry as a "co-product") either from the refining of petroleum or from the fractionation of natural gas produced from natural gas fields or wells.  Fractionation is the process of separating certain gases such as propane, butane and ethane from natural gas.

41.     As detailed below, the principal means of storing and transporting substantial quantities of propane around the country is through established storage and pipeline systems. These pipeline systems originate at underground storage caverns, called "hubs," where large quantities of propane are collected from refineries, fractionation facilities, imports and gas fields. Existing pipeline systems within the United States feed separate geographic regions of the country.

42.     In addition to pipeline systems, propane in any specific geographic region is available from two other sources: propane produced and sold directly from refineries and

fractionation facilities located within the region, and imported propane transported by rail, truck, barge or ship to private storage facilities in the region.

43.    Propane has two principal uses, as fuel for commercial and residential heating, particularly in the mid-Western and Northeastern United States, and in the production of plastics by the petrochemical industry.  Commercial (including agricultural) and residential use represent approximately 60% of propane consumed.  Petrochemical industry consumption represents the remaining approximately 40%.  The demand for commercial and residential propane for heating is highly seasonal, peaking in winter.  Petrochemical demand is more stable year-round.

**B.    The Nation's Propane Pipeline Storage and Delivery Systems**

44.    During the relevant period, two major propane storage and distribution hubs operated in the United States east of the Rocky Mountains – Mont Belvieu, Texas and Conway, Kansas.  Major propane producers, including BP, had significant crude oil refining operations in or near Mont Belvieu, Texas, which fed propane into these storage caverns.  In addition, BP had large natural gas and fractionation operations in the Gulf area that also fed propane into the Mont Belvieu caverns.

45.    TEPPCO Storage Partners LP and Duke Energy Field Services[1] co-owned several of the caverns located in Mont Belvieu during the relevant period.  Propane stored in these caverns was referred to and traded in the industry as "TET propane."[2]  As detailed below, TET propane was shipped from Mont Belvieu through the Texas Eastern Products Pipeline Co. LLC ("TEPPCO") pipeline system.

46.    In addition to propane stored in the TET cavern (and delivered through the TEPPCO pipeline), producers stored propane in other caverns at Mont Belvieu, which was then

---

[1] Duke Energy Field Services is a joint venture between Duke Energy Corporation and Philips Petroleum Company.
[2] The original owner of this cavern was the Texas Eastern Transmission Corp., or "TET."

transported through other pipeline systems through Texas and the Southeast. These systems included, principally, the Enterprise pipeline system, which ran from Mont Belvieu down along the Texas Gulf Coast, and the Dixie pipeline system, which ran through Louisiana, Mississippi, Georgia, and up into North Carolina. The propane stored in these caverns was referred to and traded in the industry as "non-TET propane." The Mid-America Pipeline Company ("MAP CO") pipeline system transports propane from the Conway, Kansas storage caverns through the central portion of the country. Each of these pipeline systems services distinct geographic areas in the country.

### C.    Market Participants for Propane

47.    Various market participants were involved in the propane industry during the relevant period. As described above, producers, including BP, produced propane either in natural gas fractionation facilities or oil refineries as a by-product of their refining operations. During the relevant period there were at least eight major producers of propane. BP was one of the largest. Producers sold propane to various other market participants, including wholesalers and marketers. Wholesalers purchased propane for resale to marketers. Marketers were companies that bought propane either directly from producers or from wholesalers for sale and delivery directly to commercial and residential consumers.

48.    Then, as now, pipeline companies did not take title to the propane. They charged government-set tariffs for transporting the propane. Brokers were companies that facilitated purchase and sale transactions between other market participants. Brokers also did not take title to the propane. Traders were companies that bought and sold propane. Traders did take title to the propane they purchased.

**D.      The TEPPCO Pipeline Service Area**

49.      During the relevant period, the TEPPCO pipeline serviced an area that include all or portions of the following nineteen states:  Arkansas, Delaware, Illinois, Indiana, Kentucky, Missouri, New Jersey, New York, Southern Ohio, Pennsylvania, Northern Tennessee, Virginia, West Virginia, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire and Maine. These nineteen states and/or portions of these states, as well as the District of Columbia, are collectively referred to herein as the "TEPPCO Pipeline Service Area."  The TEPPCO pipeline either ran through these states or ran through states contiguous to them, or was a major source of propane supply into these states and the District of Columbia.

50.      The TET propane transported through the TEPPCO pipeline was the dominant source of supply in the TEPPCO Pipeline Service Area.  Throughout the TEPPCO Pipeline Service Area, Mont Belvieu OPIS TET pricing was the benchmark price or index at which propane.

**E.      The Supply and Delivery of Propane into the TEPPCO Pipeline Service Area**

51.      There were three sources of propane into the TEPPCO Pipeline Service Area: Propane from the TEPPCO Pipeline; Refinery Production; and Propane Imports.

52.      <u>Propane from the TEPPCO Pipeline</u>.  Market participants purchased and took delivery of TET propane at terminals – off-loading points along the TEPPCO pipeline.

53.      <u>Refinery Production</u>.  Producers also sold propane produced in refineries located in the TEPPCO Pipeline Service Area.[3] Market participants contracted directly with these producers, and took delivery of propane at the producers' refineries.  During the relevant period, eighteen refineries operated within the TEPPCO Pipeline Service Area, located in Arkansas,

---

[3] Only *de minimus* natural gas fractionation occurred in the TEPPCO Pipeline Service Area during the relevant period.

Delaware, Kentucky, New Jersey, Pennsylvania, Tennessee, Virginia and West Virginia. These refineries were responsible for approximately 13 percent of the propane sold in the TEPPCO Pipeline Service Area.

54.    Propane Imports. Imported propane was also transported into the TEPPCO Pipeline Service Area by producers, wholesalers and other market participants. Imported propane entered by rail, truck, barge or ship from Canada and other foreign sources, including Europe, Africa and South America. Points of entry into the TEPPCO Pipeline Service Area for this imported propane were Virginia, New York, Rhode Island, New Hampshire and Maine. During the relevant period, BP was a major producer of propane from its natural gas fractionation facilities in Canada. BP sold the propane it stored at the Sarnia, Ontario, Canada facilities for export into the TEPPCO Pipeline Service Area. This propane was transported from Sarnia into the TEPPCO Pipeline Service Area by rail and truck through points of entry in upstate New York and Vermont.

55.    Imports were responsible for approximately 31 percent of the propane sold in the TEPPCO Pipeline Service Area overall, but only approximately 12 percent of the propane sold in the TEPPCO Pipeline Service Area excluding the six New England states. Imports from Sarnia constituted approximately 40 percent of all imports into the TEPPCO Pipeline Service Area.

56.    Regardless of the source of supply, whether from Canada, Europe or Africa, propane bound for the TEPPCO Pipeline Service Area was sold based on Mont Belvieu OPIS TET pricing. Foreign producers, including BP, sold propane directly to wholesalers, marketers or other market participants based on Mont Belvieu OPIS TET pricing.

### F.    Over-the-Counter Transactions for TET Propane

57.    During the relevant period, TET propane traded on an over-the-counter basis. Over-the-counter trades were transactions between two parties for a specified volume of TET propane, typically of a minimum of 1,000 barrels.  In any given month, market participants bought and sold propane for delivery in either the current month or future (or "out") months. Various market participants, including producers, wholesalers, traders, and commercial buyers like petrochemical companies entered into trades for TET propane ("TET trades").  The parties to these transactions negotiated the price, arriving at a specified dollar value for the transaction.

58.    During the relevant period, various available services - - including Chalkboard - - allowed buyers and sellers to post bids and offers for TET propane.   Although these bids and offers were posted on an anonymous basis, once the parties closed the deal, the parties' identities were then disclosed to one another to permit them to finalize delivery and payment terms.

59.    Counterparties also traded during the relevant period directly with each other.  As with Chalkboard transactions, the terms of these directly negotiated transactions were also reflected in written negotiated contracts.

60.    Over-the-counter transactions were also arranged through brokers.  As noted above, brokers did not take title to traded propane; rather, they served instead to match supply and demand in the market.  Brokers acted similarly to Chalkboard by maintaining anonymity (at their principal's request).  However, as with Chalkboard, the parties had to negotiate directly with each other to finalize delivery and payment terms.

61.    Like any other market, the pricing of TET propane in over-the-counter trading during the relevant period was determined by supply and demand.  Participants in the TET market subscribed to various services to acquire a constant flow of information regarding

available bids and offers over the course of the day. Defendants' manipulative accumulation of TET propane tightened the supply of TET propane and artificially raised February 2004 Mont Belvieu OPIS TET prices to supra-competitive levels. As set forth below, when participants in the market sought to settle their over-the-counter transactions, either financially or through covering by purchasing propane in the market, they were damaged as the result, *inter alia*, of having to pay these supra-competitive prices.

62.    In addition, January 2004 New York Mercantile Exchange (NYMEX) futures trading for February 2004 propane specified delivery to the TEPPCO system. Nearby futures prices (*e.g.*, prices for the next month out, namely futures trading in January for February propane) were affected by the Defendants' accumulation of their long position in February TET propane during the month of January. This illegal conduct drove up the nearby futures price in the NYMEX futures market, resulting in damages to NYMEX participants who had to settle their positions by paying the resulting inflated prices.

### G.    Other Propane Transactions Based on Mont Belvieu OPIS TET Benchmark Pricing

63.    Even beyond the TEPPCO Pipeline Service Area, Mont Belvieu OPIS TET pricing was used as the benchmark price or index at which propane, regardless of the source of supply, was bought and sold.

64.    Importers of propane bought and paid prices for such propane based on Mont Belvieu OPIS TET pricing even though that propane was not bound for the TEPPCO Pipeline Service Area.

**H.    The OPIS Price Reporting System and Mont Belvieu OPIS TET Benchmark Pricing**

65.    The primary means of tracking and reporting propane spot transactions in the United States is the Oil Price Information Service, or OPIS.  OPIS describes itself as the world's most comprehensive database and source of wholesale petroleum pricing and news information. On a daily basis, OPIS monitors more than 70,000 rack prices for multiple petroleum-based products, including heating oil, gasoline, diesel and propane.  Market participants for propane subscribe to OPIS, or otherwise have access to OPIS daily pricing information.

66.    During the relevant period, OPIS separately tracked and reported pricing information for virtually all propane spot transactions of at least 10,000 barrels[4] or greater quantity occurring for, *inter alia*, propane sold out of the Conway, Mont Belvieu TET and Mont Belvieu non-TET hubs.  These transactions were either voluntarily reported to OPIS by one of the counterparties to the transaction, or were identified by OPIS representatives when canvassing the market over the course of a day.

67.    At the end of each day during the relevant period, OPIS reported the high, low and simple average price from among all confirmed spot transactions entered into that day for, *inter alia*, Conway, TET and non-TET propane.  For each of these hubs, OPIS separately reported the high, low and average daily prices on three types of spot transactions, "out" – reflecting spot trading in the next month's propane; "prompt" – reflecting spot trading in the current month's propane with delivery due within the next 72 hours; and "any" – reflecting spot trading in the current month's propane with delivery due at any time during the month, but typically occurring at or near the end of the month.  The average OPIS "prompt" price reported

---

[4] There are 42 gallons to a barrel of propane.

daily for TET propane spot transactions was referred to in the industry as "Mont Belvieu OPIS TET."

68.    During the relevant period, OPIS was widely recognized as providing the most reliable and transparent pricing information available for propane transactions. OPIS was one of the leading reporting publications in the petroleum-based products industry. OPIS reports on its webpage that more than 100 billion gallons of fuel annually are pegged to OPIS benchmark prices. OPIS has been the industry benchmark for propane pricing since at least 1986. Prior to that time, there was no reliable public disclosure of propane transaction prices. The determination of prices charged to purchasers of propane was largely opaque and left to the discretion of the producers. Absent a public and respected pricing benchmark, there was no objective and publicly reported cross-check against which a customer could assess the reasonableness of a quoted price. By creating an open and transparent reporting system, OPIS brought uniformity and standardization to propane pricing.

69.    OPIS daily reporting of prompt, any and out transaction prices for TET propane represented the single most respected and comprehensive system for reporting open, transparent and arm's length daily transactional prices for the dominant source of propane supply for the TEPPCO Pipeline Service Area. As such, Mont Belvieu OPIS TET pricing was uniformly understood to be, and accepted as the benchmark or index price for propane produced or delivered in the TEPPCO Pipeline Service Area. Mont Belvieu OPIS TET pricing not only set the price of TET propane sold from the TEPPCO pipeline; prices for propane sold from local refineries, storage facilities and imported propane were based on it as well.

70.    Defendants have admitted in the DPA that OPIS TET pricing was the industry pricing benchmark. For example, in ¶ 60 of the DPA Statement of Facts, BP admitted that:

BP also engaged in conduct to affect the daily and monthly price published by OPIS by posting bids significantly above the prevailing bid at certain times during the day or by attempting to prevent a transaction that otherwise would have affected the OPIS average price from being reported.  In the context of the market manipulation scheme, this conduct was intended to present false information to the market concerning the actual availability of TET propane, *was intended to subvert the integrity of the industry benchmark average price*, and was intended to defraud certain counterparties.

(Emphasis added); *see also*, DPA Statement of Facts, ¶¶ 8, 59, 61.  A true and accurate copy of the DPA including Statement of Facts is attached as Exhibit A.

### I.    Supply Contracts and Purchase Agreements

71.    Many market participants secured necessary supplies of propane for the winter heating season through the long-term supply contracts, often negotiated during the preceding spring.   Wholesalers and marketers, for example, contracted with producers and other wholesalers for set amounts of propane, deliverable in designated amounts on a monthly basis at specified locations.  Under the terms of supply contracts, as discussed below, the price the buyer paid was not pre-set at the time the contract was entered into, but rather was determined at the time of delivery based on contractual pricing formulas expressly tied to Mont Belvieu OPIS TET pricing.

72.    In addition to purchases made pursuant to supply contracts, market participants also purchased propane as needed on any given day.  The price term for these "purchase agreements" was determined at the time of delivery.  The prices paid in these transactions were based on Mont Belvieu OPIS TET.

73.    During the relevant period, market participants entered into supply contracts and purchase agreements directly with producers for TET propane, for delivery at TEPPCO terminals, as well as for propane produced at refining facilities, or imported or shipped to private storage facilities located in the TEPPCO Pipeline Service Area.

### J.    Pricing Methods for Supply Contracts and Purchase Agreements

74.    During the relevant period, market participants principally used one of two pricing methodologies for propane sold in the TEPPCO Pipeline Service Area under long-term supply contracts or pursuant to purchase agreements.  These methods applied whether the propane was sold off the TEPPCO pipeline, from local refineries or imported to storage facilities. As detailed above, because Mont Belvieu OPIS TET was the industry benchmark price in the TEPPCO Pipeline Service Area, propane sold there was priced by express reference in the contract or purchase agreement to Mont Belvieu OPIS TET pricing – for example, to either the daily reported Mont Belvieu OPIS TET price in effect the day of delivery, the average of the preceding five or ten business days' Mont Belvieu OPIS TET prices, or using some other formula based on Mont Belvieu OPIS TET pricing.  Propane was also sold based on a daily set "rack" or "posted" price, which was also tied to the daily reported Mont Belvieu OPIS TET pricing.

75.    Sales prices for propane sold off of the TEPPCO pipeline also included transportation charges in the form of government-set fixed tariffs, set for each terminal point, and non-negotiable line loss charges, calculated to reflect propane lost from the pipeline during transportation.  In addition, state and federal environmental fees were also added to all propane sold.  The only discretionary pricing component was the "seller's margin" – which reflected whatever markup the seller chose to add.  All other costs were pre-set and controlled.

### K.    Petrochemical Industry Purchases

76.    As noted above, the petrochemical industry consumes propane on a year-round basis.  Pursuant to a process called thermal cracking, feedstock such as propane is "cracked" into, among other end products, ethylene, which is then used to produce plastics.  Because of the

substantial quantities of propane consumed by the petrochemical industry, the majority of ethylene crackers are located along existing pipeline routes or near ports. In the eastern portion of the United States, the majority of these facilities are located along the Gulf Coast or around the Enterprise pipeline system.

77.    Petrochemical companies in the southeastern part of the United States price overseas propane imported from, for example, Africa and Europe, at Mont Belvieu OPIS TET pricing or a blend of Mont Belvieu OPIS TET and non-TET pricing. In addition, during the relevant period, petrochemical companies bought propane directly from BP at prices tied to Mont Belvieu OPIS TET pricing.

78.    As set forth in detail below, through their monopolization and corner, Defendants drove up the prices of propane throughout the TEPPCO Pipeline Service Area to supra-competitive levels. Direct purchasers throughout the region were injured.

## VII.    DEFENDANTS' EXECUTION OF THEIR PROPANE MONOPOLY AND CORNER

### A.    Defendants' Trial Run of the Propane Monopolization and Corner in April 2003

79.    Radley, the NGL Bench Leader, and members of the NGL Trading Bench conspired to manipulate the price of TET propane during February 2004 based, in part, on information and experience gained in April and May 2003 when members of the NGL Trading Bench attempted to manipulate the price of April 2003 TET propane. During April 2003, the NGL Trading Bench attempted to corner April 2003 TET propane by taking a large long position while simultaneously attempting to corner the supply of April 2003 TET propane inventory. Through this strategy, the NGL Trading Bench members sought to make money by holding back on their April 2003 TET propane inventory until the price increased based on the resulting lack

of supply, and then selling to market participants who were short, and had to come to BP to cover their positions in April 2003 TET propane.

80.     In pursuit of this strategy, going into April 2003, BP had established a significant long position in April 2003 TET propane.  On April 2, 2003, in a taped conversation[5] (a transcript of which is attached as Exhibit B hereto), Abbott called Claborn.  Radley joined the conversation, which included the following statements:

<u>Abbott</u>:  How does it feel taking on the whole market man?

<u>Claborn</u>:  Whew, it's pretty big man.

<u>Abbott</u>:  Dude, you're the entire [expletive deleted] propane market.

\* \* \*

<u>Radley</u>:  Don't worry about it, it's the first two days of the month.  Plenty of lead time for people to think that barrels will emerge and take a short position.

\* \* \*

<u>Abbott</u>:   No, I mean, it's cool, 100% of the open interest in propane, probably, and uh 3% of the open interest in nat gas . . . I dig it, it just, sometimes it's hard, it just feels hard to take on the whole market sometimes.

\* \* \*

<u>Radley</u>:  Here's my one fear, and it's a significant fear.  Everybody waits until the last [expletive deleted] day to cover, and then we get wound up in a [expletive deleted] bunch of legal disputes.  That's my fear.

<u>Abbott</u>:  Yeah.

<u>Radley</u>:  That's my fear.  People don't cover, don't cover, then the last day they either default or come to us to get them out of it and then we have to try and basically set a price that seems fair. …

---

[5] Consistent with industry practice, during the relevant period, BP recorded the Trading Bench member's telephone conversations.  Trading Bench personnel were fully aware that their conversations were being recorded.  A true and accurate copy of all recording cited herein (as made publicly available by the U.S. Commodities Futures Trading Commission ("CFTC") were provided as exhibits to the CFTC Complaint, filed in the United States District Court for the Northern District of Illinois on June 28, 2006 (the "CFTC Complaint").

81.     Based on the April 2003 attempt to manipulate the price of TET propane, members of the NGL Trading Bench booked a profit and learned information they later used during the February 2004 manipulation strategy.  In particular, the NGL Trading Bench learned what they believed to be the "dead stock" level of TET propane, or the "minimum operating level" needed for the TEPPCO pipeline to function.  The traders' perception of the dead stock level, later coupled with knowledge of the total TEPPCO propane inventory, led the NGL Trading Bench to believe they could estimate the total size of the available inventory of TET propane, thereby allowing them to estimate the total amount of propane they would have to purchase to corner February 2004 TET propane and effectuate a manipulation.

**B.      Defendants Effectuated the February 2004 Propane Corner as Part of Their Long-Term Goal to Be Able to Effect a Corner "At Will" in the Future**

82.     Defendants believed that the month of February would be more susceptible to a successful propane market corner than April had been.  Their reasoning was discussed in a taped conversation between defendants Radley and Abbott on February 5, 2004:

Radley:   The second point is that … I would imagine the minimum operating level at the end of Feb is higher than it is at the end of March or April because I think wholesalers –

Abbott:   Have to have something on hand.

Radley:   Have to hold barrels.

Abbott:   In order to pump the first day.

Radley:   Do you know what I mean?

Abbott:   That's right.

Radley:   So I think the minimum level might be a little higher than we're assuming based on what we experienced in April [2003].  When we squeezed the April/May.

21

Abbott: Right, right. Right, which was one of the reasons why it was harder to own all that April. It was harder. That's why we had to take on a little bit more than we thought we had to take on in April. … And that's why I think that 2 million, 2.1 million barrels as that min in Feb., I think that's real, man, I think that is the – that's the bottom at TET.

*See* transcript of February 5, 2004 conversation, attached as Exhibit C hereto and Exhibit A at ¶ 31.

83. Defendants' recorded conversations and internal documentation make it clear that they planned to implement additional TET propane corners in the future. For example, defendant Radley was recorded in the February 5 conversation as stating:

Two things I thought of. … One, in terms of whether we should do this or not in terms of talking to Jim [Summers] is that what we stand to gain is not just we'd make money out of it, but we would know from thereafter that we could control the market at will. If we never break the threshold, we'll never know what the answer is, do you know what I mean?

84. Later in the same conversation, Radley and Abbott reiterated the same point:

Abbott: Okay. That's something to think about. I like that idea. I like – well, that's one way to pitch it, anyway, that there's value in knowledge.

Radley: Yeah, even if it's just for ourselves in terms of do – you know, needing the extra push to go for it if we're a little uncertain. You know, the payoff isn't just this year. It's saying for as long as we carry on trading.

Abbott: Yeah, and that's … kind of what my attitude is.

**C.    Defendants' Trading Strategies in Executing their February 2004 TET Propane Corner**

85. As detailed in both recorded conversations and in an internal assessment undertaken by BP following the February 2004 manipulation to ensure the increased efficacy of future corners, Defendants combined a strategy of buying up physical TET propane supplies with at least three related trading strategies in executing their February 2004 TET propane corner. They employed the first strategy in January 2004 (referred to herein as "Strategy #1"), when they

bought February "out" contracts, contracts for delivery of February TET propane. Using this strategy, Defendants ended the month of January with a substantial long position in February TET propane. A long position arises when a company incurs an obligation to buy and receive propane.

86.     In February, Defendants employed two additional strategies. They increased their long position by buying February TET propane "any" contracts, namely February TET propane deliverable in February (referred to herein as "Strategy #2"). In addition, based on their inside knowledge that, as the result of their monopoly and corner, they would artificially widen the spread (or price differential) between the February OPIS TET "any" price and the March OPIS TET "out" price over the course of February, Defendants also went long on the February/March spread (referred to herein as "Strategy #3"). In other words, Defendants went long (or bought) February TET and went short (or sold) March TET, intending to profit from the increased price spread their corner would create over the course of the month.

### D.     January Purchases of February TET Propane

87.     In pursuit of Strategy #1, during January 2004, BP built a sizable "long" position in February 2004 TET propane. By building this position, Defendants got a jump start on amassing control of February 2004 TET propane before February even began.

88.     During January 2004 Radley identified and discussed conditions relating to the TET propane market that would render the market ripe for manipulation. On January 8, 2004, in an audiotaped conversation with other BP employees, Radley stated that the propane market was "vulnerable to a squeeze."

89.     On January 13, 2004, in a conversation with another BP employee, Radley stated that the propane market was "tight enough that if someone wanted to play games with it, potentially they could."

90.     From Wednesday, January 7 until Friday, January 30, Defendants steadily increased their long position in February TET propane.  Defendants' January purchases of February "out" propane coincided with the dates of the two recorded conversations quoted above.  On January 8, Defendants had just completed a significant one-day purchase, almost doubling the size of BP's February TET long position from January 7.  On January 13, Defendants began a second push to increase their long position in February TET propane, which continued until the end of the month.

91.     Over the course of January, Defendants approximately tripled BP's position in February 2004 TET propane.  During January 2004 and the beginning of February 2004, Radley instructed the NGL Trading Bench to amass a significant position in February TET propane.  By the estimate of Summers, entering February 2004, BP owned contracts for delivery for nearly 50 percent of all the available TET propane.  In addition, the NGL Trading Bench entered into financial or "swap" contracts that would increase in value if the February 2004 TET propane prices rose.

92.     As a result of this conduct, beginning on January 7, 2004 Defendants artificially inflated, *inter alia*, the daily "out" prices reported by OPIS for Mont Belvieu February 2004 TET propane, injuring, among others, purchasers of February 2004 NYMEX futures contracts in January 2004, entities who sold February 2004 NYMEX futures contracts prior to January 2004 and were obligated to buy them back at artificially inflated prices to close their futures positions,

and entities who bought February "out" propane in January based on Mont Belvieu OPIS TET inflated prices.

**E.      Defendants' Manipulative Conduct Continued in February**

93.      Members of the NGL Trading Bench intended to earn a significant profit for BP by selling a portion of their February 2004 TET propane at the end of the month at prices inflated by their conduct, and then taking a small loss on the remaining barrels which would be carried into March.  As such, the NGL Trading Bench recognized that they would purchase more propane than BP needed for its own business or commercial purposes, or could actively sell to counterparties during February.  Furthermore, the NGL Trading Bench members could expect to profit personally by obtaining bonuses and other remuneration as a result of the anticipated profits BP would achieve through their market manipulation.

**(i)      Defendants' Propane Trading during the First Two Weeks of February**

94.      Beginning on the first trading day in February (Monday, February 2), Defendants actively began to implement trading Strategy #2, namely, the aggressive purchase of February TET "any" propane.

95.      By the end of the first week in February (Friday, February 6), Defendants had more than doubled the size of their February TET propane long position, to approximately 2.75 million barrels.

96.      An internal BP document (as quoted in the Commodity Futures Trading Commission (CFTC) Complaint against Defendants) described Defendants' employment of trading Strategy #3, namely going long the February/March spread:

> In February, 2004 the NGls trading bench entered into a strategy to create a long February – March spread … *The bench planned on holding a large portion of existing TET Mont Belvieu propane inventory.  It was believed that the resulting*

> *lack of supply at TET would drive up prices, further widening the spread. The bench would then liquidate its inventory at higher prompt prices before the end of February.* It was expected that only a small portion of the inventory would be rolled into March resulting in a minimal loss against a substantial gain.

(emphasis in the CFTC Complaint).

97.     Senior BP management were fully informed of, and authorized the execution of the propane monopoly and corner.  For example, Radley and Summers met with Marz, Compliance Manager for BP's NAGP unit, to obtain approval to proceed.  Marz not only gave his approval, he explicitly cautioned Trading Bench personnel to refrain from using certain words in conjunction with executing the scheme, including the word "squeeze."  As detailed below, personnel from the Trading Bench also had multiple conversations with Byers during the relevant period about the manipulative scheme and its execution.  Defendant Byers was the Chief Operating Officer for the NAGP unit.

98.     During the second week of February, BP, by and through its employees following directions from Radley, continued its aggressive purchase of February 2004 TET "any" propane. Defendants ended the day on Monday, February 9 having increased their long position through TET spot purchases of approximately 825,000 additional barrels.

99.     At approximately 4:45 p.m. CST on February 9, 2004, Radley (who was on vacation and thus was not in the office that day) called Claborn to get an update on the day's progress in executing the monopoly and corner.  Abbott subsequently joined the conversation.  A transcript of this conversation is attached hereto as Exhibit D.  During the conversation, Radley, Claborn and Abbott remarked that, among other things:

Claborn:  How much we got on?  I was just looking at that.  You want to guess?
3.1.

Radley:  You been busy today?

<u>Claborn</u>:  Oh, yeah.  Did it very quietly, ten lots, five lots, ten lots, fifteen here, five here.  The biggest lot I think I bought was 75.

<u>Radley</u>:  Off who?

<u>Claborn</u>:  Morgan Stanley.  We did get – right out of the chute we bought the 150s off Koch at 5/7/8.

<u>Radley</u>:  Yeah.

<u>Claborn</u>:  So we dropped that.  And then it was just a bunch of little ones, the little guys.  We did – Nordico (ph) did, God, 100, probably 150, 175 smoothly.  I mean there was no big lots, it's like fifteen here, ten here, then here, fifteen there.  I did two Chalkboard deals all day.

<u>Radley</u>:  Where was the spread at the end of the day?
3
<u>Claborn</u>:  I would say conservatively probably around 6-1/4.

<u>Abbott</u>:  6-1/2, 6-1/4.

* * *

<u>Abbott</u>:  I characterize it as I was kind of surprised we were able to get three hundred from the marketplace basically, maybe three, four hundred from the marketplace without moving it that much.  I mean, we definitely were moving it at the end of the day.  It was definitely firming up at the end of the day and it feels like it, you know, could – the market could have been anywhere, like sellers were at 65 cents or 62 cents, depending on where the market was, right?

<u>Radley</u>:  Yeah.

<u>Abbott</u>:  So it's kind of – it seems like something that will just kind of move fairly easily.  And then there's one more seller out there that's Dow.  I think Dow has one chunk they can do and it's about – maybe that's about it.

* * *

<u>Abbott</u>:  I mean tomorrow – Tomorrow if we are able to buy another four or five hundred thousand barrels tomorrow from the marketplace, I would be genuinely shocked, I mean really shocked.  So, you know, that's it.  Then I think we're just kinda – we'll just have to play a waiting game and see, you know, how it's going to shape up.

<u>Radley</u>:  Still remains to be seen, isn't it?  Still need to see some of these shorts come in.

Abbott:  Yeah, I mean I had – I mean, we –

Radley:  Were we the only buyer today?

Claborn:  Pretty much.

Abbott:  Pretty much.

Claborn:  There's a few other deals done besides us but nothing – not many at all. Just a few, not – I think you could put them all on one hand.  It wasn't us, but –

100.    Defendants recognized that the weather could affect the success of their manipulative scheme, as cold weather would cause demand to remain high throughout the month of February.  As such, they further noted:

Radley:  Well what about the weather outlook?

Claborn:  Yeah, it's still good.

Abbott:  The weather – yeah, I mean, the weather's still cold in the Northeast, I mean, the parts of the Midwest are now kind of just normal, normal temps is what they're forecasting, but the Northeast is still cold, still below and much bellows.  I mean, the other thing – I mean, the other thing that's – I mean, when you think about it, you know, we're not – talking with Cody [Claborn] here as we, you know, always talked about every single minute.  But, you know, we're not going to take delivery of the stuff till February 29th, right?  27th, 28th.

Radley:  Right.

Abbott:  I mean, the shippers who are going to be required to ship, yeah, they're not going to feel, people aren't going to feel concerned until it's time, right?

Radley:  Exactly.

Abbott:  This could be the last week.

Radley:  Sure, sure, that's right.  That's absolutely right.  There's no doubt about that.

101.    Defendants closely tracked the conduct of shorts for February 2004 TET propane:

Abbott:  There's absolutely shorts in the TET market, who will have to cover it. He [Trammogas] goes – so I mean he – he's not extremely bullish, but he just

thinks that, you – I mean, hey, I mean it's at, you know, 78 percent of crude.  I mean, it's not that cheap.  It's not expensive.

<u>Radley</u>:  No, no, no.  There's a long way to push it without <unintelligible>.

<u>Abbott</u>:  Yeah, yeah.

* * *

<u>Radley</u>:  This moment don't forget that although we might have three point one million long, we haven't got 3.1 million of physical yet, right?

<u>Abbott</u>:  No.

<u>Claborn</u>:  No we got 2.4 million right now.  It'll go down to 2.1 after it all priced from this point forward.

<u>Abbott</u>:  Yeah.

<u>Claborn</u>:  Well, it'll be about 2.2, I think.

<u>Abbott</u>:  It can get pretty exciting if we continue – if we go off 3 million long.  I mean, there will be – there will be – it will be exciting.

102.     Radley, Abbott and Claborn assessed the likely reaction of the market to their corner, noting:

<u>Radley</u>:  Oh, it sounds pretty good, sounds pretty good.  Something's got to give, doesn't it.

<u>Claborn</u>:  Got to give.

<u>Abbott</u>:  It could be very well, yeah, it could be very –

<u>Radley</u>:  <unintelligible> very curious.  You know, half of me is saying, look.  the fact that nothing's really moved in terms of spread yet is good, because people aren't, you know, looking for ways or alternatives or backing out demand or that sort of thing, so that's kind of a good thing.  The down side is, of course, it all happens at the last minute, it gets a bit messy, people start cheating, you know.

<u>Claborn</u>:  Not delivering.

<u>Radley</u>:  Not delivering.  You know, it starts to look a little bit funny as well, that the spread, you know, just erupts at the last minute.

Claborn:  And we don't get the price out on all this paper.

Abbott:  Well, then it's a different thing.  If we don't get a price out of this paper and we have –

Radley:  The advantage of paper, is that we're selling at an index price, there's no complaints.  If we squeeze it in the last four or five days of the month, forgive my French, it's going to be hard to say what's the fair price of the market at the time.

103.     Defendants described their efforts to deceive market participants into believing February 2004 TET propane was readily available, belying their active cornering activities. Specifically, Defendants caused offers to sell February TET propane to be presented to the market, but at prices set sufficiently above prevailing market prices so as to be unlikely to result in actual sales.  This strategy created the appearance – through the use of anonymous trading platforms like Chalkboard – that there were potentially multiple suppliers of February 2004 TET propane willing to sell:

Abbott:  I think as long as we continue to show two ways, I mean we continued to show offers today on the screen and we're showing offers just to get people comfortable with the idea of selling.  So we're continually offering it at the same time we're trying to pick up volume today.  And I think as long as you continue to show offers, then I think that's fair, you know.  We're giving some people an out, okay?

Radley:  Yep.

Abbott:  It's not – it's not unfair.  So we'll see.

Radley:  Sounds good, guys.

104.     As set forth in the CFTC Complaint, because of his use of the word "squeeze," when he returned from vacation, Radley brought the above conversation to the attention of Summers.  Summers testified under oath that he brought the conversation – and Radley's use of the word "squeeze" – to the specific attention of Byers and Marz.  He further testified that all three individuals then reviewed the audiotape.  Byers testified before the CFTC that Tim

Bullock, then President of BP NAGP also became aware of Radley's description of BP's February 2004 TET propane strategy as a "squeeze."

105.    In the above quoted February 9 conversation, Claborn stated that BP owned 2.4 million barrels of physical TET propane as of that day.  Total TEPPCO system propane inventory fell slightly between February 9, 2004 and February 13, 2004, decreasing from just over 3.2 million barrels on February 9, 2004 to just over 3.1 million barrels on February 13, 2004.  As of February 9, BP already owned approximately 75% of total February TET propane inventory.

106.    During this same period, Defendants further increased their February long position by over 1.4 million barrels.  BP's long position by the close of business on Friday, February 13, exceeded 3.2 million barrels.  Thus, as of February 13, 2004, BP's long position in February 2004 TET propane exceeded the *entire* TEPPCO system propane inventory.

107.    Between February 9 and February 27, 2004, members of the NGL Trading Bench caused bids and offers to be presented to the market via Chalkboard which were designed to falsely reflect that there was more buying or selling interest in the market than actually existed. BP also engaged in conduct to affect the daily and monthly average price published by OPIS by posting bids significantly above the prevailing bid at certain times during the day or by attempting to prevent a transaction that otherwise would have affected the OPIS average price from being reported.  In the context of the market manipulation scheme, this conduct was intended to present false information to the market concerning the actual availability of TET propane, was intended to subvert the integrity of the industry benchmark average price, and was intended to defraud certain counterparties.

108.    As reported by OPIS, the average "any" price of February 2004 Mont Belvieu TET propane rose during the first two weeks of February, from a low of around 61 cpg to 70.125 cpg on Friday, February 13.

109.    As the result of Defendants' manipulative conduct described above, prices paid in over-the-counter transactions for TET propane during this two week period were artificially inflated.  Market participants who purchased February 2004 TET propane directly from BP or any other producer in over-the-counter trading were injured.  As detailed above, the OPIS system reported daily average, high and low prices for Mont Belvieu TET propane.  Mont Belvieu OPIS TET pricing was the benchmark or index on which market participants throughout the TEPPCO Pipeline Service Area bought and sold propane, whether delivered through the TEPPCO pipeline, or purchased from a refinery or imported from Canada or overseas.  As the result of Defendants' conduct, Mont Belvieu OPIS TET pricing rose to supra-competitive levels.  These inflated prices reverberated throughout the TEPPCO Pipeline Service Area, damaging market participants, including wholesalers and marketers, who purchased propane directly from BP or any other producer through supply contracts and purchase agreements based on Mont Belvieu OPIS TET pricing.

### (ii)    Defendants' Propane Trading During the Third Week of February

110.    On Sunday, February 15, 2004, there was a rupture in the TEPPCO pipeline near Coshocton, Ohio.  TEPPCO issued a press release that advised that operations of all terminals, including propane terminals, east of Todhunter, Ohio – with the exception of Eagle, Pennsylvania – would be suspended until the pipeline could be repaired.  The pipeline rupture had the effect of increasing the amount of TET propane remaining in and available at the TET

storage caverns.  By February 16, 2004, the total TEPPCO system inventory had increased to just over 3.3 million barrels.

111.    In testimony before the CFTC, Summers acknowledged that even though, at the time the pipeline ruptured, Defendants' position in February 2004 TET propane was much greater than the demand initially anticipated by the Trading Bench, BP further increased its February 2004 TET propane position because of the rupture.  He stated that if:

> [BP] hadn't purchased that volume, then the short positions would be buying that volume from the marketplace, so we wouldn't be in a position to meet that demand. …  If we had chosen not to buy it or in fact sell our position, then the shorts could have covered a large portion of their positions at that time.

112.    In a February 16, 2004, taped conversation, Claborn made it clear that Byers was being kept apprised of how the execution of the monopoly and corner was unfolding during the relevant period.  Specifically, Claborn said that " . . . he talked to Cameron,[6] told him what we were doing, Cameron said just don't try to bring any extra attention . . .."

113.    Defendants continued their aggressive purchasing campaign of February 2004 TET propane between Tuesday, February 17 and Friday, February 20.  During that week, Defendants – by and through BP's employees, under Radley's direction – purchased at least an additional 1.4 million "any" barrels of February 2004 TET propane.  By the close of business on February 20, Defendants' position in February 2004 TET propane had increased to just under 4.7 million barrels.

114.    The total TEPPCO system propane inventory steadily increased from just over 3.4 million barrels on February 17 to just over 3.6 million barrels on February 20, 2004.  The prices of February TET propane increased over the course of the week.  Throughout this week,

---

[6] The only person with supervisory authority over the NGL Trading Bench that went by the name of "Cameron" at the time was Byers.

Defendants' position in February 2004 TET propane continued to exceed the entire TEPPCO system propane inventory, at times by as much as one million barrels.

115. On February 19, 2004, at approximately 9:30 a.m., Byers, Marz, Summers and Radley met in Byers' office to discuss the Trading Bench's activities with respect to February 2004 TET propane. In that meeting, Radley informed Marz and Byers that BP's position in February 2004 TET propane "exceeded the availability of barrels in the marketplace at that time." Marz acknowledged that during the meeting they discussed the fact that Defendants' TET position on that date was around 4.5 million barrels, and that the total available supply currently in TET storage was around 3.5 million barrels.

116. Radley informed Byers and Marz that the Trading Bench could unwind the large position it had built in February 2004 TET propane if that were Byers' and Marz's decision. Following the February 19, 2004 meeting, Defendants not only chose not to unwind BP's February 2004 TET position, they continued to *increase* their position in February 2004 TET propane.

117. At this same meeting, Byers, Marz and Radley also discussed the fact that the Trading Bench had exceeded the BP policy trading limit – which exposed BP to levels of financial risk that could be maintained only with management approval. As detailed herein, following the February 19 meeting, Defendants continued to exceed this trading limit.

118. Defendants' conduct artificially inflated the Mont Belvieu OPIS TET pricing, raising the average reported Mont Belvieu OPIS TET "any" price from 67.125 cpg on February 17 to 71.125 cpg on February 20. As a result, Defendants also increased the spread between the price of February and March TET propane to supra-competitive levels, driving the spread to 9.63 cpg on February 17 and to 12.44 cpg by February 20.

119.    By the third week of February, rumors were circulating among market participants that there was a corner on.  As described below, purchasers had little recourse to alternative supplies in the short run in the face of ever rising prices.  Little additional supply could or did come into the market to offset the Defendants' monopoly position, leaving daily over-the-counter trading constrained by the Defendants' grip on the February TET supply and purchasers injured by the resultant artificial and inflated prices.  In addition, purchasers of February TET propane, bound by pricing terms in their supply contracts and purchase agreements tied to Mont Belvieu OPIS TET pricing, even if aware of pricing abnormalities, had little option but to honor their contracts and pay the artificially inflated prices.  Defendants knew that as they drove up the price of Mont Belvieu OPIS TET, market participants throughout the TEPPCO Pipeline Service Area would be and in fact were damaged as they sought to ensure the propane supplies needed to service heating and commercial demand in the region.

(iii)    **Defendants' Actions during the Final Week of February**

120.    On Monday and Tuesday, February 23 and 24, Defendants – by and through BP employees and following Radley's directions – further increased their position in February 2004 TET propane.  Defendants bought February 2004 TET "any" propane at prices ranging on Monday from 73.5 to 75.125 cpg, and on Tuesday from 74.25 cpg to 78.25 cpg.

121.    The OPIS average price for February 2004 TET propane on February 23, 2004 increased to 74.6875 cpg, an increase of 3.5625 cpg over the OPIS average February 2004 TET propane on February 20, 2004.  Some TET propane market participants began to suspect BP might be affecting the price of February TET propane.  For example, in an instant message between two market participants, the CFTC reported the following conversation:

Participant A:  is this just an amazing short squeeze for Feb TET?  last kick at the TET cat combined with shorts . . . . . or is something else miraculous going on?

Participant B:  it bp – trying to squeeze – but the weather is not cooperating – not going to be like last year – and they have a huge position in a market that is .16.17 backward.

Participant B:  tet inventories built almost 500mb from firday [sic] thry [sic] Sunday

Participant A:  very nice!  thnx

Participant B:  you doing well?

Participant A:   then the rascals use the hi TET numbers to try supporting pricing increases in Michigan and other places!

Participant B:  tell you what . . . . . if they push it up over here, Exxon and Kinetic will jettison (even more) their own product and BP will have lots of product to get next year's prebuy programs off to a start.

Participant A:  a high priced start . . . . . they'll have to pull that old "you should pay a premo price because of BP's exceptional service and reliability" cards [sic].

122.    After 11:00 a.m. on February 24, BP employees, following directions by Radley, sold over 500,000 barrels of February 2004 TET propane at supra-competitive prices of between 79 cpg and 88.25 cpg.  Reflecting BP's dominant and controlling position in February 2004 TET propane, on February 24, 2004, between 12:33 and 4:35 p.m., there were *no* offers on Chalkboard to sell February 2004 TET propane in volumes greater than 10,000 barrels *other than* those offers made by Defendants themselves at noncompetitively set inflated prices.

123.    On February 24, 2004, Abbott sold 30,000 barrels to a counterparty.  They agreed that the contract price for that propane was determined based on the OPIS daily average price for each subsequent trading day in February.  The counterparty was not informed that BP was involved in posting "high floor" bids, "stacking" multiple offers and bids, "stepping up the price," posting deceptively low "wet" March offers,[7] or withholding supply from the market during the three-day contract term.  BP's conduct had the effect of manipulating the OPIS

---

[7] A transaction for "wet" propane requires delivery of the propane on a specified date within the contract month.

average price for each pricing day of that contract, and defrauded the counterparty who purchased TET propane based on the OPIS benchmark.

124.    On Wednesday, February 25, 2004, BP employees, following Radley's instructions, continued their aggressive purchase of February 2004 TET propane, buying more than 600,000 additional barrels at prices between 85.25 cpg and 91.25 cpg.  As the result of their illegal conduct, Defendants were able to force the purchase price for TET propane in the over-the-counter market to a reported OPIS high of 92.75 cpg.

125.    On Thursday, February 26, 2004, Defendants purchased over 250,000 additional barrels of February TET propane a prices between 79.5 cpg and 84 cpg.  In furtherance of the corner, they *refused to sell* any February 2004 TET propane to the market.

126.    At certain times during late February, members of the NGL Trading Bench refused to sell TET propane inventory to counterparties as part of their strategy to drive up the price.  Acting at the direction of the NGL Bench Leader, the traders at certain times refused to show offers or sell any of BP's TET propane, even though BP held contracts for delivery of millions of barrels, and in at least one instance a counterparty had offered "best bid."

127.    For example, on February 23, 2004, Claborn stated to a counterparty:

> Counterparty:  Can you use any Dynegy propane?
>
> Claborn:  Yea
>
> Counterparty:  Do you have any TET you can sell?
>
> Claborn:  Thought you were asking me about Dynegy.
>
> Counterparty:  Well I am.  I got a guy who wants to sell Dynegy and buy TET. Do you have any TET you can sell?
>
> Claborn:  Not right now, I don't, but I'll take the Dynegy side.

At the time Claborn refused to sell, BP's position exceeded 4 million barrels.

128.    Similarly, on February 26, 2004, BP Trader #2 stated to a counterparty:

Counterparty:  I'm looking for 5,000 barrels of TET propane, didn't know if you guys were selling or not.

BP Trader #2:  No we're not right now, actually.

*    *    *

Counterparty:  If you guys decided to come back in, I'm the best bid at five.

At the end of this conversation, BP held contracts for delivery of approximately 4.9 million barrels of February TET propane.

129.    The total TEPPCO system inventory for that day increased to just over 4.3 million barrels of propane.  As the result of the execution of Defendants' scheme, by the end of the month, BP owned over 88 percent of all February 2004 propane inventory in the TEPPCO system, and carried a position of over 5.1 million barrels.

130.    At the beginning of February 27, 2004, the last trading day of the month, BP held contract for delivery of approximately 4.9 million barrels of February TET propane.  Early on that date, employees, following Radley's directions, purchased approximately 50,000 additional barrels of February TET propane before 9:00 a.m.

131.    This meant that although BP already owned contracts for more than the deliverable supply of February TET propane on the last trading day of the month, they nonetheless bought more in an effort to ensure that they would be the only company in the market that could sell significant quantities of TET propane.

132.    By 10:00 a.m., BP was the primary seller of February 2004 TET propane for any significant volume.  BP employees, including Claborn – acting at the direction of Radley – were able to and did dictate the price of this propane as they released it for sale to, *inter alia*, shorts who needed it to cover their contractual obligations.

38

133.   BP's market dominance was explicitly captured on a recorded conversation between Claborn and a voicebroker:

Voicebroker:  Where's your next one?

Claborn:  O.K.  Confirm, Anadarko buys 25,000 physical TET Feb. at .8850.

Voicebroker:  Correct.  … that was Paul.

Claborn:  Next one is … uh … 89, … 89.

Voicebroker:  89?

Claborn:  Yep.

Voicebroker:  [Talking on other line] … 89.  [To Claborn] Just one second.  [On other line] You got one shot at it.  [To Claborn] I'm telling people they got one shot.

Claborn:  That's it.

Voicebroker:  How's your day going, man?  You're done by the way with SHY.

Claborn:  SHY buys 25,000 at .89.

Voicebroker:  89.  Where's your next?  89 and a half?

Claborn:  89 and a half.

Voicebroker:  All right.  [On other line] .89 and a half, next [to Claborn] . . . Are you just walking them up a half step?

Claborn:  Now.

Voicebroker:  For now, you are . . .

Claborn:  . . . yes.

Voicebroker:  [on other line] . . . 89 and a half is next, his next offer comes in a penny higher.  . . . Alright, I'll shoot it across to you . . . um . . . you're gonna get done.

Claborn:  Oh, I know.  But were are off that right now.

Voicebroker:  Oh, you're off that right now?

Claborn:  You want something, you bring it to me.

Voicebroker:  Ok.

Claborn:  Bring me the bid.

Voicebroker:  O.k.  Alright, thanks Cody.

*See* copy of transcript of this conversation, attached hereto as Exhibit E.

134.    Later in the morning on February 27, 2004, Claborn stated to a voicebroker:

Voicebroker:  Hey, urn, do you have an offer?  I got .90 bid by [Company C]

Claborn:  Uh, .905.

Voicebroker:  .905.  Can you hang one second?  [Talking on another line] . . . . 905, he's about to hang up.

Claborn:  No I'm not.  Don't make me feel like the bad guy here.

Voicebroker:  Would you do 50 [thousand barrels].

Claborn:  50?  I'll do 50.

Voicebroker:  He'll do 50.  [Company D]'s telling him to buy it because there's nobody else out here that has any buy you.  F***, what's it gonna go to Cody?  A buck?

Claborn:  Don't tell him you said that.

Voicebroker:  I didn't tell him that.

*    *    *

Claborn:  Everything you say is recorded on all these lines.

Voicebroker:  I hear you.

*See* DPA Statement of Facts, ¶ 55.

135.    In addition to the telephone sales, on certain occasions BP was dictating the price of sales through the use of Chalkboard.  During periods when there were relatively few sellers of

February 2004 TET propane in the market, members of the NGL Trading Bench posted both bids and offers on Chalkboard.  At regular intervals, and usually after a single transaction in the market occurred, the members of the NGL Trading Bench, often working in a coordinated fashion, would withdraw the bids and offers and increase both the bids and the offers, thereby effectively "stepping up the price."

136.    On February 27, 2004, a counterparty located in the Northern District of Illinois holding a short position in February TET propane was forced to buy from BP Products at an artificial and inflated price:

> Counterparty:  We just did a deal on Chalkboard, do you want to do another 5?
>
> Abbott:  Another five, hold on . . . we're at .925 for 5 [thousand bbls].
>
> Counterparty:  Holy smokes!  Okay.  What's going on?  Just people like me out there trying to find this?
>
> Abbott:  Yeah.
>
> Counterparty:  Well, crap, I may have to, I gotta do something here . . 925 is it?
>
> Abbott:  Yep
>
> Counterparty:  Jesus Christ, I don't have a choice do I?  Not really?
>
> Abbott:  Not if you need to cover.
>
> Counterparty:  I need to cover, why don't we go ahead and do that.

See DPA Statement of Facts, ¶ 57.

137.    Defendants were able to drive the reported OPIS high price for TET propane in over-the-counter trading up to 94 cpg.

138.    As the result of Defendants' illegal conduct, the daily reported Mont Belvieu OPIS TET average "any" prices rose substantially in the final week of February, from 74.9375 cents to a high of 89.50 cents.  In addition, the February/March spread almost doubled, from 15.8

cents to a high of 29.1 cents.  In contrast, the spread between the February price and the March price for propane sold out of the Conway, Kansas hub *fell* during this same period from 5.1 to 4.1 cents.

139.    As the result of Defendants' illegal conduct described above, Mont Belvieu OPIS TET daily reported prices during this week were artificially inflated.  Market participants who purchased February 2004 TET propane in over-the-counter trading were injured.  In addition, market participants, including wholesalers and marketers, who purchased propane based on Mont Belvieu OPIS TET pricing, whether from TEPPCO, local refineries or as imports, were also injured.

140.    On March 1, 2004, the price of TET propane fell precipitously.  The Mont Belvieu OPIS TET average price on Monday, March 1, 2004 was 61.75 cpg, almost 25 cpg below the Friday, February 27 average published price.  The price for March 2004 TET propane continued to fall for the remainder of that week.  By March 10, 2004, the price of March 2004 TET propane had fallen to 56.125 cpg.

141.    Certain counterparties failed to deliver February TET propane to BP by the end of the month in satisfaction of their obligations.  BP employees refused to accept late delivery at the lower March 2004 prices, and instead dictated that each counterparty that had failed to deliver February TET propane in a timely manner had to financially settle such contracts by paying the artificial and inflated February 27 OPIS high price – 94 cpg – to satisfy its obligation.  BP employees, following Radley's directions, refused to negotiate on this price.

142.    As noted above, multiple supply contracts tied the purchase price to, for example, the average or blended Mont Belvieu OPIS TET prices over a preceding five or ten business day period.  Under this pricing formula, Defendants' monopoly and corner continued to inflict

financial damage on these parties and entities in their direct purchases of March propane from producers of TET propane up through and including Monday, March 15, 2004.

### F.    Damages in the non-TET Propane Market

143.    As a result of the above manipulative conduct, additional supplies of propane were directed away from the non-TET caverns at Mont Belvieu and into the TET caverns in order to take advantage of the higher prices Defendants had caused as the result of their corner. This increase in supply of propane to the TET cavern occurred in several ways, including producers who shipped propane to Mont Belvieu specifically designating that such propane was to be directed to the TET cavern rather than any other cavern, and entities who owned propane already stored in the non-TET caverns at Mont Belvieu physically removing that propane and transporting it, by truck, over to the TET caverns.[8]  Because of the sharp run-up in the price of TET propane during this period, there was an active effort to move propane from the non-TET to TET storage caverns.  This had the effect of reducing the supply of available February 2004 non-TET propane and thus artificially increasing prices for that propane.

144.    As a result, market participants who bought February 2004 non-TET propane pursuant to supply contracts, purchase agreements or at rack prices, for example off of the Dixie or Enterprise Pipeline Systems, paid inflated prices for that propane, and were damaged.  In addition, market participants who purchased February 2004 non-TET propane or financially settled a purchase or sale obligation for February 2004 non-TET propane or financially settled a purchase or sale obligation for February 2004 non-TET propane in over-the-counter trading were forced to pay inflated prices, and were damaged.

---

[8] There were no pipelines connecting the non-TET and TET caverns at Mont Belvieu; therefore, any movement of propane from one cavern to another had to be done by truck.

### G.    Three Types of Damages to Direct Purchaser Plaintiffs

145.    As direct purchasers, Plaintiffs suffered damages from three sources:

#### (i)    Direct Purchases from BP within the TEPPCO Pipeline Service Area.

146.    During the relevant period, Plaintiffs purchased propane directly from BP within the TEPPCO Pipeline Service Area at prices that were artificially inflated as the result of Defendants' wrongful and illegal monopoly and corner detailed herein.

#### (ii)    Direct Purchases from other Producers within the TEPPCO Pipeline Service Area

147.    During the relevant period, Plaintiffs purchased propane from other producers within the TEPCCO Pipeline Service Area at prices that were artificially inflated as the result of Defendants' wrongful and illegal monopoly and corner detailed herein.

#### (iii)    Direct Purchasers from BP or other Producers transacted outside the TEPPCO Pipeline Service Area

148.    During the relevant period, Plaintiffs purchased propane from producers outside the TEPPCO Pipeline Service Area.  Although these purchases were transacted outside the nineteen states that constitute the TEPPCO Pipeline Service Area, Plaintiffs were parties to supply contracts and purchase agreements in which the price of propane was directly tied to Mont Belvieu OPIS TET pricing.  Defendant's illegal conduct drove up Mont Belvieu OPIS TET pricing, and thus, drove up the prices that Plaintiffs were required to pay for propane outside the TEPPCO Pipeline Service Area.

## VIII.   THE DEFERRED PROSECUTION AGREEMENT

149.    On or about October 24, 2007, BP entered into a Deferred Prosecution Agreement with the U.S. Department of Justice (the "DOJ").  The DPA is binding upon Defendants BP America, BP Corporation, BP International, BP Products, BP Energy and BP International

44

Services, collectively referred to in the DPA as the "BP Entities."  Pursuant to the DPA, the Department of Justice filed a criminal Information charging BP America with conspiring to commit offenses against the United States.  In return for the DOJ agreeing to defer prosecution of these claims, BP America, *inter alia*, agreed to pay a monetary penalty of $100 million and, separately, agreed to pay a total of $53 million into a fraud established for victim restitution.

150.    Pursuant to the DPA, BP America admitted, accepted and acknowledged responsibility for the acts of its current and former officers and employees of the BP Entities as set forth in the Statement of Facts attached thereto as "Attachment A."  BP America further agreed that the factual statements set forth in the Statement of Facts were accurate.

## IX.    THE ABILITY FOR ALTERNATIVE SOURCES OF PROPANE TO FLOW INTO THE TEPPCO PIPELINE SERVICE AREA TO UNDERMINE THE CORNER WAS EXTREMELY LIMITED

151.    As detailed above, Defendants were able to acquire and control virtually the entire inventory of physical February 2004 TET propane.  The size of this available inventory was limited by the size and storage capacity of the TET caverns.  Defendants demonstrated over the relevant period that they were willing and able to, and did, buy up available supplies of TET propane that was delivered to the TEPPCO system, driving up prices for that propane.  Market participants who were required by contract to deliver February 2004 TET propane therefore had no alternative but to purchase February 2004 TET propane from Defendants at the supra-competitive prices they imposed as part of their illegal monopoly and corner.

152.    Throughout the TEPPCO Pipeline Service Area, long-term supply contracts and purchase agreements tied the price of propane to Mont Belvieu OPIS TET pricing.  Defendants' illegal conduct drove up Mont Belvieu OPIS TET pricing, and thus, the prices market participants were required to pay for propane throughout the TEPPCO Pipeline Service Area.

This was true for any increased propane supplies that might have occurred in the supply of propane into the TEPPCO Pipeline Service Area during the relevant period.

153.    There was little ability for alternative sources of propane supply to enter the TEPPCO Pipeline Service Area in a timely manner in reaction to Defendants' monopoly and corner.  Other pipeline systems could not have responded by transporting alternative supplies of propane into the TEPPCO Pipeline Service Area because of physical limitations of pipeline system delivery.  Refineries contributed only a small percentage of the total propane consumed in the TEPPCO Pipeline Service Area.  The bulk of refinery produced propane was sold based on long-term supply contracts or purchase agreements at prices tied to Mont Belvieu OPIS TET pricing.  The fact that propane is only a minor by-product of crude oil and natural gas refining imposed a further restriction on the likelihood or ability of refineries rapidly to shift to produce substantially increased amounts of propane in reaction to Defendants' corner.

154.    The ability of propane imports from overseas to respond to Defendants' monopoly and corner was also extremely limited.  Shipments of propane from Europe, Africa and South America take at least three weeks, making it impossible for importers to have been able to react in a timely manner once talk of the corner began to circulate among market participants.  The only geographic location with propane for import into the TEPPCO Pipeline Service Area that could react quickly to changes in market conditions was Sarnia, Canada, and BP controlled virtually all propane out of Sarnia.  Beyond these logistical considerations, like refinery propane, the bulk of imported propane during the relevant period was sold at prices tied to Mont Belvieu OPIS TET pricing, including the propane BP sold out of Sarnia into the Service Area.

155.　　In summary, Defendants drove up the pricing benchmark in the TEPPCO Pipeline Service Area as the result of their illegal conduct.  The short duration of the corner, directed to February 2004 propane, precluded the market from providing any meaningful substitute source of supply.

156.　　Over the course of the relevant period, BP owned and/or controlled upwards of 90 percent of all available February 2004 TET propane inventory, and obtained and held positions in February 2004 TET propane that exceeded the entire TEPPCO system propane inventory.  As such, BP attempted to attain, did attain and did exercise monopoly power and control over the supply of February 2004 TET propane in the TEPPCO system.  Based on this control, and through the monopolistic and manipulative practices admitted to in the DPA and detailed herein, BP was able to and did inflate the price of over-the-counter transactions for February 2004 TET propane and was able to and did drive up February 2004 Mont Belvieu OPIS TET pricing. Because Mont Belvieu OPIS TET pricing was the benchmark index on which propane in the TEPPCO Pipeline Service Area (the "Relevant Market") were priced and sold, as a direct result of BP's manipulative conduct, the price of propane throughout the Relevant Market was artificially inflated throughout the relevant period.

157.　　Defendants have already admitted in the DPA that due to BP's conduct, from approximately February 12, 2004 through approximately March 2, 2004, the price of February TET propane was artificial and inflated by BP's conduct.  *See* DPA, Statement of Facts, ¶ 33.

**COUNT I**
**Against All Defendants**
**(Monopolization - § 2 of the Sherman Act)**

158.　　Plaintiffs incorporate by reference each of paragraphs 1 through 157 above as if fully set forth herein.

159.    BP willfully acquired, maintained and exercised monopoly power over the Relevant Market.  As alleged herein, it did so by executing an unlawful "market squeeze" or corner, in the February 2004 TET propane market, 2004 TET propane markets, thereby controlling and manipulating the available supply of February 2004 TET propane, and artificially inflating the price of propane sold within the Relevant Market.

160.    BP had multiple purposes for adopting its unlawful scheme.  It sought to reap monopoly profits in the sale of TET propane in the February 2004 TET propane market (which it accomplished through the "market squeeze" or corner that was intended to and did eliminate competing sellers of this propane), and in the sale of propane from Sarnia, Canada that was sold at prices based on the index OPIS TET pricing.  Defendants also sought to perfect the ability to control the TET propane market "at will," allowing them to employ monopoly and corner strategies at opportune future times to obtain monopoly profits on a recurrent basis.

161.    BP's actions to acquire, maintain and exercise monopoly power were not a consequence of superior product, business acumen or historic accident.  Its actions were the consequence of its consciously unlawful plan and practices.

162.    Defendants' actions are in violation of 15 U.S.C. § 2 *et seq.*, in that they helped BP to monopolize the market for February 2004 TET propane by foreclosing competition, which in turn allowed BP to artificially inflate the price of propane sold during the relevant period at a level that would not be obtainable in a competitive market.

163.    There is no pro-competitive justification for Defendants' actions.

164.    Defendants acted with an anticompetitive purpose and its actions had anticompetitive effects.

165.    The foregoing acts and conduct by Defendants have restrained or prevented competition and threaten to continue to restrain or prevent competition.

166.    The business of Defendants, their actions in pursuance thereof and their unlawful scheme are within, and directly affect trade and commerce among the several states.

167.    Plaintiffs have been injured in its business or property by reason of Defendants' antitrust violations.  Their injury consists of paying higher prices for propane than would otherwise have prevailed in a truly competitive market.  Such injury is of the type the antitrust laws were designed to prevent.  The antitrust injury to Plaintiffs was the direct and foreseeable result of the Defendants' multiple actions, as alleged herein.

168.    As a consequence, Plaintiffs are entitled to a permanent injunction, restraining BP from engaging in additional anticompetitive conduct, to judgment pursuant to 15 U.S.C. § 15 awarding Plaintiffs three-fold the damages sustained to its business or property, and to recover the costs and expenses of this action, including reasonable attorneys' fees.

### COUNT II
### Against All Defendants
### (Attempted Monopolization - § 2 of the Sherman Act)

169.    Plaintiffs incorporate by reference each of paragraphs 1 through 168 above as if fully set forth herein.

170.    Defendants acted with specific intent to achieve (and did achieve) for BP monopoly power over the Relevant Market.

171.    Defendants engaged in manipulative and anticompetitive acts directed to accomplishing this unlawful purpose.  As alleged herein, they did so by executing unlawful "market squeeze" or corner in the February 2004 TET propane market, which enabled them to

control and manipulate the available supply of February 2004 TET propane, and artificially inflate the price of propane.

172.   BP had multiple purposes for attempting to achieve this monopoly power.  It sought to reap monopoly profits in the sale of TET propane in the February TET propane market (which it would have (and did) accomplish through the "market squeeze" or corner that was intended to and did eliminate competing sellers in February 2004 TET propane) and, in the sale of propane imported from Sarnia, Canada that was sold at prices based on the index OPIS TET pricing.  Defendants also sought to perfect the ability to control the TET propane market "at will," allowing them to employ monopoly and corner strategies at opportune future times to obtain monopoly profits on a recurrent basis.

173.   There was a dangerous probability that Defendants would succeed in achieving monopoly power in the market for February 2004 TET, through the unlawful acts alleged herein.

174.   Defendants knew that achieving monopoly power in the market for February 2004 TET propane and artificially inflating the OPIS TET price of propane would affect supply contracts inside and outside the TEPPCO Pipeline Service Area.

175.   The business of Defendants and their actions in pursuance thereof and of the unlawful scheme described herein are within, and directly affect trade and commerce among the several states.

176.   Plaintiffs have been injured in its business or property by reason of Defendants' antitrust violations.  Their injury consists of paying higher prices for propane than would otherwise have prevailed in a truly competitive market.  Such injury is of the type the antitrust laws were designed to prevent, and flows from Defendants' unlawful conduct in attempting to

monopolize and corner the market.  Such injury was the direct, intended and/or foreseeable result of the Defendants' conduct, as alleged herein.

177.    By reason of the foregoing, Plaintiffs are entitled to a permanent injunction, restraining BP from engaging in additional anticompetitive conduct, to judgment pursuant to 15 U.S.C. § 15 awarding to Plaintiffs three-fold the damages sustained to its business or property, and to recover the costs and expenses of this action, including reasonable attorneys' fees.

### COUNT III
### Against All Defendants
### (Restitution/Disgorgement/Unjust Enrichment)

178.    Plaintiffs incorporate by reference each of paragraphs 1 through 177 above as if fully set forth herein.

179.    Defendants benefited from their unlawful acts through, *inter alia*, the receipt of overpayments by Plaintiffs.  It would be inequitable for Defendants to retain the benefit of these overpayments, bonuses and other compensation that were conferred by Plaintiffs on BP, or paid to Defendants pursuant to or as the result of the unlawful conduct described herein.

180.    Plaintiffs are entitled to the establishment of a constructive trust consisting of the overpayments and/or other compensation or benefits to BP.  These Defendants should contribute sums equal to the amount of all such overpayments, compensation and/or benefits received from which Plaintiffs may make claims on a pro-rata basis for restitution.

### COUNT IV
### Against All Defendants
### (Commodity Exchange Act)

181.    Plaintiffs incorporate by reference each of paragraphs 1 through 180 above as if fully set forth herein.

182.     This claim is brought pursuant to 7 U.S.C. § 25(a)(1)(D) and 7 U.S.C. § 13(b), for damages caused by Defendants' manipulation of the price of NYMEX futures contracts for February 2004 propane and of the propane underlying such contracts.

183.     Plaintiffs purchased and/or sold contracts for delivery and future delivery of propane, and in February 2004.

184.     As alleged herein, Defendants had the ability to influence market prices for (a) NYMEX futures contracts for February 2004 propane; and (b) propane within the Relevant Market.   This ability was demonstrated by BP's acquisition of control over the supply of February 2004 TET propane, and the resulting effect on the prices of NYMEX futures trading for February 2004 propane and the price of February 2004 TET propane.

185.     In executing their "market squeeze" or corner strategy with respect to the market for TET February 2004 propane, Defendants intended to influence market prices for (a) NYMEX futures contracts, for February 2004 propane; and (b) propane within the Market for February 2004 TET propane; and (c) propane sold outside the TEPPCO Pipeline Service Area pursuant to contracts that tied pricing to the OPIS TET pricing benchmark.

186.     During the relevant period, artificially inflated prices existed for (a) NYMEX futures contracts, including those for February 2004 propane; and (b) propane within the Relevant Market.

187.     Defendants caused these artificial prices by executing their monopoly and corner strategies with respect to the market for February 2004 TET propane, as alleged herein.

188.     Plaintiffs, who purchased February 2004 NYMEX futures contracts in January 2004 or who sold February 2004 NYMEX futures contracts prior to January 2004 and were obligated to buy them back to close their futures positions, paid prices higher than would have

existed in a normal competitive market as a direct and proximate result of Defendants' unlawful manipulation, and are entitled to recover damages pursuant to 7 U.S.C. § 25(a)(1)(D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request judgment as follows:

A.      Declaring that Defendants violated and are in violation of Section 2 of the Sherman Act and common law alleged herein;

B.      Awarding three-fold damages sustained by Plaintiffs as a result of the anticompetitive conduct alleged herein under applicable federal or common law;

C.      Ordering injunctive relief, preventing and restraining Defendant BP and all persons acting on its behalf from further engaging in the unlawful acts alleged herein;

D.      Awarding Plaintiffs' costs, interest, expenses and reasonable attorneys' fees and experts' fees incurred in connection with this action; and

E.      Awarding such further relief as the Court may find necessary and appropriate.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury.

Date:   July 24, 2008

Respectfully submitted,

/s/Stephen W. Heil
        Stephen W. Heil

Stephen W. Heil
John P. Palumbo
CRAY HUBER HORSTMAN HEIL & VanAUSDAL LLC
303 West Madison Street, Suite 2200
Chicago, IL 60606
Telephone:  (312) 332-8450
Fax:  (312) 332-8451
COUNSEL FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies pursuant to Fed.R.Civ.P. 5 and L.R. 5.5, that a true and correct copy of the foregoing Amended Complaint was filed on <u>July 24, 2008</u> with the clerk of the court using the CM/ECF system, which will send notice to counsel of record.

/s/ Stephen W. Heil
Stephen W. Heil

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO: 07 CR 683 |
| | : | |
| v. | : | **DEFERRED PROSECUTION** |
| | : | **AGREEMENT** |
| BP AMERICA INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

Defendant BP AMERICA INC. ("BP America" or the "Company"), a corporation established and existing under the laws of the State of Delaware, by its undersigned attorneys, pursuant to authority granted by its Board of Directors, and the United States Department of Justice, Criminal Division, Fraud Section (the "Department of Justice" or the "Department") enter into this Deferred Prosecution Agreement ("Agreement") which shall apply to BP America and the following BP America subsidiaries: BP Corporation North America Inc., BP Products North America Inc., BP America Production Company, BP Energy Company, and BP International Services Company (hereinafter collectively referred to as the "BP Entities"). The terms and conditions of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.     The United States will file a criminal Information that will be made public in the United States District Court for the Northern District of Illinois charging BP America with conspiring to commit offenses against the United States, that is, to violate the Commodity Exchange Act ("CEA"), 7 U.S.C. § 13(a)(2), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud), all in violation of 18 U.S.C. § 371. In so doing, BP America knowingly waives its right to be charged by indictment on this charge, as well as all rights to a speedy trial pursuant to

1



the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and all related applicable Local Rules of the United States District Court for the Northern District of Illinois for the period during which this Agreement is in effect.

2.     BP America hereby warrants and represents that the Board of Directors of BP America has duly authorized, in a specific resolution that is attached hereto, the execution and delivery of this Agreement by BP America, and that the person executing this Agreement has the authority to bind BP America.

3.     BP America admits, accepts and acknowledges responsibility for the acts of its current and former officers and employees of the BP Entities as set forth in the Statement of Facts attached hereto as "Attachment A." BP America further agrees the factual statements set forth in the Statement of Facts are accurate. Should the Department initiate the prosecution that is deferred by this Agreement, BP America agrees that it will neither contest the admissibility of, nor contradict, in any such proceeding, the Statement of Facts.

## Cooperation

4.     During the three (3) year term of this Agreement (and any extension thereof), BP America and the BP Entities agree to cooperate fully with the Department, the Commodity Futures Trading Commission ("CFTC"), any "registered entity" as that phrase is defined in 7 U.S.C. § 1a(29), or any "self-regulatory organization," as that term is defined in 17 C.F.R. § 1.3(ee), as directed by the Department or the CFTC, and an independent monitor (described in "Attachment B"), whenever any such entity, agency, or monitor investigates whether BP America, the BP Entities, or any of its directors, officers, employees, agents or consultants may

2

have: (1) engaged in any potential act of manipulation, attempted manipulation, cornering, or attempted cornering relating to the price of a "commodity," as commodity is defined in Section 1(a) of the CEA, in interstate commerce, or for future delivery; (2) knowingly delivered or caused to be delivered any false, misleading, or knowingly inaccurate information that could tend to affect the price of a commodity in interstate commerce; and/or (3) made any false or misleading statements made to any registered entity (collectively referred to as "Manipulative Conduct"). BP America agrees that its cooperation shall include, but is not limited to, the following:

a.   BP America and the BP Entities shall truthfully disclose all information with respect to the activities of BP America and the BP Entities' directors, officers, employees, agents or consultants, concerning all matters relating to the current investigation of propane and any other alleged Manipulative Conduct, about which BP America and the BP Entities have any knowledge or about which the Department shall inquire. BP America and the BP Entities shall be deemed to "have any knowledge" of alleged Manipulative Conduct when information about such alleged Manipulative Conduct is known to a representative from any BP legal group, a representative of a BP compliance group, or any individual responsible for the supervision of trading managers or his or her supervisor(s). This obligation of truthful disclosure includes the obligation of BP America and the BP Entities to provide to the Department or any agency designated by the Department, upon request, any document, record, or other tangible evidence relating to the current investigation of propane or such other Manipulative Conduct about which the Department shall inquire of BP America and the BP Entities.

i.   The Department specifically reserves the right to request that BP America and the BP Entities provide the Department with access to information, documents,

3

records, facilities and/or employees that may be subject to a valid claim of attorney-client privilege and/or the attorney work product doctrine.

ii. If BP America or the BP Entities agree to provide the Department or the Monitor with access to information, documents, records, facilities and/or employees that may be subject to a claim of attorney-client privilege and/or attorney work product doctrine, the Department will agree: (a) not to assert that the provision of such materials in any way constitutes a waiver of the attorney-client privilege and/or the work product doctrine as it relates to third parties; (b) that the production of such materials provides no ground to obtain other documents, materials, or information, although any such grounds that exist apart from such production remain unaffected; and (c) to maintain the confidentiality of such materials and not to provide them to any third party, except to the extent that disclosure is required by law, otherwise authorized by this Agreement, or necessary in furtherance of the Department's discharge of its official duties and responsibilities;

iii. Upon written notice to the Department, BP America and the BP Entities specifically reserve the right to withhold access to information, documents, records, facilities and/or employees based upon an assertion of a valid claim of attorney-client privilege or application of the attorney work product doctrine. Such notice shall include a general description of the nature of the information, documents, records, facilities and/or employees that are being withheld, as well as the basis of the claim.

iv. In the event that BP America or the BP Entities withhold access to information, documents, records, facilities and/or employees, the Department may consider this

4

fact in determining whether BP America or the BP Entities have fully cooperated with the Department.

v. Except as provided in this paragraph, BP America and the BP Entities shall not withhold from the Department any information, documents, records, facilities and or employees on the basis of an attorney-client privilege or work product claim.

b. Upon request of the Department, with respect to any issue relevant to its current investigation of propane or such other Manipulative Conduct about which the Department shall inquire of BP America and the BP Entities, BP America and the BP Entities shall designate knowledgeable employees, agents, or attorneys to provide to the Department the information and materials described in Paragraph 4(a) above, on behalf of BP America and the BP Entities. It is further understood that BP America and the BP Entities must at all times provide complete, truthful, and accurate information.

c. With respect to any issue relevant to the Department's current investigation of propane or such other Manipulative Conduct about which the Department shall inquire of BP America and the BP Entities, BP America and the BP Entities shall use reasonable efforts to make available for interviews or testimony, as requested by the Department or the CFTC, current or former directors, officers, employees, agents and consultants of BP America, or any of its current or former subsidiaries, affiliates, or its parent company. This undertaking includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement authorities, the CFTC, and any other agency designated by the Department for any civil or criminal investigative purposes. This undertaking

also includes identification of witnesses who, to the knowledge of BP America, may have material information regarding the matters under investigation.

      d.    With respect to any information, testimony, document, record, or other tangible evidence provided to the Department or the CFTC pursuant to this Agreement, BP America and the BP Entities consent to any and all disclosures to other government agencies, whether agencies of the United States or a foreign government, as the Department and the CFTC shall deem appropriate. Prior to providing any such information, the Department will seek reasonable assurances from the agency that it will abide by the terms of this Agreement and keep the information confidential except as may be necessary to discharge its official duties.

      5.    In return for the full and truthful cooperation of BP America and the BP Entities, and compliance with all the terms and conditions of this Agreement, the Department agrees not to use any information related to the conduct described in the attached Statement of Facts against BP America, the BP Entities, or any of their parent or affiliated entities in any criminal or civil case, except in a prosecution for perjury or obstruction of justice occurring after the date of this Agreement; in a prosecution for making a false statement after the date of this Agreement; in a prosecution or other proceeding relating to any crime of violence; or in a prosecution or other proceeding relating to tax enforcement. This does not preclude the Department or any government entity from using information contained in the attached Statement of Facts in a prosecution for crimes unrelated to the conduct described therein.

      6.    In addition, the Department agrees that except in the event of a violation by BP America of any term of this Agreement, the Department will bring no additional charges against BP America, the BP Entities, or any of their parent or affiliated entities relating to: (a) the events

6

or transactions described in the attached Statement of Facts; (b) the events or transactions relating to West Texas Intermediate crude oil trading from 1999 to 2005 by any BP America subsidiary, including the storage of supply in Cushing, Oklahoma and at TEPPCO and trading activities as they relate to Platts assessments; and (c) the events or transactions relating to the trading activity and price reporting of ethane and ethylene in April 2003 by any BP America subsidiary. This Paragraph does not provide any protection against prosecution for any illegal activities, if any, committed in the future by BP America or the BP Entities, nor does it apply to any illegal conduct that may have occurred in the past, which are not described in the attached Statement of Facts. In addition, this Paragraph does not provide any protection against criminal prosecution of any present or former director, officer, employee, agent or consultant of BP America or the BP Entities for any violations committed by them.

## **Monetary Penalty**

7.      BP America agrees to pay a monetary penalty of $100,000,000 made payable to the U.S. Treasury within five (5) business days after acceptance of this Agreement by the Court. This amount is a final payment and shall not be refunded (a) if the Department moves to dismiss the Information pursuant to this Agreement, or (b) should the Department later determine that BP America has breached this Agreement and brings a prosecution against it. Further, nothing in this Agreement shall be deemed an agreement by the Department that this amount is the maximum criminal fine that may be imposed in any such prosecution, and the Department shall not be precluded in such a prosecution from arguing that the Court should impose a higher fine. The Department agrees, however, that in the event of a subsequent breach and prosecution, it will recommend to the Court that the amount paid pursuant to this Agreement should be offset

against whatever fine the Court shall impose as part of its judgment. BP America acknowledges that no tax deduction may be sought in connection with the payment of this $100,000,000 penalty.

8.      The parties have agreed that the fine of $100,000,000 for defendant BP America is appropriate based upon the following factors:

a.      By entering and fulfilling the obligations under this Agreement, defendant BP America has demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct and agreed to continue its cooperation with the Department; and

b.      By entering into a deferred prosecution agreement with the Department, the defendant has, among other things, agreed to engage a monitor.

### Victim Restitution

9.      The parties agree that BP America will pay a total of $53,503,000 into a fund established for victim restitution (the "Restitution Fund"), including for possible settlement of any pending claims asserted in class action lawsuits brought by direct purchasers or indirect purchasers of February 2004 TET propane. The payment of this money into the Restitution Fund shall not constitute an adjudication of any individual claim presently asserted or asserted in the future by any victim.

10.     Victims eligible to submit claims for payment from the Restitution Fund include persons and entities that meet all three of the following criteria:

a.      purchased physical barrels of propane from February 12, 2004 through March 2, 2004;

     b.    purchased physical barrels of propane from an entity identified as a Prime Supplier by the U.S. Energy Information Administration ("EIA"); and

     c.    purchased propane transported by the Texas Eastern Products Pipeline Co., LLC ("TEPPCO") system or another pipeline system in one of the following states: Alabama, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Mississippi, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Virginia, and West Virginia.

11.    Any entity listed on the EIA Prime Supplier Exclusionary List, EIA Form-782C, in February 2004 is excluded from submitting a claim for restitution to the Restitution Fund.

12.    The exclusion of any potential victims from the class of victims eligible to be reimbursed through the Restitution Fund shall not be construed to confirm or deny potential liability for those victims.

13.    BP America agrees to retain and to compensate an individual or entity to administer the distribution of the proceeds of the Restitution Fund (hereinafter referred to as the "Third Party Administrator" or "Administrator"). The Third Party Administrator shall be selected by BP America and approved by the Department. Within 30 days of the date of execution of this Agreement, BP America will submit to the Department a proposal setting forth the identity and terms of retention and compensation of the Third Party Administrator. The Department will approve or disapprove the proposed Third Party Administrator within 15 days of its receipt of a proposal. If the Department disapproves of the proposed Third Party Administrator, BP America will, within 30 days of receipt of notice of such disapproval, submit a revised proposal, which the

Department will approve or disapprove within 15 days. The procedure set forth in this paragraph will continue, as necessary, until such time as the Department approves a proposed Third Party Administrator.

14.     Within six (6) months of the retention of the Third Party Administrator, the Administrator will prepare and submit to the Department a plan (the "Restitution Plan") setting forth the procedures governing the activities of the Third Party Administrator, including but not limited to (a) the procedures by which victims eligible to seek reimbursement from the Restitution Fund will be identified; and (b) the procedures by which the financial losses of such victims will be determined and restitution for such losses will be paid. In connection with the preparation of the Restitution Plan, BP America and the BP Entities shall assist and cooperate with the Third Party Administrator. Because the restitution paid pursuant to this Agreement is not ordered as part of a judgment of conviction, the provisions of 18 U.S.C. §§ 3663A *et seq.* are inapplicable. The Restitution Plan must be approved by the Department and the Court. The Department will approve or disapprove the Restitution Plan within 30 days of its receipt. If the Department disapproves the proposed plan, the Third Party Administrator will, within 30 days of receipt of notice of such disapproval, submit a revised plan, which the Department will approve or disapprove within 30 days. This process will continue, as necessary, until a plan is approved by the Department. Upon approval of the Restitution Plan by the Department, the Department and BP America will jointly submit the approved Restitution Plan to the Court for its approval. If the Court rejects the approved Restitution Plan, the procedure set forth in this paragraph will be repeated until such time as the Court approves a Restitution Plan. An extension of time may be granted by the Department upon request.

15.     Within twelve (12) months of the retention of the Third Party Administrator, the Administrator will prepare and submit to the Department a distribution plan (the "Distribution Plan")

setting forth the manner for distributing the restitution funds. The Distribution Plan shall outline all material issues that exist regarding the proposed distribution. The Distribution Plan must be approved by the Department and the Court. The Department will approve or disapprove the Distribution Plan within 45 days of its receipt. If the Department disapproves the proposed plan, the Third Party Administrator will, within 30 days of receipt of notice of such disapproval, submit a revised plan, which the Department will approve or disapprove within 30 days. This process will continue, as necessary, until a plan is approved by the Department. Upon the approval of the Distribution Plan, the Department and BP America will jointly submit the approved Distribution Plan to the Court for its approval. If the Court rejects the approved Distribution Plan, the procedure set forth in this paragraph will be repeated until such time as the Court approves a Distribution Plan.

16.     The Third Party Administrator shall not report to BP America or any of its direct or indirect affiliates, subsidiaries, or parent corporations.

17.     Within fourteen (14) days of appointment, the Third Party Administrator shall open an interest-bearing bank account in order to receive monies to be paid by BP America under the Agreement. All proceeds deposited shall be held in the form of cash, cash equivalents, or a similarly safe financial instrument. All interest and other income of any type earned on funds held in the account shall be available for distribution by the Third Party Administrator. Immediately after opening the account, the Third Party Administrator shall notify BP America of such opening and shall provide BP America with all bank account information necessary to enable and facilitate the funding of the bank account.

18.     BP America agrees that the $53,503,000 for the Restitution Fund shall be paid as a lump sum within five (5) business days after receiving the bank account information from the Third Party Administrator.

11

19.   None of the proceeds of the fund shall be payable as attorney's fees. All costs of administering the Restitution Fund, including all costs associated with the retention and actions of the Third Party Administrator, are to be born by BP America.

20.   Within sixty (60) calendar days after the appointment of the Third Party Administrator, BP America shall provide notice to potential victims by, at least:

a.   Providing written notification of the existence of the Restitution Fund, subject to the review of the Department, to all direct counterparties that purchased TET propane, including contracts for physical propane and financially settled contracts, from February 12, 2004 through March 2, 2004, from BP America or any of its direct or indirect affiliates, subsidiaries, or parent corporations; and

b.   Providing public notice of the existence of the Restitution Fund, subject to the review of the Department, in a nationally distributed newspaper.

21.   To the extent that any money in the Restitution Fund is not claimed by victims within two (2) years of the appointment of the Third Party Administrator, the remaining amount may, at the discretion of the Third Party Administrator, be transferred to a fund for other potential classes of victims affected by the conduct described in the attached Statement of Facts. If after three (3) years of the appointment of the Third Party Administrator, the remaining amount shall revert to the United States Treasury, unless an extension is granted by the Department.

## Other Payment

22.   In addition to the above, the parties further agree that BP America will pay $25,000,000 to the United States Postal Inspection Service Consumer Fraud Fund. BP America

12

agrees that this amount shall be paid as a lump sum within five (5) business days after acceptance of this Agreement by the Court.

## Independent Monitor

23.     Under the terms and conditions set forth in Attachment B, which is incorporated by reference herein, BP America and the BP Entities agree to oversight and monitoring by an independent monitor ("Monitor"). BP America, the CFTC, and the Department shall use mutual best efforts to identify a mutually acceptable person, who, subject to the approval of the Court, shall serve as the Monitor.

## Deferral of Prosecution

24.     In consideration of BP America's entry into this Agreement and BP America's: (a) cooperation with the Department and the CFTC in their investigations of this matter; (b) acceptance and acknowledgment of responsibility for its conduct; (c) agreement to take voluntary remedial actions, including its engagement of an outside consulting firm to evaluate BP's trading compliance programs and to adopt recommended measures; (d) engagement of an independent monitor pursuant to this Agreement; (e) agreement to continue to cooperate with the Department and the CFTC in their investigations; and (f) compliance with all of the terms of this Agreement, the Department shall recommend to the Court that prosecution of BP America on the Information be deferred for a period of three (3) years from the date of entry of this Agreement, subject to extensions as described in Paragraph 29 herein.

25.     If the Department determines, in its sole discretion, that BP America is in compliance with all of its obligations under this Agreement, including its obligation to adopt the recommendations of the Monitor, in accordance with the terms of Attachment B, at the expiration

13

of the period of deferral (including any extensions thereof), the Department will not continue a criminal prosecution against BP America and the BP Entities, will move to dismiss the Information, and this Agreement shall expire.

26.   BP America and the Department understand that the Agreement to defer prosecution of BP America must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve the Agreement to defer prosecution for any reason, both BP America and the Department are released from all obligations imposed upon them by this Agreement except that BP America agrees not to object to the dismissal of the Information and the filing of any superseding charging documents.

27.   Should the Department determine in its sole discretion that BP America or the BP Entities committed a willful and knowing material breach of any provision of this Agreement, the Department shall provide written notice to BP America of the alleged breach and provide BP America a two-week period within which to request a meeting to make a presentation to the Department to demonstrate that no material breach has occurred, or, to the extent applicable, that the breach is not a willful and knowing material breach or has been cured. The parties hereto expressly understand and agree that should BP America fail to request such a presentation within a two-week period, the Department in its sole discretion may presume that BP America or the BP Entities willfully and knowingly materially breached this Agreement.

28.   It is further understood that should the Department in its sole discretion determine that BP America has committed any federal crime involving Manipulative Conduct other than a misdemeanor violation, knowingly given false, incomplete or misleading information relating to the current investigation of propane or such other Manipulative Conduct about which the

14

Department shall inquire of BP America and the BP Entities, or have otherwise knowingly violated any provision of this Agreement, BP America shall, in the Department's sole discretion, thereafter be subject to prosecution for any federal criminal violation of which the Department has knowledge, including but not limited to a prosecution based on the Information or the conduct described therein. Any such prosecution may be premised on any information provided by or on behalf of BP America or the BP Entities to the Department or the CFTC at any time. Any such prosecutions that are not time-barred by the applicable statute of limitations on the date of this Agreement may be commenced against BP America within the applicable period governing the statute of limitations. In addition, BP America agrees to toll, and exclude from any calculations of time, the running of the criminal statute of limitations for a period of three (3) years from the date of the execution of this Agreement (with two additional extensions of the tolling agreement, as necessary, to be co-extensive with the term of the independent monitor) for any crimes encompassed in the attached Statement of Facts. By this Agreement, BP America expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing and voluntary.

29.   BP America agrees that, in the event that the Department determines, in its sole discretion, that BP America has knowingly violated any provision of this Agreement, a one-year extension of the period of deferral of prosecution may be imposed by the Department, and, in the event of additional violations, such additional one-year extensions as appropriate, but in no event shall the total term of the deferral of prosecution period of this Agreement exceed five (5) years.

Any extension of the deferred prosecution period extends all terms of this Agreement for an equivalent period.

30.    It is further agreed that in the event that the Department, in its sole discretion, determines that BP America or the BP Entities have knowingly violated any provision of this Agreement: (a) all statements made by or on behalf of BP America or the BP Entities to the Department, including the attached Statement of Facts, and any testimony given by BP America or the BP Entities before a grand jury or any tribunal, at any legislative hearings, or to the CFTC, whether prior or subsequent to this Agreement, or any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Department against BP America or the BP Entities; and (b) BP America and the BP Entities shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of BP America or the BP Entities prior or subsequent to this Agreement, or any leads therefrom, should be suppressed. The decision whether conduct or statements of any individual will be imputed to BP America or the BP Entities for the purpose of determining whether BP America or the BP Entities have knowingly violated any provision of this Agreement shall be in the sole discretion of the Department.

31.    BP America and the BP Entities acknowledge that the Department has made no representations, assurances, or promises concerning what sentence may be imposed by the Court should BP America or the BP Entities breach this Agreement and this matter proceed to judgment. BP America and the BP Entities further acknowledge that any such sentence is solely

within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

32.    BP America and the BP Entities agree that in the event they sell, merge, or transfer all or substantially all of their business operations or any part of the trading operations as they exist as of the date of this Agreement, whether such sale(s) is are structured as a stock or asset sale, merger, or transfer, they shall include in any contract for sale, merger or transfer a provision binding the purchaser(s) or any successor(s) in interest thereto to the obligations described in this Agreement.

33.    BP America further agrees that during the three (3) year period of this Agreement (or any extensions thereof), the Company will refrain from entering into any contract, agreement, or reorganization that divests the U.S. Compliance and Ethics group of its authority to implement compliance rules and regulations for trading operations in North America, without prior approval from the Department.

34.    BP America and the BP Entities expressly agree that they shall not, through their present or future attorneys, directors, officers, or any other person authorized to speak for BP America or the BP Entities, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by BP America and the BP Entities set forth above or the factual statements set forth in the Statement of Facts. Any such contradictory statement shall, subject to cure rights below by BP America and the BP Entities, constitute a breach of this Agreement and BP America and the BP Entities thereafter shall be subject to prosecution as set forth in Paragraphs 28 through 30 of this Agreement. It shall be within the Department's sole discretion and decision whether any public statement by any such person contradicting a fact contained in

17

the Statement of Facts will be imputed to BP America and the BP Entities for the purpose of determining whether they have breached this Agreement. Should the Department determine that a public statement by any such person materially contradicts in whole or in part a statement contained in the Statement of Facts, the Department shall so notify BP America or the BP Entities. Thereafter, BP America or the BP Entities may avoid a breach of this Agreement by publicly repudiating such statement within two (2) business days after notification. Consistent with the obligations of BP America and the BP Entities as set forth above, BP America and the BP Entities shall be permitted to raise defenses and to assert affirmative claims and defenses in any other separate civil and regulatory proceedings that relate to the matters set forth in the Statement of Facts. This Paragraph is not intended to apply to any statement made by any former employee of BP America or the BP Entities in the course of any criminal, regulatory, or civil case initiated against any such individual.

35.     Should BP America or the BP Entities issue a press release in connection with this Agreement or the ongoing civil and criminal investigations of propane, BP America or the BP Entities shall provide the text of the press release to the Department twenty-four hours before its public release.

36.     It is understood that this Agreement is binding on BP America and the BP Entities and the Department but specifically does not bind any other federal, state or local law enforcement or regulatory agencies, although the Department will bring the cooperation of BP America and the BP Entities and their compliance with their other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by BP America or the BP Entities and their attorneys.

37. This Agreement sets forth all the terms of the Deferred Prosecution Agreement between BP America and the BP Entities and the Department. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Department, the attorneys for BP America and the BP Entities, and a duly authorized representative of BP America and the BP Entities.

38. Any notice to BP America or the BP Entities under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service or registered or certified mail, in each case addressed to Stephen R. Winters, Associate Group General Counsel, BP America Inc., 200 West Lake Park Blvd., Houston, TX 77079. Notice shall be effective upon actual receipt by BP America.

AGREED:

    FOR DEFENDANT BP AMERICA INC:

                                                Counsel for Defendant BP America Inc.

        FOR BP CORPORATION
        NORTH AMERICA INC.:

                                                Counsel for BP Corporation North America
                                                Inc.

        FOR BP PRODUCTS
        NORTH AMERICA INC.:

                                                Counsel for BP Products North America Inc.

        FOR BP AMERICA
        PRODUCTION COMPANY:

                                                Counsel for BP America Production
                                              Company

        FOR BP ENERGY COMPANY:

                                                Counsel for BP Energy Company

        FOR BP INTERNATIONAL
        SERVICES COMPANY:

                                                Counsel for BP International Services
                                              Company

**FOR THE DEPARTMENT OF JUSTICE:**

STEVEN A. TYRRELL
Chief, Fraud Section

By:

PAUL E. PELLETIER
Principal Deputy Chief, Fraud Section

By:

JERROB DUFFY
Trial Attorney, Fraud Section

By:

STACEY LUCK
Trial Attorney, Fraud Section

United States Department of Justice
Criminal Division, Fraud Section
10th & Constitution Avenue, NW
Washington, D.C. 20530
(202) 514-0819

Filed at Chicago, Illinois, on this ___ day of October, 2007.

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, BP AMERICA INC. ("BP AMERICA" or the "Company") has been engaged in discussions with the United States Department of Justice in connection with issues in relation to certain manipulative conduct arising from the trading of TET propane in 2003 and 2004; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a deferred prosecution agreement with the United States Department of Justice; and

WHEREAS counsel for the Company have advised the Board of Directors of the Company's rights, possible defenses, the Organizational Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the United States Department of Justice;

Therefore, this Board hereby RESOLVES that:

1.    The Company (i) consents to the filing in the United States District Court for the Northern District of Illinois of an Information charging BP AMERICA with conspiring to commit offenses against the United States, that is, to violate the Commodity Exchange Act ("CEA"), 7 U.S.C. § 13(a)(2), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud), all in violation of 18 U.S.C. § 371, and (ii) waives indictment on such charges and enters into a Deferred Prosecution Agreement with the United States Department of Justice.

2.    Counsel for the Company, or his delegate, are hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the General Counsel, or his delegate, may approve;

3.    Counsel for the Company, or his delegate, the President or his delegate, and any Vice President are hereby each individually authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions; and

4.    All of the actions of the counsel for the Company, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the company.

Date: _Oct. 23, 2007_

_Paula J. Clayton_
Paula J. Clayton
Corporate Secretary
BP America Inc.

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for BP America, Inc. ("BP America"). I understand the terms of this Agreement and voluntarily agree, on behalf of BP America, to each of its terms. Before signing this Agreement, I consulted with counsel for BP America. Counsel fully advised me of BP America's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP America, which has been advised of its rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP America, in any way to enter into this Agreement. I am also satisfied with counsel's representation in this matter. I certify that I am an officer of BP America and that I have been duly authorized by the Board of Directors of BP America to execute this Agreement on behalf of BP America.

Date: 10/24/07

BP AMERICA INC.

By: _____

Paul Reed
Vice President

## CERTIFICATE OF COUNSEL

I am counsel for BP America Inc. ("BP America") in the matter covered by this Agreement. In connection with such representation, I have examined relevant BP America documents and have discussed this Agreement with the Board of Directors and authorized representative of BP America. Based on my review of the foregoing materials and discussions, I am of the opinion that: BP America's representative has been duly authorized to enter into this Agreement by its Board of Directors on behalf of BP America. This Agreement has been duly and validly authorized, executed, and delivered on behalf of BP America and is a valid and binding obligation of BP America. Further, I have carefully reviewed this Agreement with the Board of Directors and General Counsel of BP America. I have fully advised them of BP America's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. To my knowledge, BP America's decision to enter into this Agreement is an informed and voluntary one.

Date: 10·24·07

STEVEN R. PEIKIN
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498

Counsel for BP AMERICA INC.

### OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for BP Corporation North America Inc. ("BP Corporation"). I understand the terms of this Agreement, and voluntarily agree on behalf of BP Corporation, to each of its terms. Before signing this Agreement, I consulted with counsel for BP Corporation. Counsel fully advised me of BP Corporation's rights and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP Corporation, which has been advised of its rights and the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP Corporation, in any way to enter into this Agreement. I am also satisfied with the counsel's representation in this matter. I certify that I am an officer of BP Corporation and that I have been duly authorized by the Board of Directors of BP Corporation to execute this Agreement on behalf of BP Corporation.

Date: 10/24/07

BP CORPORATION NORTH AMERICA INC.

By: _____

Paul Reed
Vice President

### OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for BP Products North America Inc. ("BP Products"). I understand the terms of this Agreement, and voluntarily agree on behalf of BP Products, to each of its terms. Before signing this Agreement, I consulted with counsel for BP Products. Counsel fully advised me of BP Products' rights and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP Corporation, which has been advised of its rights and the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP Products, in any way to enter into this Agreement. I am also satisfied with the counsel's representation in this matter. I certify that I am an officer of BP Products and that I have been duly authorized by the Board of Directors of BP Products to execute this Agreement on behalf of BP Products.

Date: 10 | 24 | 07                BP PRODUCTS NORTH AMERICA INC.

By: _____
Paul Reed
Vice President

**OFFICER'S CERTIFICATE**

I have read this Agreement and carefully reviewed every part of it with counsel for BP America Production Company ("BP America Production"). I understand the terms of this Agreement, and voluntarily agree on behalf of BP America Production, to each of its terms. Before signing this Agreement, I consulted with counsel for BP America Production. Counsel fully advised me of BP America Production's rights and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP Corporation, which has been advised of its rights and the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP America Production, in any way to enter into this Agreement. I am also satisfied with the counsel's representation in this matter. I certify that I am an officer of BP America Production and that I have been duly authorized by the Board of Directors of BP America Production to execute this Agreement on behalf of BP America Production.

Date: 10 | 2 4 | 07

BP AMERICA PRODUCTION COMPANY

By: _____

Paul Reed
Vice President

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for BP International Services Company ("BP International"). I understand the terms of this Agreement, and voluntarily agree on behalf of BP International, to each of its terms. Before signing this Agreement, I consulted with the counsel for BP International. Counsel fully advised me of BP International's rights and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP Corporation, which has been advised of its rights and the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP International, in any way to enter into this Agreement. I am also satisfied with the counsel's representation in this matter. I certify that I am an officer of BP International and that I have been duly authorized by the Board of Directors of BP International to execute this Agreement on behalf of BP International.

Date:  10/24/07

BP INTERNATIONAL SERVICES COMPANY

By: _____
    James Dietz
    Vice President

**OFFICER'S CERTIFICATE**

I have read this Agreement and carefully reviewed every part of it with counsel for BP Energy Company ("BP Energy"). I understand the terms of this Agreement, and voluntarily agree on behalf of BP Energy, to each of its terms. Before signing this Agreement, I consulted with the counsel for BP Energy. Counsel fully advised me of BP Energy's rights and of the consequences of entering into this Agreement. This Agreement has been reviewed by the Board of Directors of BP Corporation, which has been advised of its rights and the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of BP Energy, in any way to enter into this Agreement. I am also satisfied with the counsel's representation in this matter. I certify that I am an officer of BP Energy and that I have been duly authorized by the Board of Directors of BP Energy to execute this Agreement on behalf of BP Energy.

Date: 10 | 24 | 07

BP ENERGY COMPANY

By: _____

Paul Reed
Vice President

2

**ATTACHMENT A**

**STATEMENT OF FACTS**

Should this matter proceed to trial, the United States is prepared to prove beyond a reasonable doubt, by admissible evidence, the allegations set forth in the Information. This evidence will establish the following:

## I.   Introduction

1.    From February 5, 2004, through March 12, 2004, employees of subsidiaries of BP America Inc. ("BP America") including, BP America Production Company and BP International Services Company (hereinafter collectively referred to as the "BP Entities") (BP America and the BP Entities will hereinafter be referred to collectively as "BP") conspired to manipulate the February 2004 propane market for propane transported in the TEPPCO pipeline system (hereinafter referred to as "TET" propane). As a result, the price of TET propane was artificial and inflated from February 12, 2004 through March 2, 2004.

2.    In accordance with the plan, the employees used the financial resources of BP to buy contracts for substantially all of the February 2004 TET propane supply to become the dominant owner, or "long-holder," of TET propane. The employees, at specific times thereafter, withheld supply from the market while continuing to purchase contracts to own more than the supply of TET propane in the TEPPCO system. BP's dominant ownership position, continued purchases of said propane subsequent to obtaining such a position, and withholding of supply at specific times thereafter, all distorted and made artificial the price of TET propane during February 2004. As a result of the employees' conduct, by the end of February 2004, BP acquired ownership of substantially all of the available supply of February 2004 TET propane in the United States. The employees executing the plan thus cornered the market for February 2004



EXHIBIT
A-2

TET propane, distorted and made artificial the price of February 2004 TET propane, and sold a portion of the supply at an artificial and inflated price.

## II.   Background

### A.   TET Propane Market

3.   Propane is a natural gas liquid ("NGL"). Propane is used by petrochemical industries to produce plastics and is also used as a source of energy for residential and commercial purposes. Residential and commercial demand for propane is seasonal. Typically, propane inventory levels are built up during the spring and summer. Then, during the winter heating season, propane consumption is high, resulting in lower inventory levels at the end of the heating season in February and March.

4.   Residential and commercial consumption of propane is greatest in the Northeast and Midwest sections of the United States. The primary means by which propane is delivered to these regions is the Texas Eastern Products Pipeline Company, LLC ("TEPPCO") pipeline system, which is the only pipeline transporting propane from the TEPPCO storage facility in Mont Belvieu, Texas, to the Northeast and Midwest. Propane in the TEPPCO system is identified as TET propane. Propane in storage facilities at Mont Belvieu that is not maintained by TEPPCO or transported in the TEPPCO pipeline is referred to as "non-TET" propane.

5.   TET propane is a commodity as defined in Title 7, United States Code, Section 1(a)(4), and TET propane that flows through the TEPPCO pipeline crosses various states. TET propane is a commodity in interstate commerce.

6.   TET propane is predominantly traded "over-the-counter" in one of three ways: (1) direct, bilateral transactions between two parties; (2) voice broker transactions; and (3) electronic

2

transactions on the "Chalkboard" trading platform.[1] In voice broker transactions, the brokers negotiate and execute deals on behalf of a buyer and seller. In Chalkboard transactions, buyers and sellers post anonymous bids and offers on an electronic website, Chalkboard, and only learn the counterparty's identity when the transaction is completed. Propane sales are generally traded in lots of 1,000 barrels (bbls) and each barrel is the equivalent of 42 gallons of propane.

7.      Propane prices are published by the Oil Price Information Service ("OPIS"). The prices published by OPIS are specific to the type of propane, such as TET propane, and the month or time period for which the propane is to be delivered. Generally, a price is published for the current (or "prompt") month, the next (or "forward") month and for delivery the next day. Propane traders trade TET propane contracts based upon these delivery distinctions.

8.      OPIS also publishes "average" prices, such as "daily average" and "monthly average," based on information collected directly from market participants. An OPIS "daily average" price consists of the mean between the lowest and the highest reported prices on a given day. Parties sometimes trade propane based on a "daily" or "monthly" average price as published by OPIS. As a result, OPIS prices published for TET propane can affect the price paid by both commodity traders and end users for many categories of propane in the Midwest and Northeast, including, but not limited to, the District of Columbia and Illinois.

## B.      Corporate Organization and Structure

9.      BP plc was a major international energy company headquartered in London, England, and organized as a private limited company under the laws of England and Wales, the shares of which were traded on the London Stock Exchange and the New York Stock Exchange.

---

[1] During all times relevant to this Statement of Facts, Chalkboard was owned by Chemconnect, Inc.

10.    BP America was a wholly owned subsidiary of BP plc.  BP America is a holding company incorporated under the laws of Delaware and headquartered in Warrenville, Illinois, within the Northern District of Illinois.

11.    BP Corporation North America Inc. ("BP Corporation"), BP Products North America Inc. ("BP Products"), BP America Production Company ("BP America Production") and BP International Services Company ("BP International") were all subsidiaries of BP America.

12.    Within and across the corporate structure of BP, there were a number of groups, business units, and teams that focused on specific aspects of the companies' business.  These groups and business units were not separate legal entities but rather existed within and across the various BP legal entities.

13.    The organizational group responsible on a global basis for overseeing trading activity was the Integrated Supply & Trading ("IST") group.  Within IST there were a number of regional business units.  The regional business unit responsible for the trading of gas and power products, including propane, in North America was North America Gas & Power ("NAGP").  During 2003 and 2004, the team within NAGP focused on the trading of natural gas liquids, including propane, was known as the NGL trading bench ("NGL Trading Bench" or "Bench").

14.    A separate regional business unit responsible for the production, transportation, and sales of natural gas liquids, including propane, in North America was the Natural Gas Liquids Business Unit ("NGLBU").

### C.    The NGL Trading Bench

15.    During February 2004, the NGL Trading Bench was located in Houston, Texas, and employed approximately eight traders.  All of the members of the NGL Trading Bench were employees of BP America Production, reporting to managers and other executives who were

4

employed by other BP America subsidiaries. The NGL Trading Bench entered into contracts to purchase and sell propane on behalf of BP Products.

16.    Once a contract was executed, a confirmation notice was sent to the counterparty, via the mails and wires of the United States, between BP's offices in Texas or Illinois and the various counterparties' offices which were located in Texas, Illinois, New York, and elsewhere.

17.    BP recorded the NGL Trading Bench traders' telephone communications. Traders had stations on the bench with separate telephone lines. The traders were aware that their conversations were recorded on those telephones.

18.    The NGL Trading Bench purchased and sold propane for use in BP Products' wholesale and petrochemical businesses, and for speculative purposes to generate a profit.

19.    BP Trader #1 was the primary trader responsible for trading TET propane from at least January 2003 to April 2005.

20.    Dennis N. Abbott was another trader on the NGL Trading Bench during the relevant time period. Abbott's primary responsibility involved the trading of heavy NGLs such as butane, and as the need arose, light NGLs, such as propane and other commodities.

21.    BP Trader #2 was a trader primarily responsible for trading ethane and other NGLs, as well as propane, during 2003 and 2004. During February 2004, BP Trader #2 assisted with the trading of TET propane and aided in the execution of the manipulation scheme.

22.    BP Trader #3 was primarily responsible for trading other categories of propane during 2003 and 2004, but also traded TET propane during the relevant time period.

23.    The direct supervisor of the traders on the NGL Trading Bench was the "bench leader" ("BP Bench Leader"). The BP Bench Leader's responsibilities included the development

and oversight of the NGL Trading Bench's trading strategies, and reporting to and seeking approval from executives who oversaw the NGL Trading Bench's trading operations.

24.     The BP Bench Leader reported to a Vice President responsible for supervising BP's trading in NGLs ("BP Executive #1"). BP Executive #1 was an employee of BP America Production.

25.     BP Executive #1 reported to the Chief Operating Officer of NAGP ("BP Executive #2"). BP Executive #2 was responsible, among other things, for the development, implementation, and execution of trading and marketing strategies for NAGP and was an employee of BP International.

26.     BP Executive #2 reported to the Chief Executive Officer or Business Unit Leader of NAGP ("BP Executive #3"). BP Executive #3 was an employee of BP International

27.     A BP Compliance Manager for NAGP ("BP Compliance Manager") sat on the NAGP trading floor and was an employee of BP America Production.

## III.   2003 TET Propane Manipulation Attempt

28.     The BP Bench Leader and members of the NGL Trading Bench conspired to manipulate the price of TET propane during February 2004 based, in part, upon information and experience gained in April and May of 2003 when members of the NGL Trading Bench attempted to manipulate the price of April 2003 TET propane. During April 2003, the NGL Trading Bench attempted to corner April 2003 TET propane by taking a large long position. Through this strategy, the NGL Trading Bench members sought to make money by purchasing substantially all of the available April TET propane supply, and sought to hold those barrels until the price increased based on the resulting lack of supply and then sell the barrels to market shorts.

29.   During a conversation on April 12, 2003, BP Trader #1, Abbott, and the BP
Bench Leader stated:

| | |
|---|---|
| Abbott: | *How does it feel taking on the whole market*, man? |
| BP Trader #1: | Whew. It's pretty big man. |
| Abbott: | Dude, you're the entire f[***]ing propane market. |

\*         \*         \*

| | |
|---|---|
| BP Bench Leader: | Don't worry about it, it's the first two days of the month. Plenty of lead time for people to think that barrels will emerge and take a short position. |
| Abbott: | No, I mean, it's cool, *100% of the open interest in propane* probably, and uh 3% of the open interest in nat gas....I dig it, it just, sometimes its hard, *it just feels hard to take on the whole market sometimes.* . . . |

(emphasis added).

30.   Based on the April 2003 attempt to manipulate the price of TET propane,
members of the NGL Trading Bench booked a profit and learned information that they later used
during the February 2004 manipulation strategy. In particular, the NGL Trading Bench learned
what they believed to be the "dead stock" level of TET propane, or the "minimum operating
level" needed for the TEPPCO pipeline to function. The traders' perception of the dead stock
level, later coupled with knowledge of the total TEPPCO propane inventory, led the NGL
Trading Bench to believe they could estimate the total size of the available physical supply of
TET propane, thereby allowing them to estimate the total amount of physical contracts they
would have to purchase to corner February 2004 TET propane and effectuate a manipulation.

31.    On or about February 5, 2004, the BP Bench Leader and Abbott discussed the
attempt to manipulate or "squeeze" the price of April 2003 TET propane and the dead stock
information they gleaned from the prior attempt, stating:

BP Bench Leader:    The second point is, that I would imagine that the
minimum operating level at the end of Feb[ruary] is
higher than it is at the end of March or April
because I think the wholesalers have to hold barrels.
So I think the minimum level might be a little
higher than we're assuming based on what we
experienced in April *when we squeezed the April
May.*

Abbott:    Right, which was one of the reasons why it was
harder to own all that April. That's why we had to
take on a little bit more than we thought we had to
take on, in April. And that's why I think that 2 mm,
2.1 mm barrels as that minimum in Feb., I think
that's real, man, I think that is, that's the bottom at
TET.

(emphasis added).

## IV.    2004 Propane Manipulation

32.    During February 2004, members of the NGL Trading Bench developed a plan to
manipulate the price of February 2004 TET propane by becoming the dominant owner of
February 2004 TET propane.  As explained below, the strategy was intended to force other
market participants holding short positions in TET propane at the end of February to purchase
February 2004 TET propane from BP at an artificial and inflated price.   Between approximately
February 9, 2004, and February 27, 2004, members of the NGL Trading Bench executed the
manipulation scheme by buying almost all of the available February TET supply in the TEPPCO
system, withholding that supply during the month, and selling a portion of the supply later in the
month, to certain counterparties holding short positions at artificial and inflated prices.

8

33.    Due to BP's conduct, from approximately February 12, 2004, through approximately March 2, 2004, the price of February TET propane was artificial and inflated by BP's conduct.

## A.    The Scheme

34.    During January 2004, the BP Bench Leader identified and discussed conditions relating to the TET propane market that would render the market ripe for manipulation. On or about January 8, 2004, during a regularly scheduled call, the BP Bench Leader stated to other employees located in Texas, Illinois, and elsewhere that the TET propane market was "vulnerable to a squeeze."

35.    In addition, on or about January 13, 2004, the BP Bench Leader stated to another employee that February 2004 TET propane in the short term was "tight enough that if someone wanted to play games with it, potentially they could." The BP Bench Leader further stated that if someone wanted "to get a hold of this [TET propane] market and play some games with it" they could.

36.    On or about February 5, 2004, during a conversation with Abbott, the BP Bench Leader articulated the intent of the February 2004 TET trading strategy and the justification necessary for obtaining approval for the strategy:

> Two things I thought of. One, in terms of whether we should do this or not, in terms of talking to [BP Executive #1], what we stand to gain, is not just we'd make money out of it, but we would know from thereafter that *we can control the market at will*. If we never break the threshold, we'll never know what the answer is, you know what I mean?

(emphasis added).

37.    During January 2004 and the beginning of February 2004, the BP Bench Leader also instructed the NGL Trading Bench to amass a significant position in February TET propane,

9

both contracts for delivery of physical barrels as well as financial or "swap" contracts. By the estimate of BP Executive #1, entering February 2004, BP owned contracts for delivery for nearly 50% of all of the available physical February TET propane.

38.    Members of the NGL Trading Bench intended to earn a significant profit for BP by selling a portion of their February 2004 TET propane at the end of the month at prices inflated by their conduct, and then taking a small loss on the remaining barrels which would be carried into March. As such, the NGL Trading Bench recognized that they would purchase more propane than BP needed for its own business or commercial purposes, or could actively sell to counterparties during February. Furthermore, the NGL Trading Bench members could expect to profit personally by obtaining bonuses and other remuneration as a result of the anticipated profits BP would achieve through their market manipulation.

### B.    Execution of the Scheme: Buy, Withhold, and Sell

#### 1.    The NGL Trading Bench's Attempt to Buy All Available Supply

39.    Between on or about February 5, 2004 and on or about February 9, 2004, the BP Bench Leader directed the execution of the manipulation scheme by instructing BP Trader #1, Abbott, BP Trader #2, and BP Trader #3 to buy a significant amount of February 2004 TET propane without arousing the suspicion of other market participants.

40.    On the afternoon of February 9, 2004, the BP Bench Leader spoke to BP Trader #1 and Abbott to check the progress of the scheme. During the conversation, the BP Bench Leader, BP Trader #1, and Abbott stated:

> BP Bench Leader:    What's been going on?
>
> BP Trader #1:    How much we got on?  I was just looking at that, you wanna guess?  3.1 [million bbls].
>
> BP Bench Leader:    Has it been busy today?

BP Trader #1:      Oh yeah. Did it very quietly. 10 lots, 5 lots, 10
                   lots, 15 here, 5 here. The biggest lot I think was 75.

                              *        *        *

BP Bench Leader:   Did you feel good about it?

Abbott:            I kinda characterize it as . . . I characterize it as I
                   was kinda surprised we were able to get 300 from
                   the marketplace, basically, maybe 3-400 from the
                   marketplace, without moving it that much. I mean
                   we definitely were moving it [the price of TET
                   propane] at the end of the day, it was definitely
                   firming up at the end of the day . . . So it's kinda . . .
                   it seems like something that will just kinda move
                   fairly easily.

41.    Later, during the same telephone call on February 9, 2004, the same traders

discussed the plan to continue to purchase large quantities of TET propane:

Abbott:            I mean tomorrow, tomorrow if we are able to buy another
                   4-500 [thousand] barrels tomorrow from the marketplace. I
                   would be genuinely shocked. I mean, really shocked so . . .
                   that's it. Then I think . . . we'll just have to play a waiting
                   game and see, you know, how it's gonna shape up.

BP Bench Leader:   It, um, still remains to be seen, doesn't it? Still need to see
                   some of these shorts come in . . . .

42.    Finally, during the same February 9, 2004 telephone call, the traders identify the

true nature of the scheme as one to "squeeze" other market participants:

BP Bench Leader:   Half of me is saying, look, the fact that nothing's really
                   moved in terms of the spread yet is good, because people
                   aren't looking for ways out . . . alternative feeds, or backing
                   out demand, so that's kind of a good thing. The down side
                   is, of course, if it all happens at the last minute, it gets a bit
                   messy. People start cheating, not delivering, and may start
                   to look a little bit funny as well that the spread, you know,
                   just erupts at the last minute.

11

BP Trader #1:       And we don't get the price out on all this paper [financial or "swap" contracts].

Abbott:             Well, that's a different, thing, if we don't get a price out on all this paper.

BP Bench Leader:    The advantage of paper, is that we're selling at an index price there's no complaints. *If we squeeze it in the last four or five days of the month, ah, forgive my French, but ah, you know, it's going to be hard to say what's the fair price of the market at the time*.

(emphasis added).

43.    Based on the activities of the BP Bench Leader, and BP Trader #1, Abbott, BP Trader #2, and BP Trader #3, between the morning of February 9, 2004 and the close of business of February 13, 2004, the NGL Trading Bench purchased contracts for an additional 1.4 million barrels of February 2004 TET propane. As a result, at the close of business on February 13, 2004, the position of the NGL Trading Bench exceeded 3 million barrels of physical propane, in addition to a volume equivalent to approximately 480,000 barrels in "paper" or financially settled propane contracts.

44.    As of February 13, 2004, the NGL Trading Bench estimated that BP's position then exceeded the volume of TET propane supply in the TEPPCO system. Additional waterborne imports or other sources could increase the supply, and delivery from the storage facility through the pipeline to end users could reduce supply during the month. Therefore, the NGL Trading Bench continued to monitor the TEPPCO inventory level. The traders on the NGL Trading Bench frequently discussed these inventory levels and also their estimates of the "dead stock," or minimum amount of propane needed for the pipeline to operate.

45.    On approximately February 15, 2004, factors unanticipated by the NGL Trading Bench caused the price of TET propane to decrease and the amount of available TET propane to increase. First, on February 15, 2004, the TEPPCO pipeline ruptured near Coschocton, Ohio,

12

causing a suspension in the delivery of propane until the pipeline was repaired. The rupture caused the amount of propane stored in Mont Belvieu, Texas, to accumulate and decreased the amount of propane that could be delivered from the pipeline. Second, weather forecasts around that time changed and unexpectedly indicated warmer weather in the Northeast, reducing the demand and expected demand of TET propane. Third, on February 17, 2004, BP received a published report from Commercial Services Company, Ltd. which forecast approximately 4.2 million barrels of propane destined for the United States via cargo ship in February 2004. This represented an increase in the amount of propane being imported into the United States. Combined, these factors put downward pressure on the price throughout the remainder of the month.

46.     Because the NGL Trading Bench had already purchased such a large quantity of February TET propane, by February 17, 2004, the NGL Trading Bench anticipated a significant loss of money if they began to unwind, or sell, their position at the prevailing price or if prices dropped further from the then-existing levels.     Nevertheless, the NGL Trading Bench accumulated even more TET propane.

47.     Between February 17, 2004 and February 20, 2004, the NGL Trading Bench purchased a substantial amount of additional contracts for more than 1.4 million barrels of physical February 2004 TET propane. By February 20, 2004, BP's position exceeded the TET propane in the TEPPCO system by approximately 1 million barrels.

48.     Between February 20, 2004, and February 29, 2004, the TEPPCO system propane inventory continued to increase. At various times during that period, BP's position in February TET propane also increased. During the last trading week of the month, BP's position reached approximately 5 million barrels of physical TET propane. From approximately February 17,

13

2004 through the last trading day of the month, February 27, 2004, BP's position exceeded the

TEPPCO system inventory.

### 2.   Selective Withholding of Supply

49.   At certain times during late February, members of the NGL Trading Bench

refused to sell physical TET propane to counterparties as part of their strategy to drive up the

price. Acting at the direction of the BP Bench Leader, the traders at certain times refused to show

offers or sell any of BP's TET propane, even though BP held contracts for delivery of millions of

barrels, and in at least one instance a counterparty had offered "best bid."

50.   For example, on February 23, 2004, BP Trader #1 stated to a counterparty:

| | |
|---|---|
| Counterparty: | Can you use any Dynegy propane? |
| BP Trader #1: | Yea. |
| Counterparty: | Do you have any TET you can sell? |
| BP Trader #1: | Thought you were asking me about Dynegy. |
| Counterparty: | Well I am.  I got a guy who wants to sell Dynegy and buy TET.  Do you have any TET you can sell? |
| BP Trader #1: | Not right now, I don't, but I'll take the Dynegy side. |

At the time BP Trader #1 refused to sell, BP's position exceeded 4 million physical barrels.

51.   Similarly, on February 26, 2004, BP Trader #2 stated to a counterparty:

| | |
|---|---|
| Counterparty: | I'm looking for 5,000 barrels of TET propane, didn't know if you guys were selling or not. |
| BP Trader #2: | No we're not right now, actually. |

                                    *      *      *

| | |
|---|---|
| Counterparty: | If you guys decided to come back in, I'm the best bid at five. |

14

At the time of this conversation, BP held contracts for delivery of approximately 4.9 million barrels of February TET propane.

52.   BP did not offer or sell physical barrels of propane on February 26, 2004, but continued to purchase even more TET propane during the day.

### 3.   The NGL Trading Bench Sells at an Inflated Price

53.   At the beginning of February 27, 2004, the last trading day of the month, BP held contracts for delivery of approximately 4.9 million barrels of February TET propane. The NGL Trading Bench began the day by buying additional barrels of February TET propane before 9:00 a.m. from the remaining counterparties who still had barrels to sell. This meant that although BP already owned contracts for more than the deliverable supply of February TET propane on the last trading day of the month, they bought more in an effort to ensure that they would be the only company in the market that could sell significant quantities of TET propane. By the end of the day, BP sold approximately 530,000 physical barrels of its accumulated February TET propane position. BP had to accept delivery of the remaining 4.4 million barrels and carry them into March at a significant loss.

54.   By mid-morning on February 27, 2004, the price for TET propane was not the result of legitimate forces of supply and demand, but was dictated by BP. Certain counterparties had no ability to bargain that day, but instead had to pay the prices set by BP:

| BP Trader #1: | [Company A] buys 25,000 at .89. |
| Voicebroker: | .89. Where's your next?  .89 and a half? |
| BP Trader #1: | .89 and a half. |
| Voicebroker: | Alright.  .89 and a half, next....are you just walking them up half step? |
| BP Trader #1: | Now. |

| Voicebroker: | For now you are? |
| --- | --- |
| BP Trader #1: | Yes. |
| Voicebroker: | 89 and half is next, his next offer is coming in a penny higher. |

55.     Later in the morning on February 27, 2004, BP Trader #1 stated to a voicebroker:

| Voicebroker: | Hey, um, do you have an offer? I got .90 bid by [Company C]. |
| --- | --- |
| BP Trader #1: | Uh, .905. |
| Voicebroker: | .905. Can you hang one second?  [Talking on another line]. . . .905, he's about to hang up. |
| BP Trader #1: | No I'm not. Don't make me feel like the bad guy here. |
| Voicebroker: | Would you do 50 [thousand barrels]. |
| BP Trader #1: | 50? I'll do 50. |
| Voicebroker: | He'll do 50.  [Company D]'s telling him to buy it because there's nobody else out here that has any but you.  F***, *what's it gonna go to [BP Trader #1]? A buck?* |
| BP Trader #1: | Don't tell him you said that. |
| Voicebroker: | I didn't tell him that. |
| | *         *         * |
| BP Trader #1 | Everything you say is recorded on all these lines. |
| Voicebroker: | I hear you. |

56.     Further, in addition to the telephone sales, on certain occasions BP was dictating the price of sales through the use of Chalkboard. During periods when there were relatively few sellers of February 2004 TET propane in the market, members of the NGL Trading Bench posted both bids and offers on Chalkboard. At regular intervals, and usually after a single transaction in

the market occurred, the members of the NGL Trading Bench, often working in a coordinated fashion, would withdraw the bids and offers and increase both the bids and the offers, thereby effectively "stepping up the price."

57.    On February 27, 2004, a counterparty located in the Northern District of Illinois holding a short position in February TET propane was forced to buy from BP Products at an artificial and inflated price:

| | |
|---|---|
| Counterparty: | We just did a deal on Chalkboard, do you want to do another 5? |
| Abbott: | Another five, hold on . . . we're at .925 for 5 [thousand bbls]. |
| Counterparty: | Holy smokes!  Okay.  What's going on?  Just people like me out there trying to find this? |
| Abbott: | Yeah. |
| Counterparty: | Well crap, I may have to, I gotta do something here. .925 is it? |
| Abbott: | Yep |
| Counterparty: | Jesus Christ, I don't have a choice do I?  Not really? |
| Abbott: | Not if you need to cover. |
| Counterparty: | I need to cover, why don't we go ahead and do that. |

58.    After selling concluded on February 27, 2004, the NGL Trading Bench had not sold enough to make a profit and had to take delivery of the remaining barrels at a significant loss. In an effort to mitigate these losses, in March 2004, the bench members refused to accept "late" deliveries and required counterparties that were "caught short" in their position from February to financially settle such contracts by paying the February 27 OPIS high price, which had been artificial and inflated by BP.

#### 4.    Fraudulent Conduct to Support Scheme Throughout the Month

59.    To execute the manipulation scheme, members of the NGL Trading Bench not only attempted to purchase all of the available February 2004 TET supply, but they also engaged in tactics to conceal their efforts, mislead counterparties, and otherwise manipulate the index price.

60.    Between February 9 and February 27, 2004, members of the NGL Trading Bench caused bids and offers to be presented to the market via Chalkboard which were designed to falsely reflect that there was more buying or selling interest in the market than actually existed. BP also engaged in conduct to affect the daily and monthly average price published by OPIS by posting bids significantly above the prevailing bid at certain times during the day or by attempting to prevent a transaction that otherwise would have affected the OPIS average price, from being reported. In the context of the market manipulation scheme, this conduct was intended to present false information to the market concerning the actual availability of TET propane, was intended to subvert the integrity of the industry benchmark average price, and was intended to defraud certain counterparties.

61.    On February 24, 2004, Abbott sold 30,000 barrels to a counterparty. They agreed that the contract price for that propane was determined based on the OPIS daily average price for each subsequent trading day in February. The counterparty was not informed that BP was involved in posting "high floor" bids, "stacking" multiple offers and bids, "stepping up the price," posting deceptively low "wet" March offers, or withholding supply from the market during the three-day contract term. BP's conduct had the affect of manipulating the OPIS average price for each pricing day of that contract, and defrauded the counterparty who purchased TET propane based on the OPIS benchmark.

62.    In certain transactions in which the NGL Trading Bench sold February 2004 TET propane using voice brokers, commission payments were made by counterparties using checks transmitted via the U.S. mail. In transactions in which the NGL Trading Bench sold February 2004 TET propane based on the OPIS index price, payments were wired by the counterparties from various states, including Texas and New York, to BP's account at Bank One, in Chicago, Illinois.

## C.    Market Reaction and Industry Reports

63.    Members of the NGL Trading Bench knew that counterparties and market observers were making allegations that someone was attempting a short squeeze, and that some suspected BP. BP Trader #1, Abbott, BP Trader #2, and BP Trader #3 were each confronted by market participants with allegations that BP was involved in a "short squeeze."

64.    On February 23, 2004, OPIS published a newsletter that included the following:

The gas liquids market is largely focused on the antics of Mt. Belvieu propane. Prices have held a strong tone as traders gossip about *the possibility that a short squeeze is being put in play in the TET market.* The short squeeze could be complicating the efforts of some to price inbound cargos of propane, traders add. Indeed, TET propane "anys" traded from 72-75.375cts/gal through the morning. Non-TET barrels were worked from 67-69.375cts/gal. In contrast, the Conway propane market has been quiet with confirmed deals holding a 61.25-61.75cts/gal range. Bushton barrels are thought to be trading at a 1-2cts/gal discount to Conway.

(emphasis added).

65.    On February 24, 2004, OPIS published a newsletter that included the following:

In spot trading . . . the talk in the propane markets is that one or more firms may be involved in a short squeeze in the TET propane market. Traders speculate that those firms own a hefty proportion of the inventories in TET storage and they are making sellers pay up for the right to cover. "Somebody's got to be getting killed," said one trader. "I hope nobody that owes me money." Traders marveled at the fact that TET propane opened at 74 cts/gal and ended the session at 88.25 cts/gal[.]

19

### D.    BP Management's Failure to Address the Conduct

66.    During and after the execution of the manipulation scheme, members of the NGL Trading Bench provided certain information to various BP executives and the BP Compliance Manager. Although the conduct violated BP's written policy, the BP Executives and Compliance Manager failed to report this conduct to authorities, take affirmative steps to ensure such trading strategies did not recur, and chose not to discipline any of the traders, managers, or the compliance official involved until the CFTC initiated an investigation. At no time during February 2004 did anyone at BP bring the scheme to the attention of the legal department.

67.    Initially, between February 5 and 9, 2004, the BP Bench Leader provided BP Executive #1 with certain information about the proposed strategy.

68.    On or about February 19, 2004, the BP Bench Leader met with BP Executive #1, BP Executive #2, and the BP Compliance Manager. At the time of the meeting, the TEPPCO pipeline had ruptured, the NGL Trading Bench had exceeded its position limit size imposed by BP policy, BP had accumulated contracts for over 4.5 million barrels of February TET propane, and the total available supply of propane in the TEPPCO storage facility was approximately 3.5 million barrels. After the February 19, 2004 meeting, the NGL Trading Bench continued to accumulate February TET propane.

69.    After the February strategy had concluded and the NGL Trading Bench anticipated that the loss associated with the strategy would be approximately $10 million, BP management instituted a business review of the trading strategy.

70.    In preparation for the business review, the BP Bench Leader and BP Executive #1 caused a PowerPoint presentation entitled "Lessons Learned" to be drafted. A purpose of the "Lessons Learned" PowerPoint presentation was to determine why BP lost money and how to

make such a strategy profitable. One slide in the presentation compared BP's position in physical TET propane during February to the available supplies in the TEPPCO system, and clearly indicated that BP's position exceeded the available supply of propane by as early as February 11, 2004. The slide also indicated that BP continued to accumulate more propane after its position significantly exceeded the total TEPPCO inventory. Certain slides from the "Lessons Learned" PowerPoint were presented, again, on or about March 26, 2004, and at high level management meetings on April 15 and July 28, 2004.

71.     Further, by at least May 5, 2004, BP Executive #3 and the BP Compliance Manager became aware of the tape recorded conversation of February 9, 2004 conversation in which the BP Bench Leader used the word "squeeze" to describe the February trading activity to BP Trader #1 and Abbott.

72.     The conduct of the NGL Trading Bench was not self-reported to the authorities, nor was timely discipline imposed on any of the traders, managers, or the compliance official involved. In fact, BP initially informed members of the NGL Trading Bench that they would receive monetary bonuses at the end of the year.   BP Executive #2 also informed the NGL Trading Bench in early March 2004, despite the $10 million loss, that no trader would lose his or her job. Only after a regulatory inquiry commenced in 2005 was disciplinary action taken against certain individuals and other traders learned they would not receive their anticipated end of the year bonuses.

## V.    Conclusion

73.     Based on the facts set forth above, BP admits that through the actions of its employees, BP conspired to corner the market and manipulate the price of February 2004 TET propane contrary to Commodity Exchange Act ("CEA"), 7 U.S.C. § 13(a)(2), and engage in

transactions that violated 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), all in violation of 18 U.S.C. § 371.

## ATTACHMENT B

## INDEPENDENT MONITOR

### I.   ENGAGEMENT OF THE MONITOR

1.   Engagement.  BP America Inc. ("BP America") agrees to engage an independent monitor ("Monitor") within sixty (60) calendar days of the signing of the attached Deferred Prosecution Agreement (the "Agreement"), to oversee BP America and its subsidiaries, including BP Corporation North America Inc., BP Products North America Inc., BP America Production Company, BP Energy Company, and BP International Services Company (hereinafter collectively referred to as the "BP Entities") compliance with their obligations under the Agreement, to review and monitor the effectiveness of BP America and the BP Entities' compliance controls as they pertain to the applicable anti-manipulation and reporting provisions of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, ("CEA") and applicable Commodity Futures Trading Commission ("CFTC") regulations, and to make such recommendations as the Monitor believes are necessary to comply with the Agreement.

2.   Consultation and Selection.  BP America, the CFTC, and the U.S. Department of Justice, Fraud Section (the "Department") shall use mutual best efforts to identify a mutually acceptable person, who, subject to the approval of the Court, shall serve as the Monitor.

3.   Period of Engagement.  BP America agrees that the period of engagement for the Monitor is three (3) years from the date of the engagement of the Monitor, subject to extensions as described in Paragraphs 28 and 29 of the Agreement.

4.   Replacement.  If the Monitor resigns or is terminated by the Department or the CFTC, or is otherwise unable to fulfill his or her obligations as set out herein, BP America, shall

within thirty (30) calendar days nominate a proposed replacement to the Department and the CFTC for approval. If, after an additional thirty (30) day period, the parties are unable to identify a mutually acceptable person, then the Department, in consultation with the CFTC, shall propose two candidates to BP America for selection.

5. Hiring Authority and Compensation. The Monitor shall have the authority to employ legal counsel, consultants, investigators, experts, and any other personnel reasonably necessary to assist in the proper discharge of the Monitor's duties, as specified herein. BP America shall have the opportunity to perform routine conflict checks on individuals or entities the Monitor proposes to engage and within two weeks, BP America shall advise the Monitor if any conflicts exist. The Monitor shall not engage any individual or entity as to which BP America reasonably believes a conflict exists. The compensation and expenses of the Monitor, and any persons hired by the Monitor pursuant to his or her authority under the Agreement, shall be paid by BP America or its successor. The Monitor, and any persons hired by the Monitor, shall be compensated in accordance with their respective typical hourly rates or a reasonable fee determined by the Monitor.

6. No Affiliation. The Monitor is not, and shall not be treated for any purpose, as an officer, employee, agent, or affiliate of BP America, the BP Entities, the Department or the CFTC. The Monitor shall not owe any fiduciary duties or other duties or obligations of any kind to BP America and the BP Entities' directors, officers, employees, shareholders, bondholders or creditors. Moreover, BP America and the BP Entities shall not employ the Monitor for a period of five (5) years commencing on the date of the Monitor's engagement. Further, BP America and the BP Entities shall not employ any entity or individual hired by the Monitor to fulfill its responsibilities during the Monitor's engagement, either directly or indirectly, for a period of two

2

(2) years, commencing on the date that the entity's or individual's engagement terminates, without prior approval from the Department and the CFTC.

7.   No Attorney-Client Relationship.   It shall be a condition of the Monitor's retention that the Monitor is independent of BP America and the BP Entities and that no attorney-client relationship shall be formed between them. BP America shall not claim any work product privilege as to documents created by the Monitor or by any agents of the Monitor.

8.   Indemnification.   BP America shall provide an appropriate indemnification agreement to the Monitor with respect to any claims arising out of the performance of the Monitor's duties.

9.   No Defense Premised on Monitor's Findings.   BP America and the BP Entities agree that the Monitor's findings do not constitute a defense to any action that the CFTC or the Department may elect to bring against BP America or the BP Entities for such activities.

10.   Notice of the Monitor.   Within thirty (30) days of the engagement of the Monitor, BP America and the BP Entities shall advise their employees in writing of the engagement of the Monitor, the Monitor's powers and duties as set forth in the Agreement, and the ability of employees to communicate with the Monitor through OpenTalk, and a method of communicating by telephone and/or email directly with the Monitor. Such notice shall inform employees that they may communicate with the Monitor anonymously or otherwise, and that no director, officer, employee, agent or consultant shall be penalized in any way for providing information to the Monitor. In addition, such notice shall direct that, if any director, officer, employee, agent or consultant is aware of any violation of any law relating to Manipulative Conduct (as defined in Paragraph 4 of the Agreement) that has not been reported to an appropriate federal, state or local agency, the director, officer, employee, agent or consultant is obligated to report such violation or

3

conduct to a BP America, a BP Entity, a compliance officer or to the Monitor. Such notice shall also include directions that cooperation with the Monitor is mandatory.

11.   Cooperation.  BP America and the BP Entities shall direct their directors, officers, employees, agents, and consultants to cooperate with the Monitor in the execution of his or her duties under the Agreement.  If, in the Monitor's discretion, a director, officer, employee, agent, or consultant of BP America or the BP Entities fails to cooperate with the Monitor, the Monitor may notify BP America, the Department and the CFTC.  The Department may evaluate BP America's response to the uncooperative individual in evaluating BP America's cooperation under this Agreement.  Further, BP America and the BP Entities agree that any director, officers, employees, agents, and consultants may communicate with the Monitor anonymously and that no director, officer, employee, agent or consultant shall be penalized in any way for providing information to the Monitor.  In addition, if any director, officer, employee, agent or consultant is aware of any violation of any law relating to Manipulative Conduct that has not been reported to an appropriate federal, state or local agency, the director, officer, employee, agent or consultant is obligated to report such violation or conduct to a BP America, a BP Entity, a BP compliance officer or to the Monitor.

4

## II.   OVERSIGHT AUTHORITY AND DUTIES

### A.   Monitor Responsibilities

12.   The Monitor shall:

a.   Review and monitor BP America's compliance with the Agreement.

b.   Review, evaluate, and monitor BP America and the BP Entities' compliance policies and procedures to ensure they are generally effective in preventing and detecting Manipulative Conduct by any BP America or BP Entity director, officer, employee, or agent. This shall include a review of the Integrated Supply & Trading ("IST") group's policies and procedures as they apply to BP America and the BP Entities.

c.   Review, evaluate, and monitor BP America and the BP Entities' commodity trading compliance programs, including but not limited to trading surveillance systems, risk management systems, regulatory training, and compliance training, to ensure they are generally effective in preventing and detecting any Manipulative Conduct by any BP America or BP Entity director, officer, employee, or agent.

d.   Review, evaluate, and monitor BP America and the BP Entities' commodity trading compliance structure, composition, and resources, including but not limited to, compliance personnel compensation, compliance personnel recruitment programs, and compliance personnel training, to ensure the compliance group or function has the appropriate authority, structure, and resources to be generally effective in preventing and detecting any Manipulative Conduct by any BP America or BP Entity director, officer, employee, or agent.

e.   Review, evaluate, and monitor BP America and the BP Entities' commodity trading policies, procedures, and practices, including but not limited to any trader recruitment, training, compensation, and evaluation process, to determine if they are generally

5

effective to prevent and detect any Manipulative Conduct by any BP America or BP Entity director, officer, employee, or agent.

      f.     Pursuant to Paragraphs 25 and 26, conduct an audit of BP America and the BP Entities' commodity trading operations for the purpose of testing and evaluating the effectiveness of BP America and BP Entities' trading compliance systems, policies and programs. This shall necessarily include an operational audit of the IST group's operations as it pertains and functions within the commodity trading operations of BP America and the BP Entities.

      g.     Review activities relating to the commodity trading operations of BP America and the BP Entities to provide recommendations for corrective action and to evaluate the effectiveness of implemented recommendations.

13.     It is the intent of the Agreement that the provisions regarding the Monitor's authority and duties be broadly construed.

### B.    Written Reports and Recommendations

14.     BP America agrees that during the three (3) year period of engagement, and any extensions thereof, the Monitor shall prepare work plans for assessment, an initial report, and at least two (2) follow-up reports (subject to extension) as described below.

### 1. Work Plans

15.     Within sixty (60) days of the engagement of the Monitor, the Monitor shall prepare a written work plan. In order to conduct an effective initial review and to fully understand any existing deficiencies in controls, policies and procedures related to commodities trading and Manipulative Conduct, the Monitor's initial work plan shall include such steps as are necessary to develop an understanding of the facts and circumstances surrounding the trading

6

activities of BP America and the BP Entities. The work plan shall be submitted to the Department, the CFTC, and BP America for review. In the event BP America or the BP Entities object to any part of the work plan, the Department and the CFTC, shall, in their discretion, determine the matter.

16. With respect to each of the two (2) follow-up reviews (subject to extension), the Monitor shall prepare a written work plan, which shall be submitted to BP America, the Department, and the CFTC for comment. In the event BP America or the BP Entities objects to any part of the work plan, the Department and the CFTC, shall, in their sole discretion, determine the matter.

**2.    Initial Review**

17. In connection with the Monitor's responsibility to determine whether BP America and the BP Entities' policies and safeguards are generally effective in detecting and deterring Manipulative Conduct, the Monitor shall conduct an initial review and prepare an initial report assessing the areas described in Section II. A. herein.

18. In connection with the initial review, the Monitor shall issue a written report within one hundred eighty (180) calendar days from the date of the Monitor's engagement setting forth the Monitor's assessment and making recommendations, if any, reasonably designed to improve the policies and procedures of BP America and the BP Entities for detecting and deterring Manipulative Conduct. The Monitor shall provide the report to the Department, the CFTC, the Vice-President for Compliance and Ethics, BP America Inc., the Board of Directors of BP America, and the Board of Directors of BP Products North America. The Monitor may extend the time period for issuance of the report with prior written approval of the Department, in consultation with the CFTC.

7

19.    The initial report shall describe the Monitor's assessment of BP America and the BP Entities in the areas described in Section II. A. herein. The report shall include the Monitor's methodology, information relied upon, and basis for assessment. In addition, in undertaking the assessment and review, the Monitor shall formulate conclusions based on, among other things:

a.    inspection of documents, including all the policies and procedures relating to the trading and compliance programs designed to detect and deter Manipulative Conduct;

b.    meetings with and interviews of employees, officers, and directors of BP America and the BP Entities, and any other relevant persons;

c.    an on-site observation of BP America and the BP Entities' trading surveillance systems, risk management systems, and telephonic and instant message recording system; and

d.    analyses, studies and testing of the trading and compliance programs designed to detect and deter Manipulative Conduct at BP America and the BP Entities.

20.    The initial report shall also contain any recommendation the Monitor may have with regard to matters assessed, setting forth why such recommendations are reasonably designed to improve BP America and the BP Entities' compliance with the anti-manipulation and record keeping provisions of the CEA.

21.    Within sixty (60) calendar days after receiving the Monitor's report, BP America and the BP Entities shall adopt all recommendations in the report; provided, however, that within thirty (30) calendar days after receiving the report, BP America shall:

a.    advise the Monitor, the CFTC, and the Department in writing of any recommendations that BP America or the BP Entities consider unduly burdensome, impractical, or unreasonably costly; and

8

b.  propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose or provide an explanation as to the reason for disagreement regarding the objective or purpose of the Monitor's recommendation.

With respect to any recommendation that BP America or the BP Entities consider unduly burdensome, impractical, or costly, and with respect to which BP America provides written notice of such, BP America and the BP Entities need not adopt the Monitor's recommendation within the aforementioned sixty (60) day time period.  As to any recommendation on which BP America and the Monitor do not agree, such parties shall attempt to reach an agreement within thirty (30) calendar days after BP America serves the written notice and proposed alternative.  In the event BP America and the Monitor are unable to agree on an alternative proposal, BP America shall submit the issue and supporting documentation in writing to the Department and the CFTC within thirty (30) calendar days of the Monitor's decision to reject BP America's proposed alternative. The Department and the CFTC's determination on the issue shall be binding.  With respect to any recommendation that the Monitor determines cannot reasonably be implemented within sixty (60) calendar days after BP America receives the report, the Monitor may extend the time period for implementation with prior written approval of the Department and the CFTC.

22.     All Monitor recommendations that are mutually acceptable to both the Monitor and BP America shall be employed by BP America and the BP Entities for at least a period of (3) years from the time of the implementation.

### 3.     Annual Reviews

23.     The Monitor shall undertake two (2) follow-up reviews to further monitor and assess whether the policies and procedures of BP America and the BP Entities are reasonably designed to detect and prevent violations of the anti-manipulation provisions of the CEA.

24.    With regard to the second assessment and report, the time frames and requirements set forth above in Paragraphs 14 through 22 shall apply, except for the following modifications:

a.    The work plan for the second assessment shall be submitted to the parties by the Monitor no later than sixty (60) calendar days from the first anniversary of the date of execution of the Agreement. The work plan for the third assessment shall be submitted to the parties by the Monitor no later than sixty (60) calendar days from the second anniversary of the date of execution of the Agreement;

b.    The second assessment shall be completed no later than one hundred eighty (180) calendar days from the first anniversary of the date of execution of the Agreement. The third assessment shall be completed no later than one hundred eighty (180) calendar days from the second anniversary of the date of execution of the Agreement; and

c.    In addition to the minimal requirements set forth in Paragraph 19, the second and third assessments shall include a test of the effectiveness of BP America and the BP Entities' compliance programs and policies.

## C.    Operational Audit

25.    The Monitor shall conduct an audit of BP America and the BP Entities' commodity trading operations for the purpose of testing and evaluating the effectiveness of BP America and the BP Entities' trading compliance systems, policies and programs. In determining the scope of the audit, the Monitor shall review and consider KPMG's Report of its review of BP's Integrated Supply & Trading Compliance Program, but shall retain discretion to determine the scope of any additional audit work.

26. The Monitor, in his or her discretion, may engage an audit firm with the necessary resources to conduct the operational audit.

## D. Investigation of Potential Violations

27. At any time during the course of the engagement, should the Monitor discover any evidence indicating that BP America or the BP Entities, or their officers, directors, employees or agents have violated provisions of the CEA, the CFTC's regulations, or have violated any provision of the Agreement, the Monitor shall notify BP America, unless the Monitor in his or her discretion determines notification directly to the Department and the CFTC is necessary and appropriate. BP America shall have thirty (30) days from the date of notice from the Monitor to provide notice to the Department and the CFTC of the alleged violation. If BP America fails to provide notice to the Department and the CFTC within the thirty (30) day period, the Monitor shall then report the matter directly to the Department and the CFTC. If a matter is reported by the Monitor to the Department and/or the CFTC, the Monitor shall provide the Department and the CFTC any and all information relating to the evidence or alleged violations. This Paragraph shall not preclude the Monitor from discussing other related matters directly with the Department or the CFTC.

28. If at any time during the course of the engagement, the Monitor discovers evidence of a potential violation of the CEA or CFTC regulations that occurred after the date of this Agreement, the Monitor shall have the discretion to investigate and report to the Department and the CFTC about the matter. At the sole discretion of either the Department or the CFTC, either government agency may direct the Monitor to discontinue the investigation to allow for a government investigation to commence.

11

29.    BP America agrees that during the engagement of the Monitor, the Monitor shall have the discretion to review activities that occurred prior to the date of the agreement for the purpose of informing him or herself of the relevant facts to develop prospective recommendations for corrective action.

## III.   ACCESS TO INFORMATION

30.    BP America and the BP Entities shall cooperate fully with the Monitor and the Monitor shall have the authority to take such reasonable steps, in his or her view, as may be necessary to be fully informed about the operations of BP America and the BP Entities within the scope of his or her responsibilities under this Agreement. To that end, BP America and the BP Entities shall provide the Monitor:

a.    access to all files, books, records, personnel, and facilities that fall within the scope of responsibilities of the Monitor under this Agreement;

b.    the right to interview any director, officer, employee, agent or consultant of BP America or the BP Entities and to participate in any meeting concerning any matter within or relating to his or her jurisdiction; and

c.    the right to observe BP America or the BP Entities business operations that fall within the scope of responsibilities of the Monitor under this Agreement.

31.    In the event that BP America or the BP Entities seek to withhold from the Monitor access to information, documents, records, facilities and/or employees which may be subject to a claim of attorney-client privilege or to the attorney work product doctrine, BP America or the BP Entities shall promptly provide written notice of this determination to the Monitor and the Department. Such notice shall include a general description of the nature of the information, documents, records, facilities and/or employees that are being withheld, as well as

12

the basis for the claim. The Department may then consider whether to make a further request for access to such information, documents, records, facilities and/or employees, as provided in Paragraph 4(a) of the Agreement. Except as provided in this paragraph, BP America and the BP Entities shall not withhold from the Monitor any information, documents, records, facilities and/or employees on the basis of an attorney-client privilege or work product claim.

32.    If BP America or the BP Entities agree to provide the Monitor with access to information, documents, records, facilities and/or employees which may be subject to a claim of attorney-client privilege or to the attorney work product doctrine, as provided in Paragraph 4(a) of the Agreement, the Monitor will agree: (a) not to assert that the BP Entities' provision of such materials in any way constitutes a waiver by BP of the attorney-client privilege and/or the work product doctrine; (b) that the production of such materials provides no ground to obtain other documents, materials, or information although any such grounds that exist apart from such production remain unaffected; and (c) to maintain the confidentiality of such materials and not to provide them to any third party, except to the extent that disclosure is required by law or may be necessary in furtherance of the Monitor's discharge of his or her official duties and responsibilities.

33.    Except insofar as BP America and the BP Entities retains the attorney-client privilege and/or work product doctrine described in Paragraph 4(a) of the Agreement, BP America shall not withhold from the Department, and shall require the Monitor to agree not to withhold from the Department, any documents or information on the basis of any privilege or work product claims. Failure of any BP America or BP Entity director, officer, employee or agent to cooperate with the Monitor may, in the sole discretion of the Monitor, serve as a basis for

13

the Monitor to refer the non-cooperating individual to BP America or the appropriate BP Entity for disciplinary action.

34. The Monitor shall take appropriate steps to maintain the confidentiality of any information entrusted to him or her while executing his or her duties under the Agreement and shall share such information only with the Department, the CFTC, and individuals or entities hired by him or her. The Monitor shall also take appropriate steps to ensure that any consultants, entities, and/or individuals engaged by him or her to assist with the duties under the Agreement shall maintain the confidentiality of information obtained while executing his or her duties.

35. Any reports and information that are provided to the Department and/or the CFTC by the Monitor shall be filed under seal with the Court. The Department and the CFTC shall maintain the confidentiality of all information provided by the Monitor to the Department or the CFTC, including the periodic reports described in this Agreement, except to the extent that disclosure may be necessary by the Department or the CFTC in connection with the discharge of their official duties.

SPEAKER 1: Cody.
SPEAKER 2: Hey Cody, its Dennis.
SPEAKER 1: Hey man.
SPEAKER 2: How does it feel taking on the whole market, man?
SPEAKER 1: Whew! It's pretty big, man.
SPEAKER 2: Dude, you're the entire [expletive deleted] propane market.
SPEAKER 1: Yeah, I think uhh,
SPEAKER 2: Where are all these, where are all these
SPEAKER 1: We had some participants coming in this morning thinking it was a pretty good buy.
SPEAKER 2: Where, where are all these barrels, I mean I saw, I mean you did some big rolls yesterday with LD and Shell right?
SPEAKER 1: Yeah.
SPEAKER 2: Yeah, I mean, where are all these barrels coming from in April, man?
SPEAKER 1: That's what we're gonna find out.
SPEAKER 2: I mean, gimme a break, I don't understand. I mean, there's not that many barrels available, dude.
SPEAKER 1: I know it.
SPEAKER 2: I mean, I don't get it. And it's a good value, dude. I don't know what's going on.
SPEAKER 3: I wouldn't worry about it, don't worry about it. It's the first two days of the month. Plenty of lead time for people to think the barrels will emerge and take a short position.
SPEAKER 2: Yeah.
SPEAKER 3: If these were being more ratably sold across the month then be more worried about it.
SPEAKER 2: Right. Nah, that's what it looks like to me, it looks like a group of, you know the herd is just saying take one last stab at it, really try to jam it down. Just throw something at it.
SPEAKER 3: Well the one concern, the one concern is chemical demand. I mean that is <unintelligible> one concern. That's clearly going to be a little bit weak. But if you look at the statistics from every single year of the April build the max we've ever seen is 4 million barrels. That was in a year when we had 1.2 million barrels of Houston imports. Through Enterprise. And we're not going to get that this month, so.
SPEAKER 2: Yeah. Overall that is the one thing looming over the whole market. You know, I pointed out, you know, just feels, I mean everything, the whole market feels soft, right. I mean, everything kinda feels soft, so.
SPEAKER 3: <unintelligible> We're below 5 dollars in gas.
SPEAKER 2: We are?
SPEAKER 3: Yeah, it just opened below <unintelligible>.
SPEAKER 2: Cool, cool.
SPEAKER 3: I actually did, yesterday, I did roll shorts forward from Dec into July on the crude side.
SPEAKER 2: Yeah I saw that.
SPEAKER 3: <unintelligible> I bought 200 May puts,
SPEAKER 2: On crude?
SPEAKER 3: No, on gas. <unintelligible>
SPEAKER 2: On gas? Good.
SPEAKER 3: So we've got a lot more gamma in the book now.
SPEAKER 2: Good.
SPEAKER 3: So in terms of the whole complex moving lower, and for us just supporting propane, you know, above our hedges, we're well geared for that.
SPEAKER 2: Yeah.
SPEAKER 3: <unintelligible> best scenario for us.


EXHIBIT
B

SPEAKER 2: You know I was looking at

SPEAKER 3: No one necessarily gets hurt on the propane side, you know, we're not attracting too much attention because propane itself <unintelligible>

SPEAKER 2: You know what I was looking at Mark? I was looking at the open interest on, the open interest in natural gas on the May and June contracts.

SPEAKER 3: Yeah.

SPEAKER 2: I think if you add, I think we're like 3% of the open interest in natural gas futures. We have a lot of nat gas shorts on.

SPEAKER 3: <unintelligible> pretty significant.

SPEAKER 2: The [expletive deleted]!

SPEAKER 3: We've converted, we're buying some back, we've converted to puts.

SPEAKER 2: Oh, okay, all right. Yeah. No, I mean, its cool, 100% of the open interest in propane probably, and 3% of the open interest in nat gas. No, I dig it, it's just, sometimes its hard, it just feels hard to take on the whole market sometimes. But I mean, you look at the position and it's right. I think we're going to get paid off. It's just a matter of

SPEAKER 3: Here's my one fear. Here's my one fear, and it's a significant fear. Everybody waits until the last [expletive deleted] day to cover and then we get wound up in a [expletive deleted] bunch of legal disputes.

SPEAKER 2: Yeah.

SPEAKER 3: That's my fear. People don't cover, don't cover, then on the last day they either default, or they come to us to get them out of it, and then we have to try and basically set a price that seems fair.

SPEAKER 2: I think you're gonna

SPEAKER 3: Rather than come in to the market and cover their shorts, they'll just hold out, hold out, hold out, and then on the last day, I think we're going to see some people cheat on us.

SPEAKER 2: Nah, I think, Cody can . . . Cody, you still there?

SPEAKER 1: Yeah.

SPEAKER 2: Yeah, I think what you might see is, as it becomes crunch time, they're not gonna wait, no one's going to wait til the last day to start buying things back. You're gonna start to see a pinch, you know, come the middle, with a week or two left, I think you should start to see it. But then, if it gets strong there, if April May goes to like a half cent, or a penny, penny and a half, two cents, whatever. Then you gotta fill those guys out then, because. I don't know. You're gonna see it before then, I think. If it's gonna happen.

SPEAKER 1: I would tend to agree that historically, they won't wait until the last week. <CROSSTALK>

SPEAKER 3: Look at what happened to that March TET, or the end of Feb. That end of Feb TET position. I mean the last two days it went [expletive deleted] stupid.

SPEAKER 2: Yeah. But it was getting strong the week before that, but that just got really stupid the last couple days.

SPEAKER 3: Yeah, but at least the fact that it got stupid and lots of volumes traded was the people <CROSSTALK>

SPEAKER 1: That was true demand shorts, people didn't know they were short and they were getting short because of demand . . .

SPEAKER 2: Yeah.

SPEAKER 1: driven weather. It was the wholesalers that were just having to buy, having to buy to fill the pipeline.

SPEAKER 2: Yeah.

SPEAKER 1: <unintelligible>

SPEAKER 2: So, hang in there guys.

SPEAKER 1: Oh, we are.

SPEAKER 3: The other little concern is, we're not spending too much time on the heavies. I mean, the heavies are definitely the feed of choice for the chems.

SPEAKER 2: Yeah.
SPEAKER 3: Hey, the possible good news, and we'll see about this, but we're seeing some ethylene interest. Chocolate Bayou had problems, <unintelligible> had problems and, we might be able to get rid of some.
SPEAKER 2: Good. Okay.
SPEAKER 3: You know, it's not in the bank yet, so wait and see.
SPEAKER 2: Alright. Sounds good guys. Hang in there, man.
SPEAKER 1: Have fun.
SPEAKER 2: See ya, bye-bye.
(end of recording)

Updated June 27, 2006

SPEAKER 1: It's Dennis Abbott.
SPEAKER 2: Dennis Abbott, Mark Radley.
SPEAKER 1: Hey, Mark.
SPEAKER 2: How you doing?
SPEAKER 1: Good.
SPEAKER 2: Two things I thought of.
SPEAKER 1: Yes.
SPEAKER 2: One, in terms of whether we should do this or not in terms of talking to Jim, is that, what we stand to gain is not just that we'd make money out of it, but we would know from thereafter that we could control the market at will. If we never break the threshold, we'll never know what the answer is, do you know what I mean?
SPEAKER 1: Yeah, if you go for it, you'll know okay, wait a minute, this market's way to big, we can never, ever do this.
SPEAKER 2: And we'll never try it again.
SPEAKER 1: We'll never try it again. Yeah, there's a certain, you know, I kind of scoff at about, you know, you know things or will learn something from it. But you do. I mean there's value in that knowledge.
SPEAKER 2: Absolutely.
SPEAKER 1: There's a lot of value in that knowledge.
SPEAKER 2: Absolutely.
SPEAKER 1: And no, I mean, that's part of it. I don't know how you would value that knowledge, but...
SPEAKER 2: Well, the second point is--
SPEAKER 1: Um-hmm.
SPEAKER 2: The second point is that--
<PAUSE>
...I would imagine the minimum operating level at the end of Feb is higher than it is at the end of March or April because I think the wholesalers--
SPEAKER 1: Have to have something on hand.
SPEAKER 2: Have to hold barrels.
SPEAKER 1: In order pump the first day.
SPEAKER 2: Do you know what I mean?
SPEAKER 1: That's right.
SPEAKER 2: So I think the minimum level might be a little higher than we're assuming based on what we experienced in April, when we squeezed the April/May.
SPEAKER 1: Right, right. Right, which is one of the reasons why it was harder to own all that April. It was harder. That's why we had to take on a little bit more than we thought we had to take on in April.
SPEAKER 2: Exactly.
SPEAKER 1: But--and that's why I think that 2 million, 2.1 million barrels as that min in Feb, I think that's real, man, I think that is the--that's the bottom at TET
SPEAKER 2: Yep. So... It'll be close. It will be close. I think if we do see some, little bit stronger buying either Friday or Monday suggesting that that's the way the Europeans do sell their cargoes and that they've not, you know, there's not some other process going on there.
SPEAKER 1: Yeah.
SPEAKER 2: They're the shorts and they've already sold their barrels. The selling has taken place already. We've seen it.
SPEAKER 1: Yeah. I mean, if you were--well, put your--well, just--I--I just--I'm pretty convinced they have to have had, Mark, because, I mean--



EXHIBIT

C

SPEAKER 2: So it's just a butane cargo into Bayway, and—
SPEAKER 1: Yeah, if you're a European, you have to sell it, you know. You have to have
done it.
SPEAKER 2: Yeah. Well, the good thing about them as a short is that they don't care what price they
get, either. As long as they get the OPIS average for the day, they don't give a jot.
SPEAKER 1: Right.
SPEAKER 2: Do you know what I mean?
SPEAKER 1: That's exactly right. And they locked in their economics. That's why they
don't care about selling. And they sold it a long time ago, right? They sold it at higher levels.
SPEAKER 2: Exactly.
SPEAKER 1: Okay. That's something to think about. I like that idea. I like—well,
that's one way to pitch it, anyway, that there's value in knowledge.
SPEAKER 2: Yeah, even if it's just for ourselves in terms of do—you know, needing the
extra push to go for it if we're a little uncertain. You know, the payoff isn't just this year. It's saying for
as long as we carry on trading.
SPEAKER 1: Yeah, and that's—and that's—you know, that's kind of—and that's kind
of my—that's kind of what my attitude is. I feel like we could do it. Just try it and just accept
the fact okay, the down side is we learned a lot but just have the mental attitude to say okay, this
is going to hurt, but we're prepared for it and just have fun with it, go for it, you know, try to anyway.
SPEAKER 2: Yep.
SPEAKER 1: Okay?
SPEAKER 2: All right, man.
SPEAKER 1: Sounds good.
SPEAKER 2: See you.
(End of recording.)

Updated June 27, 2006

SPEAKER 2: Cody, Mark Radley here.
SPEAKER 1: Hello, Mark Radley.
SPEAKER 2: How you doing?
SPEAKER 1: Good, how you doing?
SPEAKER 2: Fine. What's been going on?
SPEAKER 1: How much we got on? I was just looking at that. You want to guess? 3.1.
SPEAKER 2: You been busy today?
SPEAKER 1: Oh, yeah. Did it very quietly, ten lots, five lots, ten lots, fifteen here, five here. The biggest lot I think I bought was 75.
SPEAKER 2: Off who?
SPEAKER 1: Morgan Stanley. We did get--right out of the chute we bought the 150s off Koch at 5-7/8.
SPEAKER 2: Yeah.
SPEAKER 1: So we dropped that. And then it was just a bunch of little ones, the little guys. We did--Nordico (ph) did, God, 100, probably 150, 175 smoothly. I mean there was no big lots, it's like fifteen here, ten here, ten here, fifteen there. I did two Chalkboard deals all day.
SPEAKER 2: Where was the spread at the end of the day?
SPEAKER 1: I would say conservatively probably around 6-1/4.
SPEAKER 3: 6-1/2, 6-1/4
SPEAKER 1: Something like that. Dennis is on now. Sounds like you're doing dishes, man.
SPEAKER 2: It's Nipper. Nipper making noise. Did you feel good about it?
SPEAKER 3: I mean, I kind of characterize this as--hey, Nipper.
SPEAKER 1: Hey, Nipper.
SPEAKER 3: I characterize it as I was kind of surprised we were able to get three hundred from the marketplace basically, maybe three, four hundred from the marketplace without moving it that much. I mean, we definitely were moving it at the end of the day. It was definitely firming up at the end of the day and it feels like it, you know, could--the market could have been anywhere, like sellers were at 65 cents or 62 cents, depending on where the market was, right?
SPEAKER 2: Yeah.
SPEAKER 3: So it's kind of--it seems like something that will just kind of move fairly easily. And then there's one more seller out there that's Dow. I think Dow has one chunk they can do and it's about--maybe that's about it.
SPEAKER 1: That's what we thought.
SPEAKER 2: What about crude today?
SPEAKER 3: Crude didn't do a heck of a lot. It kind of--it kind--it bobbed around, was down a little bit and just kind of rallied into the close, I think, just because we're going to have this OPEC meeting late tonight, tomorrow morning. I think people just short covering for that meeting.
SPEAKER 2: Yeah.
SPEAKER 3: So it was up like 30 cents or maybe 25 cents in Aprils and Mays. I mean the propane that we were doing and the crude we were doing at the same time we didn't lose anything on. I mean, it's still, you know. Yeah, propane kept up with crude.
SPEAKER 1: And we were up one cent on the mark, day-to-day mark on pro and I think crude was up 30.
SPEAKER 3: I mean tomorrow-- Tomorrow if we are able to buy another four or five hundred thousand barrels tomorrow from the marketplace, I would be genuinely shocked, I mean really shocked. So, you know, that's it. Then I think we're just kinda--we'll just have to play a waiting game and see, you know, how it's going to shape up.
SPEAKER 2: Still remains to be seen, isn't it? Still need to see some of these shorts come in.
SPEAKER 3: Yeah, I mean I had--I mean, we--



EXHIBIT

SPEAKER 2: Were we the only buyer today?

SPEAKER 1: Pretty much.

SPEAKER 3: Pretty much.

SPEAKER 1: There's a few other deals done besides us but nothing--not many at all. Just a few, not--I think you could put them all on one hand. It wasn't us, but--

SPEAKER 3: We had--

SPEAKER 2: What about the surrounding news? What were the draws like over the weekend, or whatever?

SPEAKER 3: Well, we had 150 draw in on Friday and then we had the slower draws, maybe we only drew like 50 over the weekend because yeah that butane slug and plus it helps you look back at the data market. It always--it always, the draws always slow down Saturday and Sunday because of truck liftings. The truckers go home and, you know, they sleep with their women and stuff, so.

SPEAKER 2: Well what about the weather outlook?

SPEAKER 1: Yeah. It's still good.

SPEAKER 3: The weather--yeah, I mean, the weather's still cold in the Northeast, I mean, the parts of the Midwest are now kind of just normal, normal temps is what they're forecasting, but the Northeast is still cold, still below and much belows.

I mean, the other thing--I mean, the other thing that's--I mean, when you think about it, you know, we're not--talking with Cody here as we, you know, always talked about every single minute. But, you know, we're not going to take delivery of the stuff till February 29th, right? 27th, 28th.

SPEAKER 2: Right.

SPEAKER 3: I mean, the shippers who are going to be required to ship, yeah, they're not going to feel, people aren't going to feel concerned until it's time, right?

SPEAKER 2: Exactly.

SPEAKER 3: This could be the last week.

SPEAKER 2: Sure, sure, that's right. That's absolutely right. There's no doubt about that.

SPEAKER 3: So, and I was talking to Trammogas just a little while ago, you know, and they're--and he--he firmly believes, you know, he's never been that bullish, but he did say they were definitely importers who are short TET.

SPEAKER 1: He knows for sure.

<CROSSTALK>

SPEAKER 3: There's absolutely shorts in the TET market, who will have to cover it. He goes--so, I mean he--he's not extremely bullish, but he just thinks that, you know--I mean, hey, I mean it's at, you know, 78 percent of crude. I mean, it's not that cheap. It's not expensive.

SPEAKER 2: No, no, no. There's a long way to push it without <unintelligible>

SPEAKER 3: Yeah, yeah.

SPEAKER 2: <unintelligible>.

SPEAKER 3: No, the other thing I thought about today is if overall chem run rates are higher, it's saying the same thing we said before, that the amount of dead stock might be actually higher in PADD 3 because if your chemical run rates are harder, then your chances are you're having to hold more--more stock, you know, more neutral stock.

SPEAKER 2: <unintelligible> down <unintelligible>

SPEAKER 3: I don't know. I never know--I don't know what the story is. Cody, do you know what the story is?

SPEAKER 1: No.

SPEAKER 3: We don't know how they trade. We don't understand it. I mean they were--we asked them this, Cody asked them this morning, okay, where are you at and she goes ehhh, you know, we, you know, you know, she kind of hemmed and hawed and then the market's up one cent or three quarter--or 75 points and suddenly they wanted like, you know, peddle a hundred thousand barrels. So I don't quite understand that trading method or what triggers that or if there's a big flat price element to it or what. But there were-- well, all the conversation with this guy, with Yunis, Yunis is this guy that I talk to a lot.

SPEAKER 1: I tried to get a little more out of Dow. She asked me, you know, are you guys, you know, looking at more propane. I said well, yeah, in fact we are switching a little bit over to propane and she said well, same here and she sold me 50. When I asked her, okay, if we're going to do something, let's do a little bit more size and that's all she could do was 50. And then Yunis, of course, who does, I think it's his book.

SPEAKER 3: Their hedging.

SPEAKER 1: The hedging book is maybe still he held some front-end length in front of it, anticipating the same problem happened last year based on the fundamentals. So he showed Dennis the hundred thousand about three quarters of a cent later, so I don't—

SPEAKER 2: This moment don't forget that although we might have three point one million long, we haven't got 3.1 million of physical yet, right?

SPEAKER 3: No.

SPEAKER 1: No, we got 2.4 million right now. It'll go down to 2.1 after it all priced from this point forward.

SPEAKER 3: Yeah.

SPEAKER 1: Well, it'll be about 2.2, I think.

SPEAKER 3: It can get pretty exciting if we continue—if we go off 3 million long. I mean, there will be--there will be—it will be exciting.

SPEAKER 2: What did Morgan say about their 75,000? That's quite a big position for him.

SPEAKER 1: He didn't say anything. We were Yahoo-ing back and forth. He said I got 75 here and he was like at the time he was probably a half cent above the market and I kind of tried to embarrass him into selling it lower. <unintelligible> hey it's offered it 61, 60 and a

half here, he was, I think, at 61 and I said, you know, you know, we'll pass because we're picking up a little bit here.

SPEAKER 3: He's a reluctant seller.

SPEAKER 1: He's a very, very reluctant seller. And then he showed—he came back later in the day. Maybe he was putting something on against it and he said I'll do 50 there, 60 and three-quarters. I said all right, we'll do that. And then about five minutes later, he goes now I can do the other 25 there. So he was spreading against something.

SPEAKER 2: Some <unintelligible>

SPEAKER 1: He said, I mean, I kind of Yahoo-ed him. I said thanks for the deal, you know, and he goes, you still fancy—you fancy stuff for a pop. And I wrote down as time will tell, you know. I said it's a decent value. And he goes yeah, it still has a chance on a spread basis, but less explosive in my view than it was. And that's all he said. So maybe he's just selling, just kind of giving up. He had it and now he's just kind of giving up.

SPEAKER 1: So he's getting offers.

SPEAKER 3: Let's face it.

SPEAKER 2: We're the only people that can do anything with that contract.

SPEAKER 3: That's right. That's right. And so, man, if you're sitting around with a hundred or a couple hundred thousand barrels--

SPEAKER 2: <unintelligible> feature today?

SPEAKER 3: They're out. They don't have a drop.

SPEAKER 2: They're clearly short, they're short.

SPEAKER 1: Yeah, they are.

SPEAKER 3: Flavins's (ph).

SPEAKER 1: I wonder if that's one they want to go to the basketball game Wednesday night to discuss--

SPEAKER 3: Well, Flavins.

<CROSSTALK>

SPEAKER 1: Fly boy's out.

SPEAKER 3: Flavins out in Connecticut.

SPEAKER 1: So they're flying without a driver except for Dean.

SPEAKER 3: There's not even an offer. I mean, they're out. I mean, I don't know if they're short. They just--they just don't have any length left, that's for sure.

SPEAKER 1: Could be the Euros that got them, you know.

SPEAKER 3: You never know.

SPEAKER 2: Were most people selling outrights or trying to fill the spread?

SPEAKER 1: Mostly I would say the little guys, the small, little trading houses and the producers were selling the outrights. We did have Koch, of course did the 150 on the spread and then Dennis did a couple other deals on March-April—I mean Feb-Mar--April. But there wasn't a lot of spread talk today, mainly just hem and hawing around the flat price on the Feb and the March. I didn't see a lot of direct.

SPEAKER 2: What about natty?

SPEAKER 3: Nah, it didn't do much today. It started out stronger. Cash natty was a little bit stronger. It tried to rally. It was up ten, eleven cents and then it kind of went out with a wimper. The whole curve is up five cents, but the front was off three or four cents. I tell you, we got really good fills today. I mean, we were quiet. We did, I mean--

SPEAKER 2: <unintelligible>

SPEAKER 3: I got to commend--I got to commend Cody did a really good job. We--you know, he just waited it out and just continued to wait and wait and people just, you know,

SPEAKER 1: Marlene's on the bandwagon with 165. We've filled her for 165,

so she's on the spread at 165.

SPEAKER 2: Good, good.

SPEAKER 3: We'll see.

SPEAKER 2: Oh, it sounds pretty good, sounds pretty good. Something's got to give, doesn't it.

SPEAKER 1: Got to give.

SPEAKER 3: It could be very well--yeah, it could be very--

SPEAKER 2: <unintelligible> very curious. You know, half of me is saying, look. The fact that nothing's really moved in terms of a spread yet is good, because people aren't, you know, looking for ways out or alternatives or backing out demand or that sort of thing, so that's kind of a good thing. The down side is, of course, it all happens at the last minute, it gets a bit messy, people start cheating, you know.

SPEAKER 1: Not delivering.

SPEAKER 2: Not delivering. You know, it starts to look a little bit funny as well, that the spread, you know, just erupts at the last minute

SPEAKER 1: And we don't get the price out on all this paper.

SPEAKER 3: Well, then it's a different thing. If we don't get a price out of this paper and we have--

SPEAKER 2: The advantage of paper, is that we're selling at an index price, there's no complaints. If we squeeze it in the last four or five days of the month, forgive my French, it's going to be hard to say what's the fair price of the market at the time.

SPEAKER 3: I think as long as we continue to show two ways, I mean we continued to show offers today on the screen and we're showing offers just to get people comfortable with the idea of selling. So we're continually offering it at the same time we're trying to pick up volume today. And I think as long as you continue to show offers, then I think that's fair, you know. We're giving some people an out, okay?

SPEAKER 2: Yep.

SPEAKER 3: It's not--it's not unfair. So we'll see.

SPEAKER 2: Sounds good, guys.

SPEAKER 3: Okay. Hey, you having fun?

SPEAKER 2: Well, we are, yes.

SPEAKER 1: How's the weather?

SPEAKER 2: Oh, it was terrible the first two days and it has been nice today.

SPEAKER 3: Good.

SPEAKER 2: <unintelligible> rather nice day.

SPEAKER 3: What day are you coming back? How many more days do you have down there?
SPEAKER 2: We're coming back on Tuesday.
SPEAKER 3: Tuesday?
SPEAKER 2: Of the following week. The week on Tuesday.
SPEAKER 3: Oh, wow, you're getting some good time down there.
SPEAKER 2: <unintelligible>
SPEAKER 1: Don't forget your sun screen.
SPEAKER 3: Way to go.
SPEAKER 2: <unintelligible> Yeah.
SPEAKER 3: Way to go, man. You're getting some good time down there.
SPEAKER 2: Yeah.
SPEAKER 3: Relax.
SPEAKER 2: Well, I need you guys to, you know, try and have fun.
SPEAKER 1: We got it.
SPEAKER 2: <unintelligible>
SPEAKER 1: (Laughter). That's enough. Have a good one <unintelligible> See you.
SPEAKER 3: See you.
(End of recording.)

Updated June 27, 2006

SPEAKER 1: Cody.

SPEAKER 2: Hey.

SPEAKER 1: Hey.

SPEAKER 2: Where's your next one?

SPEAKER 1: O.K. Confirm, Anadarko buys 25,000 at physical...physical TET Feb. at .8850.

SPEAKER 2: Correct. . . . that was Paul

SPEAKER 1: Next one is ..uh...89, . . . .89.

SPEAKER 2: .89?

SPEAKER 1: Yep.

SPEAKER 2: [Talking on other line]....89. [To Claborn] Just one second. [On other line] You got one shot at it. [To Claborn] I'm telling people they got one shot.

SPEAKER 1: That's it.

SPEAKER 2: How's your day going, man? You're done... by the way with SHV.

SPEAKER 1: SHV buys 25,000 at .89

SPEAKER 2: 89. Where's your next? 89 and a half?

SPEAKER 1: 89 and a half.

SPEAKER 2: Alright. [On other line] . .89 and a half, next [to Claborn]... Are you just walking them up a half step?

SPEAKER 1: Now.

SPEAKER 2: For now, you are ....

SPEAKER 1: ...yes.

SPEAKER 2: [on other line]...89 and a half is next, his next offer comes in a penny higher.... Alright. I'll shoot it across to you...um...you're gonna get done.

SPEAKER 1: Oh, I know. But we are off that right now.



SPEAKER 2: Oh, you're off that right now?

SPEAKER 1: You want something, you bring it to me.

SPEAKER 2: Ok.

SPEAKER 1: Bring me the bid.

SPEAKER 2: O.k. Alright, thanks Cody.

Updated June 27, 2006