UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THOMPSON'S GAS & ELECTRIC SERVICE, INC., a Maryland corporation, REGIONS PROPANE-ALABAMA, LLC, an Alabama Limited Liability Company, SUBURBAN GAS PROPANE PARTNERS, LLC, a Maryland Limited Liability Company, SHELBY PROPANE GAS COMPANY, INC., an Alabama corporation, and DEUPREE GAS, INC., an Alabama corporation,<br><br>   Plaintiffs,<br><br>   v.<br><br>BP AMERICA INC., BP CORPORATION NORTH AMERICA INC., BP INTERNATIONAL SERVICES COMPANY, BP PRODUCTS NORTH AMERICA, INC., BP ENERGY COMPANY AND BP AMERICA PRODUCTION COMPANY,<br><br>   Defendants. | No. 08 CV 2693<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

**I. BACKGROUND**

  There is little dispute regarding the facts in this case. As part of its Deferred Prosecution Agreement with the government,[1] Defendants BP America Inc. and BP Products North America,

---

[1] On June 28, 2006, the U.S. Commodity Futures Trading Commission filed a Complaint for Injunctive and Other Equitable Relief and Civil Monetary Penalties under the Commodity Exchange Act against BP Products North America, Inc. On October 24, 2007, the BP Defendants and the Department of Justice entered into a Deferred Prosecution Agreement, an alternative to adjudication in which Defendants made certain admissions and agreed to cooperate with the government.

Inc. ("BP Defendants" or "Defendants") admitted that in February 2004, some of its traders manipulated the February 2004 TET propane market, propane stored in and shipped via the Texas Eastern Products Pipeline Company, LLC ("TEPPCO") pipeline system.[2] In order to artificially create a lack of supply and raise TET propane prices, BP traders, who trade in gas and power products including propane, purchased more TET propane for February 2004 delivery than BP needed. By doing so, BP traders believed they could force counterparties with short positions[3] to pay inflated prices to cover their delivery obligations at month's end. As part of the 36-day manipulation scheme, whatever remained would be sold at a small loss in March.[4] BP succeeded in inflating propane prices for 19 days, driving the cost per gallon up to 94 cents from an earlier February low of 61 cents; however, the scheme eventually failed, as many counterparties declined to purchase as anticipated.

Beginning February 26, prices began to drop. As a result of Defendants' conduct, "additional supplies of propane were directed away from the non-TET caverns," increasing supply to the TET cavern, and on March 1, the price plummeted to 61.75 cents per gallon, nearly 25 cents below the February 27 price. BP took a $10 million loss on the propane it sold in March. Plaintiffs, parties who purchased propane directly from producers, allege that as a result

---

[2] The TEPPCO system is the primary delivery system of propane to the Northeastern and Midwestern regions of the United States.

[3] An investor "goes short" or takes a short position when he or she borrows assets, usually in the form of securities, from a third party and sells them, with the intention of later buying the assets back and returning them to the lender. A short seller makes a profit when after the initial sale, the security falls in price, and the seller buys it back for less than he sold it.

[4] Plaintiffs allege that this scheme was hatched with the benefit of knowledge gained during a similar attempt in April 2003.

of this scheme, they suffered damages by paying artificially inflated prices. They seek restitution as well as damages under the Sherman Act, the Commodity Exchange Act ("CEA"), and common law and statutory fraud.[5] BP Defendants move to dismiss the complaint in its entirety. For the following reasons, Defendants' motion is granted in part and denied in part.

## II. STANDARD OF REVIEW

A Motion to Dismiss under Rule 12(b)(6) requires that I analyze the legal sufficiency of the complaint, and not the factual merits of the case. *Autry v. Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir.1998). I must take all facts alleged in Plaintiffs' complaint as true and draw all reasonable inferences from those facts in favor of Plaintiffs. *Caldwell v. City of Elwood*, 959 F.2d 670, 671 (7th Cir.1992). Plaintiffs, for their part, must do more than solely recite the elements for a violation; they must plead with sufficient particularity so that their right to relief is more than a mere conjecture. *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs must plead their facts so that, when accepted as true, they show the plausibility of their claim for relief. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Plaintiffs must do more than plead facts that are "consistent with Defendants' liability" because that only shows the possibility, not the plausibility, of their entitlement to relief. *Id.* (internal quotations omitted).

## III. DISCUSSION

### Monopolization Claim Under § 2 of the Sherman Act

Section 2 of the Sherman Act imposes a penalty on persons who monopolize, attempt to monopolize or conspire to monopolize any part of interstate commerce. 15 U.S.C. § 2 (2004).

---

[5] A substantially similar complaint was filed against the same defendants in *Amerigas Propane, L.P., et al. v. BP Products North America, et al.*, No. 08 CV 981.

"The offense of monopoly under [§] 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). "Monopoly power has long been defined in the courts as the power to exclude competition or to control price[.]" *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989). Plaintiffs may prove market power either (1) "through direct evidence of anticompetitve effects," or (2) "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case." *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000). "The existence of such power ordinarily may be inferred from the predominant share of the market." *Grinnell*, 384 U.S. at 571.

Plaintiffs argue that they have adequately pleaded market power under either rubric. First, they claim that the direct evidence in this case proves that BP had market power. By the end of February, BP owned 88% of all of that month's propane inventory in the TEPPCO system and held a position of over 5.1 million barrels. On February 24, there were no offers on Chalkboard[6] to sell February 2004 TET propane in volumes greater than 10,000 barrels other than offers made by Defendants themselves at non-competitively set inflated prices. (This was done to suggest that TET propane was available, but also in an attempt to ensure that no one would buy). By February 27, BP was the primary seller of February 2004 TET propane, and BP employees dictated the price of this propane as they released it for sale to shorts who needed it to cover their contractual obligations.

---

[6] Chalkboard is a propane trading platform where bids are offered anonymously and party identities are revealed at the time of negotiation.

Plaintiffs also claim that the circumstantial evidence in this case proves that BP had market power, again citing the 88% market share held by BP in February 2004. *See MCI Comm. Corp. v. American Tel. and Tel. Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983) ("Where the data reveals a market share of more than seventy to eighty percent, the courts have inferred the existence of monopoly power."). Plaintiffs contend that barriers to entry were high in that other pipelines could not have transported propane to the TET market due to physical limitations; refineries could only supply a small amount of propane; and overseas imports took several weeks to arrive.

Defendants argue that Plaintiffs have failed to allege "lasting structural change" and durable market power, both of which they maintain are necessary to state a claim for monopolization. Defendants first assert that monopolization requires an alteration of market structure. *See, e.g., Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 600 (S.D.N.Y 1989) ("Section 2 [ ] is aimed primarily not at improper conduct but at a pernicious market structure in which the concentration of power saps the salubrious influence of competition."). Defendants further assert that monopolization requires durability, citing several cases in support,[7] including *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, where the Court noted that

---

[7] *See e.g. American Prof. Testing Svc., Inc. v. Harcourt Brace Jovanovich Legal and Prof. Pub., Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997) (insisting on a "'preliminary showing of significant and more-than-temporary harmful effects on competition (and not merely upon a competitor or customer)' before these practices can rise to the level of exclusionary conduct.") (quoting 3 P. Areeda & D. Turner, Antitrust Law 737b at 278 (1978)); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 885 F.2d 683, 695-96 (10th Cir. 1989) ("If the evidence demonstrates that a firm's ability to charge monopoly prices will necessarily be temporary, the firm will not possess the degree of market power required for the monopolization offense.") (citing 3 P. Areeda & D. Turner, Antitrust Law 807 (1978)). *See also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767-68 (1984) ("In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization.").

> Although most courts do not explicitly discuss the persistence of a firm's ability to charge supracompetitive prices as a measure of a firm's market power, courts indirectly consider the potential longevity of supracompetitive pricing whenever they use market share to evaluate the degree of market power. . . The durability of a firm's ability to charge supracompetitive prices also underlies another factor used to evaluate the degree of market power [barriers to entry]. . . Only when an alleged monopolist faces substantial competition from a known competitor who will enter the market in a definite period of time, ought courts to decline to find sufficient market power to satisfy the requirement for the monopolization offense.

885 F.2d 683, 696 n.21. and n.23 (10th Cir. 1989). In this case, BP traders knew that competitors could and would enter the market within a matter of weeks, and their plan was meant to capitalize on this lag. According to Defendants, this reveals the lack of requisite durability.

Defendants also dispute Plaintiffs' claims of the existence of significant barriers to entry, another factor considered by courts to indicate to what extent Defendants were able to exclude competition. Defendants argue that Plaintiffs failed to allege substantial barriers to entry, and that even a market share of 100 percent cannot establish monopolization where barriers to entry are low.[8] The Seventh Circuit has "long held that low barriers to competition demonstrate the

---

[8] Defendants cite *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) (agreeing with the proposition that "100% market share does not demonstrate that it had the power to control prices or exclude competition in the absence of any evidence that (a firm) could prevent entry of other market participants"); *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986) (market share simply "reflects current sales, but today's sales do not always indicate power over sales and prices tomorrow"); *Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307, 313-14 (3d Cir. 1982) (no monopoly power in spite of 100% market share where barriers to entry were low); *United States v. Syufy Enter.*, 903 F.2d 659,665-66 (9th Cir. 1990) ("In evaluating monopoly power, it is not market share that counts, but the ability to maintain market share"); *Metro Mobile CTS, Inc. v. Newvector Comm., Inc.*, 661 F. Supp. 1504, 1522 (D. Ariz. 1987) ("Even though NewVector had a 100% share of the wholesale market during the headstart period, that fact alone is not enough to establish monopoly power" as "(a) court is to look beyond market share in determining monopoly power") (citing *Ball Mem'l*, 784 F.2d at 1336 and *Pacific Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975)); 2B Areeda, et al., *supra*, ¶ 420a, at 71 ("the inference of market power from a large market share is wrong if entry conditions are not taken into account. In the extreme case of costless and instantaneous entry, even a 100 percent market share entails no power at all").

absence of monopoly power." *Indiana Telecom Corp., Inc. v. Indiana Bell Tel. Co., Inc.*, No. 97-1532-C, 2001 WL 1168169, at *11 (S.D. Ind. Sept. 25, 2001) (citing *Am. Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1320-21 (7th Cir. 1991) (no monopoly power where defendant faced a "horde of existing competitors")).

> To justify a finding that a defendant has the power to control prices, entry barriers must be significant - they must be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting. . .. Barriers to entry are insignificant when natural market forces will likely cure the problem. In such cases, judicial intervention into the market is unwarranted.

*Rebel Oil Co. Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (citation omitted). Defendant argues that it was precisely because supply can and did rush to market causing prices to fall that there were no meaningful barriers to entry. According to Defendants, natural market forces did cure the problem and that this fact precludes a finding that there were any significant barriers to entry.

Plaintiffs counter that they have adequately pled structural change and durability where Defendants succeeded in purchasing the majority of the existing supply of propane in the TEPPCO service area, thereby altering the market by preventing competition in the February 2004 TET propane market. At the October 7, 2009 hearing,[9] Plaintiffs argued that the Seventh Circuit has recognized claims for monopolization of month-long commodities markets, citing

---

[9] On October 7, 2009, the parties in both this case and *Amerigas Propane, L.P., et al. v. BP Products North America, et al.*, No. 08 CV 981, appeared before me to present oral argument addressing the pending motions to dismiss in both cases. While the Amerigas and Thompson Gas plaintiffs do present some different arguments in their briefs, it was counsel for the Amerigas plaintiffs who addressed the court on behalf of the plaintiffs. I am assuming for the purposes of this motion that the arguments advanced by Amerigas' counsel at the hearing are adopted by the Thompson Gas plaintiffs.

*Peto v. Howell*, 101 F.2d 353 (7th Cir. 1938).[10] In that case, the plaintiff grain dealer sued the defendant grain trader alleging monopolization of month-long corn market. The court noted that "it is not to be conceived that a monopoly of all that part of interstate commerce in the city of Chicago for one day is any less a violation of the law than a monopoly over the same product and the same market for thirty days or for a year. It is the act of monopoly over a product in any part of interstate commerce that is forbidden." *Id.* at 356. While Court in *Peto* addressed the Sherman Act's interstate commerce requirement and not durability, it found that the plaintiff had made a "prima facie case" for monopolization since "[a] monopoly in violation of the act, even though limited to Chicago or to a specific time, is still in violation of the law." *Id.* at 362. In response, Defendants cite Professor Phillip E. Areeda's antitrust scholarship in which he posits: "Market power need not trouble the antitrust authorities unless it is both substantial in magnitude and durable. For antitrust purposes, therefore, market power is the ability (1) to price substantially above the competitive level and (2) to persist in doing so for a significant period without erosion by new entry or expansion." 2B Areeda, Philip E., et al., Antitrust Law ¶ 501, at 111 (3d ed. 2007). According to Defendants, Prof. Areeda has been long recognized in this circuit,[11] and I should adopt Areeda's view.

Whether the "monopoly" alleged by Plaintiff was a short-term price spike, as Defendants maintain, or a cornering of the market, depends upon how the relevant market is defined. Plaintiffs maintain that the relevant market in this case was the TET propane market for February

---

[10] Plaintiffs also cite *Pollock v. Citrus Ass'n. of N.Y. Cotton Exch.*, 512 F. Supp. 711, 718-19 (S.D.N.Y. 1981), and *Minpeco, S.A. v. Hunt*, 718 F. Supp. 168, 171-72 (S.D.N.Y. 1989), where the court found that the plaintiffs had adequately pled or proven, respectively, month-long monopolies, but in neither case was durability specifically considered by the court.

[11] Defendants note that the Seventh Circuit has cited Areeda's scholarship in this field more than 65 times over the last 40 years.

2004, since only February propane could satisfy shorts obliged to deliver propane no later than the last day of February. Both parties agree that in March 2004, BP trading bench members refused to accept late deliveries and required counterparties that were "caught short" in their position from February to financially settle their contracts by paying the February 27 OPIS[12] high price which had been artificially inflated. This fact seems to cut both ways. BP specifically refused to negotiate late delivery, which demonstrates that March TET could not satisfy shorts for February TET and supports Plaintiffs' suggestion of a narrow market. But the fact that counterparties refused to buy at the inflated price and sought to negotiate late delivery also indicates that this might be a regularly used tactic in the futures market and that the relevant market should not be so narrowly defined. Furthermore, the fact that non-TET propane was routed to TET caverns also suggests that the market is broader geographically than Plaintiffs imply. However, drawing all reasonable inferences in Plaintiffs' favor, as I must at this stage, the refusal to accept March TET supports Plaintiffs' contention that the relevant market at issue here is the February 2004 TET propane market. Furthermore, "[t]he definition of relevant markets within which to measure the effects on competition of the proposed acquisition is a question of fact." *Kaiser Aluminum & Chem. Corp. v. F.T.C.*, 652 F.2d 1324, 1329 (7th Cir. 1981). As such, Plaintiffs' allegations relating to the relevant market must be taken as true.

Even assuming that "lasting structural change" and durability are necessary elements for a monopolization claim, Plaintiffs have adequately pled them in light of my assumption that the relevant market in this case is the TET propane market for February 2004. Prices were driven up during the month of February and plummeted on March 1, partly because, as Plaintiffs concede,

---

[12] OPIS is a benchmarking service which compiles and summarizes propane prices from both suppliers and customers. See http://opisnet.com.

"additional supplies of propane were directed away from the non-TET caverns," increasing supply to the TET cavern. The court in *Colorado State* noted: "Only when an alleged monopolist faces substantial competition from a known competitor who will enter the market in a definite period of time, ought courts to decline to find sufficient market power to satisfy the requirement for the monopolization offense." 885 F.2d at n.23. In this case, competitors did enter the market, but apparently not before the month was over. This supports Plaintiff's allegations that "[t]here was little ability for alternative sources of propane supply to enter the TEPPCO Pipeline Service Area in a timely manner[,]" that BP traders used this and the other alleged barriers to their advantage, and they were, in fact, able to affect market prices. Moreover, *Peto v. Howell*, 101 F.2d 353, is still good law in this circuit.[13] And while the Court in that case did not specifically address the questions of durability and market structure, *Peto* supports the plausibility of Plaintiffs' monopoly claims.[14] For these reasons, Defendants' motions to dismiss the monopoly claims against it are denied.

**Attempted Monopolization Claim Under § 2 of the Sherman Act**

"To prove attempted monopolization under section 2 of the Sherman Act, a plaintiff must show (1) specific intent to achieve monopoly power, (2) predatory or anticompetitive conduct

---

[13] Judge Posner cited *Peto* in *Kohen v. Pacific Investment Management Company*, 571 F.3d 672, 674 (7th Cir. 2009), a CEA case, as support for the statement that "A corner is a form of monopolization." This lends credence to the notion that *Peto* is still good law, even on the issue of a month-long corner as a monopoly. Defendant argued at the October 7, 2009 hearing that Judge Posner was using the term "monopoly" not in the formal, legal sense, but rather in a more colloquial way, to mean the holding of a big position. But Judge Posner's citation of *Peto*, and other sources that define monopoly in a futures market suggests quite the opposite. *Id.*

[14] Prof. Areeda's view is not irreconcilable with the Court's holding in *Peto*, nor is it irreconcilable with the facts alleged in this case. Assuming that the relevant market is as narrow as Plaintiffs claim, three or four weeks without new entries to the market can be considered a "significant period."

directed to accomplishing this unlawful purpose, and most important for purposes of this case, (3) a dangerous probability that the attempt to monopolize will be successful." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989). In evaluating "dangerous probability," courts must consider the firm's "capacity to commit the offense, the scope of its objective, and the character of its conduct. The ultimate concern is the firm's actual or threatened impact on competition in the relevant market." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271 (7th Cir. 1981) (citation omitted).

Plaintiffs allege that Defendants acted with specific intent to achieve monopoly power over the markets for April 2003, when it tested its manipulation, and for February 2004 TET propane, when it actually achieved monopoly power. According to Plaintiffs, Defendants "engaged in manipulative and anti-competitive acts directed to accomplishing this unlawful purpose," and there was a dangerous probability that Defendants would succeed in achieving monopoly power in the markets for April 2003 and February 2004 TET propane where Defendants maintained 88% market share. *See L&W/Lindco Products, Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632, 637 (N.D. Ill. 1997) (defendant's "alleged 40% potential market share does not preclude [plaintiff] from proving at trial the 'dangerous probability' element because market share is not dispositive of market power" although it is an indicator.).

Defendants argue that the structure of the TET propane market prevented dangerous probability of any monopolization. *See e.g.* 1 Antitrust Law Developments 316 (6th ed. 2007) ("[E]ven a defendant with a relatively high market share may not have a dangerous probability of successfully monopolizing the market if there are no substantial entry barriers."). Defendants maintain that they did not control the available supply to the market, and Plaintiffs, in their complaint, note that there were at least eight major producers of propane during the relevant

11

period. *See Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484, 487 (D.C. Cir. 1996) (court dismissed attempted monopoly claim where plaintiff's "own complaint acknowledged that there [were] multiple [] service providers in competition with [defendants], and there [was] no reasonable basis for believing that all other competitors. . . [would] be driven out of business."); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) ("The ultimate inquiry in any attempted monopolization case remains whether the defendant has or reasonably might come close to having the ability to control total market output and prices . . . . "). Plaintiffs do acknowledge the presence of competition generally, but allege that (1) other pipeline systems could not have transported propane to the TET market in time; (2) refineries could only produce very small amounts of propane and were minor suppliers; and (3) overseas imports took several weeks to arrive - too late to foil BP's end-of-month price hikes.

Assuming that the relevant market is the February 2004 TET propane market, Plaintiffs can withstand a motion to dismiss this claim. Although suppliers existed that could introduce more propane into the market, they could not do so within the relevant time frame. As discussed *supra*, the state of the market structure, as it existed during the relevant time frame, did not prevent the probability of a successful monopoly. For these reasons, Defendants' motion to dismiss this claim is denied.

**Illinois Consumer Fraud Act**

To adequately plead a claim under the Illinois Consumer Fraud Act ("ICFA"), a plaintiff must allege: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002).

Defendants make two arguments in an attempt to defeat Plaintiffs' ICFA claims: (1) Plaintiffs' allegations negate the element of causation necessary to state claim; and (2) Plaintiffs fail to allege sufficient conduct occurring within Illinois. Because Plaintiffs fail to adequately allege the requisite causation, I need not address Defendants' second argument.

Defendants contend that because Plaintiffs essentially posit a fraud-on-the-market theory of causation, they cannot survive a motion to dismiss this claim. In *Oliveira*, the Illinois Supreme Court rejected a "market theory" of causation where the plaintiff gasoline purchaser failed to allege that defendant oil company's advertisements were deceptive or induced him to make a purchase, and instead alleged "that he was damaged by defendant's advertisements because the ads created an 'artificially inflated' price for the gasoline he purchased." *Id.* at 155. The Court found that because the plaintiff could not demonstrate that he was deceived by defendant's advertisement, he could not adequately plead proximate causation under the ICFA and his claim was dismissed. Defendants in this case maintain that Plaintiffs' claim is based on a "market theory" of causation and must fail under Illinois law.

Plaintiffs attempt to distinguish this case from *Oliveira* by arguing that *Oliverira* involved material misrepresentations about the quality of the product at issue, whereas here, "the OPIS TET Price is itself the misrepresentation." In *Oliverira*, the plaintiff did not allege that he had actually seen the allegedly misleading advertisements. Here, Plaintiffs maintain that by "relying" on the OPIS benchmark, they did indeed rely on the false information provided by Defendants to the markets.

The allegations that Defendants' conduct affected the reported benchmark price is a market theory of causation rather than one of direct reliance. As the Court in *Oliveira* points out, a market theory of causation is akin to the fraud on the market theory articulated in *Basic v.*

*Levinson*, 485 U.S. 224, 241 (1988). There, the Court explained that "[t]he fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business...." *Id.* (citation omitted). Based on this hypothesis, when a company introduces misinformation to the market or omits certain material information, the market price of the stock is affected. This is exactly what Plaintiffs allege here. At the October 7 hearing, Plaintiffs argued that this is not a classic fraud-on-the-market case in that BP actually controlled the market, suggesting that it was BP and BP alone setting the price and controlling the information, and that Plaintiffs necessarily relied on the misconduct BP engaged in as it exercised that control. In other words, the OPIS price was solely based on BP's actions. But even assuming this to be true, it is no different from a company committing a fraud on the market by introducing misinformation that affects the stock price. The company is in complete control of the information it releases about itself, and the knowledge of all of the internal corporate goings-on are in the company's possession. It is the company itself that has the power to speak definitively on its own behalf. The fact that it is able to affect the market price of its own stock through misinformation or concealment is what makes it a fraud on the market. BP's control of the majority of the market and, allegedly, a large portion of the information flowing into it, does not necessarily mean that Plaintiffs "relied" on BP's misconduct. Just as in *Oliveira*, Defendants' misconduct led to Plaintiff paying an inflated price - in this case, the OPIS TET Price. Plaintiffs do not allege that they saw and relied on any specific statements by Defendants, only that the OPIS TET Price reflected the misinformation provided by Defendants. Without direct reliance and subsequent deception, there can be no proximate cause. and Plaintiffs' ICFA claims cannot

survive Defendants' motion to dismiss. *See, e.g., De Bouse v. Bayer*, No. 107528, 2009 WL 4843362, at *5 (Ill. Dec. 17, 2009); *Oliveira*, 776 N.E.2d at 155.

**Fraud**

Under Illinois law, the elements of common law fraud are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.,* 675 N.E.2d 584, 591 (Ill. 1996). Because Plaintiffs fail to allege false statements by Defendants, and put forth what is essentially a fraud-on-the-market theory of fraud, Plaintiffs' claim cannot survive a motion to dismiss.

Plaintiffs do maintain that on two occasions, BP representatives made certain statements to "a counterparty like Plaintiffs." However, Plaintiffs do not allege that Defendants made any false, deceptive or misleading statements by Defendants directly to them.[15] Instead they allege that Defendants "engaged in conduct to affect the daily and monthly average price published by OPIS," and that "this conduct was intended to present false information to the market concerning the actual availability and appropriate pricing of TET propane," and "to subvert the integrity of the industry benchmark average price[.]" According to Plaintiffs, the price was itself the

---

[15] It should be noted that Plaintiffs have also failed to identify any specific BP Defendant who made any specific misrepresentation at any specific time to any specific Plaintiff representative, which fails to satisfy pleading requirements of Federal Rule of Civil Procedure 9(b). Which particular misrepresentations were made, to whom, and how, would certainly be within Plaintiffs' knowledge and are not facts exclusively held by Defendants. And where claims for fraud in Illinois require personal reliance on the alleged misrepresentation, such information is crucial to determining whether this element is adequately pled.

15

misrepresentation, and because they purchased propane, the price of which was pegged to OPIS TET Price, they relied on the misrepresentation and were injured.

Plaintiffs cite no case law to support their assertion that OPIS TET Price qualifies as a misrepresentation, and it is difficult to see how it does.  The price of a commodity reflects how much its owner is willing to sell it for, rather than an intrinsic value. The fact that Defendants were offering propane for sale at inflated prices does not mean those prices were somehow "false."  Buyers were able to and presumably did buy the propane at this inflated price and no Plaintiff alleges that it did not receive the product it paid for.  Without allegations of a false statement relied upon by Plaintiffs, Plaintiffs' fraud claim must fail.  Furthermore, in order to successfully plead a common law fraud claim, Illinois law requires that a plaintiff allege that he personally relied upon the misrepresentation at issue. *Connick*, 675 N.E.2d at 591-92.  Here, Plaintiffs are essentially alleging a fraud-on-the-market theory of reliance, discussed *supra*, whereby Defendants provided misinformation to the market, thus affecting the price of the commodity at issue.  Plaintiffs in this case paid an inflated price which reflected the misinformation provided by Defendants, but did not personally rely on the misinformation. Plaintiffs' failure to allege personal reliance also dooms their fraud claim.  *See e.g. In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1060 (N.D. Ill. 1995) (a fraud-on-the-market presumption of reliance cannot replace actual reliance as required by Illinois common law fraud claim in case alleging market manipulation in violation of the CEA); *In re Information Resources, Inc. Securities Litig.*, No 89 C 3772, 1994 WL 124890, at *3 (N.D. Ill. Apr. 11, 1994) ("every Northern District of Illinois case addressing this issue has declined to extend the fraud-on-the-market presumption to Illinois common law fraud claims.").  For these reasons, Defendants' motion to dismiss Plaintiffs' fraud claim is granted.

**Plaintiffs' Claims under the Commodity Exchange Act**

Section 22(a)(1)(D) of the CEA, codified at 7 U.S.C. § 25(a)(1)(D) (2008), creates a private right of action solely for plaintiffs injured from a manipulation of a futures market or organized exchange. 7 U.S.C. § 25(a)(1)(D) (2008); *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033 (S.D.N.Y. 1993). The statute "creates the exclusive remedies available to those injured by violations of the CEA, and makes those remedies available only to persons injured in the course of trading on a contract market." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1153 (7th Cir. 1992) (emphasis added; abrogated on other grounds); *see also Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir. 2006) (dismissing CEA claim where "[plaintiff] lack[ed] standing because it was not 'engaged in any transaction on or subject to the rules' of a contract market and did not suffer any 'actual losses that resulted from such transaction' as required by § 22 of the CEA"); *DGM Investments, Inc. v. N.Y. Futures Exchange, Inc.*, 265 F. Supp. 2d 254, 263 (S.D.N.Y. 2003) (holding that only plaintiffs who sufficiently plead losses incurred on the contract market have standing under the CEA); *Kohen v. Pacific Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 474 (N.D. Ill. 2007) (plaintiff had standing to assert CEA claim where it alleged that it "suffered actual damages from purchasing the [futures contract] at a manipulated price"). Section 22 specifies that only those persons trading in a "contract of sale of any commodity for future delivery" may bring suit, and it is well established that this language refers to a futures contract, rather than a cash-forward contract for sale of a physical commodity. *See* 7 U.S.C. § 25(a)(1)(B)&(D); *Commodity Futures Trading Comm'n v. Zelener*, 373 F.3d 861, 865-66 (7th Cir. 2004); *Nagel v. ADM Inv. Svcs., Inc.*, 65 F. Supp. 2d 740, 751 (N.D. Ill. 1999), aff'd, 217 F.3d 436 (7th Cir. 2000).

Plaintiffs bring a claim under the CEA, alleging that they suffered actual injury from purchasing propane at a manipulated price. Plaintiffs base their purported "direct purchaser" standing on their allegation that they "purchased propane directly from producers," and their own damages allegations show that all of their alleged losses occurred as a result of purchasing physical propane. According to Plaintiffs, their position one step downstream from the direct purchasers of the futures contract does not divest them of standing. Plaintiffs claim that they were, indeed, "injured in the course of trading on a contract market." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d at 1153 (7th Cir. 1992). However, standing to bring a CEA manipulation claim under 7 U.S.C. § 25(a)(1)(D) requires that the plaintiffs' injury arise as a result of having purchased or sold "a contract of sale of any commodity for future delivery (or option on such contract or any commodity). . . " 7 U.S.C. § 25(a)(1)(B). In this Circuit, this means a futures contract. *Commodity Futures Trading Comm'n v. Zelener*, 373 F.3d 861, 865-66 (7th Cir. 2004); *Nagel v. ADM Investor Servs., Inc.*, 65 F. Supp. 2d 740, 751 (N.D. Ill. 1999), *aff'd*, 217 F.3d 436 (7th Cir. 2000). Without satisfying this condition precedent, it is difficult to see how Plaintiffs have standing. *See Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 917 (8th Cir. 2001) ("Standing exists under the [CEA] if the plaintiff purchased a futures contract through the defendant and suffered at the defendant's hands some wrong for which the Act provides a remedy."). Plaintiffs' CEA claim cannot survive a motion to dismiss.

**Unjust Enrichment**

Defendants argue that Plaintiffs' unjust enrichment claims should be dismissed on two grounds: (1) as a result of the manipulation scheme, Defendants sustained losses of $10 million, and therefore Plaintiffs have not conferred a benefit on Defendants; and (2) the constructive trust remedy Plaintiffs seek is unavailable to them in this case because Plaintiffs do not identify a res.

18

Because both of these arguments fail, Defendants' motion to dismiss Plaintiffs' unjust enrichment claim is denied.

"To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 678-679 (Ill. 1989) (citations omitted). Defendants first argue that they received no benefit as a result of this scheme, and that, in fact, they sustained substantial losses. As a result, they claim, Plaintiffs cannot allege that they have "unjustly retained a benefit" to Plaintiffs' detriment. *Id.* at 679. While it may be true that, in the end, Defendants' scheme resulted in massive losses, it is not necessarily the case that Defendants were not unjustly enriched by Plaintiffs. Defendants admit to misconduct that led to the inflation of propane prices in February 2004, and Plaintiffs allege that they purchased propane from BP during this time period. Plaintiffs have adequately alleged their conferral of a benefit upon Defendants - in this case, the difference in price between the inflated price paid and the value of the propane had the market not been misinformed. The fact that the scheme as a whole failed is not relevant to the allegations that Plaintiffs paid more than they should have as a result of Defendants' misconduct.

Second, Defendants argue that the constructive trust remedy[16] sought by Plaintiffs is "unavailable" here because Plaintiffs cannot identify a res. In support of their contention,

---

[16] "A constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct." *Eychaner v. Gross*, 779 N.E.2d 1115, 1143, (Ill. 2002).

19

Defendants cite *Eychaner v. Gross*, 779 N.E.2d 1115, 1143 (Ill. 2002), where the Court noted that proceeds of allegedly wrongful conduct "must exist as an identifiable fund traceable to the conduct, such that it can become the res of the proposed trust." In *Eychaner*, the Court dismissed the plaintiffs' constructive trust claim where, after a bench trial, they failed to prove that the funds at issue were tied to the alleged misconduct. However, the procedural posture of *Eychaner* is distinguishable from that in this case, and although the legal maxim articulated there may be true, Plaintiffs need not identify the res at this stage. *People ex rel. Hartigan v. Candy Club*, 501 N.E.2d 188, 191 (Ill. App. Ct. 1986) ("we would not require a plaintiff, at the pleading stage, to make detailed assertions as to where the money or property is to be found, provided that the complaint alleges that the money was misappropriated in some form."). For these reasons, Defendants' motion to dismiss Plaintiffs' unjust enrichment count and the accompanying requested remedy is denied.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted as to Plaintiffs' fraud, ICFA and CEA claims, and denied as to Plaintiffs' claims of monopolization, attempted monopolization and unjust enrichment.

ENTER:

James B. Zagel
United States District Judge

DATE: February 25, 2010